**In re ASARCO LLC, et al., Debtors.**

**Nos. 09–CV–177, 05–21207.**

United States District Court,
S.D. Texas,
Corpus Christi Division.

Nov. 13, 2009.

Heather J. Panko, Jacob Lee Newton, Sander L. Esserman, Steven A. Felsenthal, Stutzman Bromberg et al., Dallas, TX, for In re Official Committee of Asbestos Claimants.

Alan S. Tenenbaum, Eric D. Albert, U.S. Dept. of Justice, Washington, D.C., for In re United States.

Harlin C. Womble, Jr., Nathaniel Peter Holzer, Shelby A. Jordan, Jordan Hyden et al., Corpus Christi, TX, Jack L. Kinzie, James R. Prince, Judith W. Ross, Omar Jesus Alaniz, Samara Kline, Baker Botts LLP, Dallas, TX, Mary Millwood Gregory, Tony M. Davis, Baker Botts LLP, Houston, TX, for Debtor Asarco LLC, et al.

Charles A. Beckham, Jr., Christopher L. Castillo, Elizabeth Brooks Hamilton, Haynes and Boone, LLP, Houston, TX, Irene Bogdashevsky, Milbank, Twee, Hadley & McCloy, LLP, New York, NY, Robert Jay Moore, Milbank, Tweed, Hadley & McCloy, LLP, Los Angeles, CA, Trey An-drew Monsour Haynes & Boone LLP Dallas, TX, for Interested Party Asarco Incorporated, Americas Mining Corporation.

Derek J. Baker, Reed Smith et al., Philadelphia, PA, James C. McCarroll, Reed Smith LLP, New York, NY, Paul M. Singer, Reed Smith LLP, Pittsburgh, PA, Mark Allan Worden, Fulbright Jaworski LLP, Houston, TX, for Interested Party Official Committee of Unsecured Creditors of Asarco LLC.

### MEMORANDUM OPINION, ORDER OF CONFIRMATION, AND INJUNCTION

ANDREW S. HANEN, District Judge.

## TABLE OF CONTENTS

I. Introduction ................................................. 317

II. Case History ............................................... 319

III. Confirmation History ..................................... 319

IV. The Report and Recommendations from the Bankruptcy Court ............. 321

V. Summary of Objections ..................................... 322

VI. Debtor's Plan v. Parent's Plan ............................ 323
 A. Summary of the Plans ................................. 323
 1. The Debtor's Plan ............................... 323
 2. The Parent's Plan ............................... 325
 B. Findings by the Bankruptcy Court ..................... 326
 1. Findings Regarding Confirmability of the Plans ...... 326
 2. Findings Regarding Which Plan Should be Confirmed Under Section 1129(c) of the Bankruptcy Code ...... 326
 C. Objections to the Bankruptcy Court's Findings ......... 327
 1. Objections to the Bankruptcy Court's Findings Regarding the Value of the Debtor's Plan ......... 328
 2. Objections to the Bankruptcy Court's Findings Regarding Confirmability of the Parent's Plan ......... 328
 3. Objections to the Bankruptcy Court's Analysis Under Section 1129(c) ......... 329
 D. Discussion ........................................... 329
 1. The Value of the Debtor's Plan Is Not Greater Than the Value of the Parent's Plan ......... 329
 2. The Parent's Plan is Confirmable ................ 331
 3. The Section 1129(c) Analysis Compels Configuration of the Parent's Plan ......... 332
 a. Type of Plan .............................. 332
 b. Treatment of Creditors and Equity ......... 333

 c. Feasibility ...............................................334
 d. Preferences of Creditors and Equity ...........................335
 e. Synthesis of the Section 1129(c) Test ........................338

VII. **Consideration of the Debtors' September 10th Plan** ........................338
 A. The Bankruptcy Court's Findings and Recommendation ..................338
 B. Arguments of the Parties ........................................340
 C. Discussion ....................................................340
 1. The Procedure Proposed by the Parties and Adopted by the District
 Court Does Not Provide for Plan Modification Following the
 Bankruptcy Court's Recommendation ...........................341
 2. The Bankruptcy Code Does Not Guarantee the Debtors an Absolute
 Right to Modify Their Plan of Reorganization ..................343
 D. Even if the Debtor's September 10th Plan Were Considered, the
 Parent's Plan Remains Superior Under the Section 1129(c) Analysis.....345

VIII. **Labor and Special Successorship Objections** ................................345
 A. The Lack of a CBA Does Not Bar Confirmation of the Parent's Plan.....350
 B. The SSC Does Not Apply Because Exigent Circumstances Exist ..........352
 C. The Possibility of a Strike Does Not Make the Parent's Plan Infeasible.....354

IX. **Objections of Governmental Entites** .....................................355

 X. **Clean Hands** ..............................................................356

XI. **Conclusion** ...............................................................357

XII. **Order of Confirmation, Injunctions, and Matters Incident to
 Confirmation** .............................................................358
 A. Treatment of Claims .............................................359
 B. Section 524(g) Trust ..........................................361
 C. Environmental Custodial Trusts ...................................363
 D. The Special Successorship Clause of the Collective Bargaining
 Agreement ....................................................364
 E. Employee Benefit Plans and Other Benefits.........................364
 F. Preservation of Causes of Action ...............................365
 G. Authorizations ................................................365
 H. Consideration .................................................367
 I. Parent's Plan Administrator ....................................368
 J. Deemed Substantive Consolidation..................................368
 K. Other Implementation Provisions ..................................369
 L. Operations from Confirmation Date to Effective Date ..................371
 M. Injunctions, Releases, and Discharge ..............................371
 N. Plan Distributions .............................................386
 O. Bar Date Provisions ...........................................389
 P. Disputed Claims................................................390
 Q. Objections to Parent's Plan .....................................392
 R. Miscellaneous .................................................393

XIII. **Notice of Effective Date** ...............................................398

XIV. **Confirmation Order Exhibit 1 Schedule of Released Litigation** ..............398

## I. *Introduction*

This Court has before it the Report and Recommendation of the Bankruptcy Court as to the confirmation of the plan for reorganization in the bankruptcy case styled, *In re ASARCO, LLC, et al.* (Doc. Nos. 8, 22), as well as objections and replies to objections filed by the various parties af-

fected by that Report and Recommendation. Also before the Court is an additional Report and Recommendation pertaining to the Debtor's Sixth Amended Joint Plan of Reorganization filed by the Debtor[1] on September 10, 2009 and the objections pertaining to it. (Doc. No. 55.)

The procedure by which these matters were initially before the Bankruptcy Court and by which this case is now back before this Court (*i.e.,* the withdrawal of the bankruptcy reference and the referral back to the Bankruptcy Court for a Report and Recommendation) was conceived of and agreed upon by the parties, and finally submitted to both the Bankruptcy Court and this Court for approval. It was ultimately approved by both in a hearing presided over both by the Bankruptcy Judge and the undersigned. The main interests of the parties in involving the District Court and requesting this not altogether unique procedure were two-fold. It enabled the Bankruptcy Court—which has extensive knowledge of bankruptcy issues generally, this bankruptcy proceeding specifically, and the parties associated in various capacities with this proceeding—to decide the principal bankruptcy issues, including those related to which

Plan should be confirmed, while at the same time allowing this District Court (with the jurisdiction to enter a § 524 channeling injunction) the ability to enter all final and necessary orders to complete the contemplated legal and jurisdictional requirements.

As noted above, this was the procedure conceived of and agreed upon by all parties. This Court (as well as the Bankruptcy Court) relied upon the representations of the parties in granting the motion adopting their request. (Doc. No. 7.)[2] All parties (especially the two proponents of reorganization plans under the Bankruptcy Code) emphasized to both the Bankruptcy Court and this Court the fact that the timing of the confirmation of one of the two plans and the issuance of final order by this Court was of critical importance and that any delay could lead to the loss of financial commitments which were the foundation of the proposed plans.[3] This matter, originally pending before a different district judge, was no doubt transferred to the undersigned because of this request of expediency since this Court already had more than a passing familiarity with some of the issues involved.[4] By the

---

**1.** As used in the first eleven sections of this Opinion, the term "Debtor" is used in the same manner as the Bankruptcy Court's usage, and includes all of the entities and companies listed in the Bankruptcy Court's Report and Recommendation at Doc. No. 22 at 3 n. 3.

**2.** Where a document has been filed as part of both the Bankruptcy Docket for Case No. 05–21207 and the Civil Docket for Case No. CC–09–177, citations refer to the Civil Docket entry. Where a document has been filed only as part of the Bankruptcy Docket, citations use "(Bk. Doc. No. ##)" to refer to the appropriate docket entry.

**3.** (*See* August 6, 2009 Hrg. Tr., Bk. Doc. No. 12500 at 16–22.)

**4.** This Court has had prior experience with the Debtor, the parent and a number of creditors when it tried the adversary proceeding styled, *ASARCO, LLC, et al. v. Americas Mining Corporation,* Civil Action No. B–07–CV–018 (Adversary Number 07–2009). *See ASARCO LLC v. Americas Mining Corp.,* 382 B.R. 49 (S.D.Tex.2007) ("*ASARCO I*"); *ASARCO LLC v. Americas Mining Corp.,* Civil Action No. B–07–CV–018, 2008 WL 2714661 (S.D.Tex.2008) ("*ASARCO II*"); *ASARCO LLC v. Americas Mining Corp.,* 396 B.R. 278 (S.D.Tex.2008) ("*ASARCO III*"); *ASARCO LLC v. Americas Mining Corp.,* 404 B.R. 150 (S.D.Tex.2009) ("*ASARCO IV*"); *ASARCO LLC v. Americas Mining Corp.,* Civil Action No. B–07–CV–018, 2009 WL 2168778 (S.D.Tex.2009) ("*ASARCO V*"). These may be referred to collectively as the "SCC Litigation." Due to this Court's history with at

time this Court signed the necessary order implementing the parties' proposal on August 6, 2009, the Bankruptcy Court already had a case management plan in place and discovery concerning the competing plans was ongoing. Subsequently, the Bankruptcy Court held a timely confirmation hearing pursuant to the established schedule and ruled promptly. This Court has now complied with the procedures agreed to by the parties and the governing statutory/procedural time limits for objections to the Report and Recommendation and has held a hearing to allow all parties so inclined to voice their concerns. This Court hereby issues its ruling.

## II. *Case History*

This case is now in its fifth year of bankruptcy proceedings. While the path has not necessarily been as expedient or as unerring as some would have preferred, it has led all concerned to a point where the end, barring appeals, is now in sight. The Bankruptcy Court detailed the history of the proceedings held in that Court in its Report and Recommendation and this Court feels no need to repeat that history here. Of further importance to understanding many of the objections filed in this Court is the history between the Debtor and the Parent, as well as the relationships the Debtor has, and has had, with its workforce, its creditors and various governmental entities. Many of those relationships, while not discussed in the context of these objections, are detailed in this Court's opinion in *ASARCO LLC v. Americas Mining Corp.*, 396 B.R. 278 (S.D.Tex. 2008). Again, this Court feels no need to repeat those details except to the extent and in the context required to address the matters at hand.

In many ways, the course of this bankruptcy has been a contentious and hard-fought piece of litigation, with multiple adversary proceedings, including one which required a month-long trial. In other ways, this proceeding can be labeled as one of the most successful bankruptcy proceedings in recent history, for the Bankruptcy Court ultimately had before it not just one, but two confirmable plans—both of which have been described by most as "full payment plans." Additionally, the Debtor in the past few years has been operated as a successful mining venture and has accumulated over one billion dollars ($1,000,000,000) in cash assets while awaiting plan confirmation. Whether this result was due to good stewardship, excellent management, higher copper prices, appropriate judicial oversight by the Bankruptcy Judge, extraordinary good luck, or a combination of all these factors may be debated, but the ultimate result is inarguable.

## III. *Confirmation History*

While the bankruptcy proceeding and its ancillary adversary proceedings have brought both the Bankruptcy Court and this Court many complex and unique legal questions, the recent pathway leading up to confirmation has been comparatively straight-forward. The Bankruptcy Court was initially faced with three competing confirmation plans: (1) the Debtor's (Sterlite) plan [5]; (2) the plan proposed by the

least some of the issues, it was assigned by the Chief Judge of this District to preside over the current matter. (Doc. No. 6.)

**5.** Sterlite is the sponsor behind the Debtor's Plan. Therefore, Sterlite's plan for acquisition, which will be discussed in greater detail below, is the same plan being urged by the Debtor. Throughout this opinion it will be referred to interchangeably as the "Debtor's" Plan or the "Sterlite" Plan. A reference to "Sterlite" is a reference to "Sterlite USA" unless otherwise noted. AMC is the parent corporation of the Debtor, and its plan will be referred to as the Parent Plan.

parent (Americas Mining Corporation, or "AMC"); and (3) a plan proposed by Harbinger Capital Partners Master Fund I, Ltd., and Citigroup Global Markets, Inc. ("Harbinger").[6] On June 11, 2009, the Bankruptcy Court entered an order setting the schedule for plan confirmation. (Bk. Doc. No. 11698.) Objections to the Joint Disclosure Statement had to be made by June 22, 2009; objections to the plans had to be filed by July 29, 2009; and the actual confirmation proceeding was scheduled for back-to-back weeks in August. In the same order, the Court similarly addressed other items, among which were: (1) the need to consult with the District Court to formulate a procedure for the issuance of a § 524(g) channeling injunction; (2) the discovery that was being permitted with regard to the competing plans; (3) the overall timing of a multitude of events and deadlines; and (4) the establishment of a document depository. Finally, the Bankruptcy Court set August 7, 2009 as its final pre-confirmation status conference to discuss all of the trial issues in preparation for the actual presentation of testimony. The confirmation hearing was then to begin as scheduled the following Monday.

On August 6, 2009, the day before the pre-trial conference, a hearing was held in Brownsville. (*See* Bk. Doc. No. 12500.) The undersigned, as well as the Bankruptcy Judge, presided over the consideration of a joint motion to withdraw the reference and to refer the case back to the Bankruptcy Court for a Report and Recommendation on the confirmation issues. It was

emphasized at that hearing that capital was sitting on the sidelines waiting to conclude the transaction and that those investors providing support for the competing plans would not let that cash sit idle indefinitely. With that concern in mind, both plan proponents stressed to this Court and the Bankruptcy Court that time was of the essence.

To further that purpose, the parties submitted an agreed order for this Court's consideration—an order signed after hearing the arguments of all concerned. (Doc. No. 7.) By virtue of that order, this Court withdrew the reference from the Bankruptcy Court and then referred all issues relating to the plan confirmation back to the Bankruptcy Court to conduct a hearing on confirmation. The Bankruptcy Court was to issue a Report and Recommendation to this Court and then the parties would then have ten (10) days to object to those findings of fact and conclusions of law.

The Bankruptcy Court held confirmation hearings over the prescribed two-week period and promptly issued its initial Report and Recommendation on August 31, 2009.[7] That opinion recommended the confirmation of the Parent's Plan. (Doc. Nos. 8, 22.) By the September 10, 2009 deadline, many parties had filed a variety of objections. The Debtor, however, not only filed objections, but also filed a Sixth Amended Joint Plan of Reorganization—a new version of the Sterlite Plan which contains different or increased proposals that were never contained in prior ver-

---

**6.** As the case progressed, the Harbinger Plan was withdrawn, leaving only two competing plans for the Bankruptcy Court to consider.

**7.** It later issued an Amended and Supplemented Report and Recommendation for Entry of Findings of Fact and Conclusions of Law on Plan Confirmation on September 11, 2009 (Doc. No. 22), which contained the

same basic findings and conclusions, but which tidied up some ministerial matters. For purposes of this opinion and order, the Court need not differentiate between these two versions, but the Court will cite to the Amended Report and Recommendation. (Doc. No. 22.)

sions. That new plan had not been considered by any of the parties or witnesses at the confirmation hearing, nor was it the subject of either the Report and Recommendation dated August 31, 2009, or its successor, the Amended and Supplemental Report and Recommendation dated September 11, 2009. In its Report and Recommendation to this Court, the Bankruptcy Judge gave exhaustive consideration to both the Debtor's and Parent's Plans and then recommended that this Court confirm the Parent's Plan as being most appropriate. Ultimately, the Bankruptcy Court, in an attempt to further aid this Court, reviewed the newly proposed Sixth Amended Joint Plan of Reorganization filed by the Debtor and issued a show cause order questioning whether it could or should even consider the new plan. Briefing on this issue was filed and the Bankruptcy Court ultimately issued a third Report and Recommendation which recommended that the new version should not be considered. (Doc. No. 55.) It further concluded that if one were to consider the Debtor's "new" plan, it was still inferior to the plan proposed by the Parent. Thus, after all was said and done, the conclusion of the Bankruptcy Court remained the same.

## IV. *The Report and Recommendations from the Bankruptcy Court*

As stated above, the Bankruptcy Court has, in effect, filed three Reports and Recommendations for this Court's consideration. The first, dated August 31, 2009, is the Original Report and Recommendation resulting from the confirmation hearing. (Doc. No. 8.) The second is the Amended and Supplemental Report and Recommendation filed September 11, 2009. (Doc. No. 22.) These will be referred to jointly as the "Original Report and Recommendation." The third Report and Recommendation is the Report and Recommendation to the District Court Regarding Debtor's

Sixth Amended Joint Plan of Reorganization dated September 24, 2009. (Doc. No. 55.) This will be referred to separately as the "September 24th Recommendation." It was issued to address the Plan filed by the Debtor after the Original Report and Recommendation was submitted to this Court.

The Original Report and Recommendation was the one contemplated by the parties and by this Court when it adopted the procedures to be followed. It was generated to report the findings of fact and conclusions of law that resulted from the plan confirmation hearing. The Bankruptcy Court found that the Parent's Plan complied with all of the requirements of the Bankruptcy Code and should be confirmed. It found that the Debtor's Plan was ultimately feasible and confirmable but was inferior to the Parent's Plan and should not be confirmed.

While this Court is writing for the purpose of addressing the Original Report and Recommendation, the September 24th Recommendation, and to enter a final judgment in this matter, it finds no need to rehash each and every finding of fact or conclusion of law. Instead, it will address topically the primary objections. As with the arguments of counsel, those findings and conclusions addressed will not be taken seriatim as numbered in the Original Report and Recommendation, but instead will be addressed in a manner similar to the parties' presentation of objections to the Court. Therefore, any finding or conclusion not specifically discussed, rejected, or revised in whole or in part is ADOPTED. Those objections not specifically granted are hereby DENIED.

With regard to the September 24th Recommendation, the Court will address it and the Bankruptcy Court's recommendations on the "new" plan in a separate sub-

section of this opinion. Again, any specific objection not granted can be considered DENIED. Any finding of fact or conclusion of law not specifically rejected or revised should be considered ADOPTED.

Finally, the Court notes that while a number of parties have made objections to the Original Report and Recommendation and the September 24th Recommendation, very few objections, if any, relate to technical compliance with the provisions of the Bankruptcy Code. In the Original Report and Recommendation, this Court finds no non-compliance with either the requirements of Code nor with any procedure required by law or adopted by the parties. Consequently, to the extent any objection applies to the Bankruptcy Court's compliance with the Code or with any notice or procedural requirement, it is overruled. This opinion will limit itself almost entirely to the substantive choices recommended by the Bankruptcy Court and the objections thereto.

## V. *Summary of Objections*

This Court has received multiple objections from a variety of parties interested in the outcome of this matter. The Court will not attempt to address each objection in the order made, but will instead combine its analysis and address the major, or most frequently raised, objections to the rulings in a global fashion. There are objections which the Court has elected not to address directly in this opinion. To the extent that is the case, the Court notes that it has considered those objections and hereby overrules them.

The most prevalent objections can be divided into three (3) main categories. The first grouping attacks the primary decision (and reasoning supporting it) to recommend that the Parent's Plan be confirmed. These objections not only include attacks on the ultimate conclusion, but also

focus on the analysis of the two competing plans and the Bankruptcy Court's reliance upon, application of, and interpretation of certain governing Code provisions.

A large subset of these objections is really aimed at the specifics of the two plans and the reasoning underlying the conclusion that Parent proposed the best plan. A second subset of these objections attacks the Bankruptcy Court's analysis and treatment of creditors and equity—more specifically, complaints are made that the Bankruptcy Court put too much emphasis on the interests of equity at the expense of the creditors or, more accurately, in spite of the creditors' preference for the Debtor's Plan. A third, but by no means insubstantial, subgroup of objections questions the Bankruptcy Court's analysis of the relative feasibility of the two plans, which includes the ability to fund the obligations at closing, the likelihood that the plan will actually close, the ability to fund the ongoing company, and the projected stability of the post-bankruptcy company.

There is clearly a second major area of dispute over whether, and, if so, the extent to which the Bankruptcy Court should have considered the plan filed after it issued its adverse recommendation that the Parent's Plan be confirmed. This, of course, includes a secondary dispute between the parties as to how much, if at all, this Court should consider it. Additionally, there is a disagreement as to whether this new plan results in a change of the ultimate result or whether the Parent's Plan remains superior.

The third major area of dispute is the area of the relationships between the Debtor, the Parent, Sterlite, and the United Steelworkers ("USW" or "Union"), the principal labor union at ASARCO's mines. While there is some overlap between this topic and that of feasibility, substantial

legal objections have been asserted based upon certain provisions of the Collective Bargaining Agreement and certain subsequent provisions and stipulations. Additionally, certain objections were raised based on prior relations that the USW and the Governmental Entities have had with the Parent. These objections are concerned with the behavior that the objectors fear the Parent would continue to engage in if its plan were selected.

In the final portion of this opinion and order, the Court will address the request for a so-called "channeling injunction" under § 524(g) of the Bankruptcy Code. While the two plan proponents disagree as to which proponent should ultimately be the beneficiary of such an injunction, there is little or no dispute over the propriety of such an injunction. In fact, in their competing plans, both have included proposed language for such an injunction that borders on being identical at least in effect.[8] In addition to issuing the injunction, the final portion of this opinion and order contains the language necessary to implement the confirmed plan.

## VI. *Debtor's Plan v. Parent's Plan*

### A. *Summary of the Plans*

#### 1. *The Debtor's Plan*

The Debtor's Plan is based on the New Plan Sponsor PSA, which is the Settlement and Purchase and Sale Agreement entered into by Sterlite, the Debtor, and other parties, on March 6, 2009. (*See* Plan Exhibit 18 to Debtor's Plan (Executed Form of New Plan Sponsor PSA), Bk. Doc. Nos. 12648–4, 12648–5; Amendments No. 6 and 7, Bk. Doc. No. 12648–6.) In total, the Debtor's Plan Sponsor (Sterlite) would pay $2.1355 billion in cash. This figure is composed of the cash paid pursuant to the New Plan Sponsor PSA, as described in the following paragraph, plus a $722 million payment for interests in the SCC Litigation Trust, further detailed below. In addition to the $2.1355 billion in cash, Sterlite would offer a put option of $160 million ($137 million net present value) to the Asbestos Creditors.

Pursuant to the New Plan Sponsor PSA and the Debtor's Plan, Sterlite agrees to pay the following consideration for the Debtor's assets: (1) "an amount equal to" (a) $1.1 billion as the Closing Payment; (b) $224.84 million as the Class 3 Monetization Payment; (c) $88.66 million as the Class 4 Copper Note Payment; and (2) assumption of Assumed Liabilities by the Sterlite. (Debtor's Plan, Bk. Doc. No. 12694 at Art. 10.1(b); Bk. Doc. No. 12648–6 at Section 4.1.)

The Debtor's Plan also creates the "SCC Litigation Trust," which would essentially hold the rights to pursue certain claims of the Debtor. Certain classes of claims[9]

---

**8.** The Court notes that the primary parties have disputed what standard of review this Court should implement in resolving the objections. (*See* October 19, 2009 Hrg. Tr., Doc. No. 67 at 8–12.) The Debtor, and those opposing the Parent's Plan, suggest this Court should treat it like any other Report and Recommendation that one might receive from a United States Magistrate Judge and, therefore, the review is basically *de novo* as to contested facts and law. 28 U.S.C. § 636(b). The Parent, having prevailed in the Court below, not surprisingly suggests a higher standard applies—that of "clearly erroneous"—at least with respect to core issues. The Parent

further argues that the choice of which plan to confirm is a core issue. Given the procedural history of this case, this issue would be one that only a law professor would relish. This Court, however, finds no need in resolving this case to "decide this issue" and leaves it open to the wild world of academic debate. Nevertheless, since the Parent prevailed in the Bankruptcy Court, this Court, out of an abundance of caution, utilized the standard proposed by the Debtor.

**9.** Under the Debtors' Plan, the classes of claims and interests are set out as follows: Class 1 is Priority Claims; Class 2 is Secured

would be given interests in the SCC Litigation Trust, and as beneficiaries would be entitled to cash recovered by the Trust. By far, the litigation with the greatest potential pay-out is the fraudulent transfer judgment in favor of ASARCO LLC decided by this Court.[10] Under the Debtor's Plan, Sterlite would pay an additional amount, approximately $722 million, in exchange for Class 3's interests in the SCC Litigation Trust. (Bk. Doc. No. 12694 at Art. 4.2(c); Amendment Nos. 5 and 7 to the New Plan Sponsor PSA, Bk. Doc. Nos. 12445-2 at 9, 12648-6 at 8.) The Debtor's Plan would then distribute interests in the SCC Litigation Trust to Classes 4, 6, 7, and 8 in priority order. (Bk. Doc. No. 12694 at Arts. 4.2(d)-(h), 4.3.) The equity interests in ASARCO, or Class 8, would only be paid after all other creditors' allowed claims are paid out, and the current equity owner would not retain its ownership. (Bk. Doc. No. 12694 at Arts. 4.2(h), 4.3(b).)

In addition to their interests in the SCC Litigation Trust, holders of the Class 4 Asbestos Claims would be given an option to sell their interests in the Trust back to Sterlite for $160 million. This "Asbestos Put Option" has been given a net present value of $137 million. (Doc. No. 12 at 13 n. 15; Ex. D471; Ex. P433.)[11] An Asbestos Trust would be created under the Debtor's Plan, and pursuant to a channeling injunction, if the Debtor's Plan were confirmed, the Asbestos Trust would process and pay out Class 4 claims. (Doc. No. 12694 at Art. 4.2(d).) The Asbestos Trust would be funded by assets including $700 million in cash, an additional $27.5 million in cash for administrative expenses, the Class 4 interests in the SCC Litigation Trust,[12] equity interests in Reorganized Covington,[13] and interests in the liquidation trust.[14] (*Id.*) The Court notes that these cash payments are *not* in addition to the consideration listed above in the first paragraph of this section, but come out of the funds paid by Sterlite for transfer of the Debtor's assets and other available "distributable cash" held by the Debtor. (*See* Debtor's Glossary, Bk. Doc. No. 12696-1 at ¶¶ 55, 63,

Claims; Class 3 is General Unsecured Claims; Class 4 is Unsecured Asbestos Personal Injury Claims; Class 5 is Convenience Claims; Class 6 is Late-filed Claims; Class 7 is Subordinated Claims; Class 8 is Interests in ASARCO; Class 9 is Interests in the Asbestos Subsidiary Debtors; and Class 10 is Interests in the Other Subsidiary Debtors. (Bk. Doc. No. 12694 at Art. 3.2.)

10. *See ASARCO LLC v. Americas Mining Corp.*, 404 B.R. 150 (S.D.Tex.2009). Pursuant to the Debtor's Plan, if it were confirmed, the Bankruptcy Court would enter findings regarding the total amount of allowed claims and the value of the SCC Litigation in order to calculate the appropriate assignment of interests. This case remains on appeal. Certain testimony and exhibits in evidence contain widely varied predictions regarding the current value of this judgment—all of which are well-below the estimated value of the stock in question.

11. As used in this opinion and order, Exhibits (noted "Ex. ____") refer to the exhibits offered and admitted in the confirmation hearing held by the Bankruptcy Court unless otherwise noted.

12. These interests could be sold in exchange for $160 million, as per the aforementioned Asbestos Put Option.

13. Reorganized Covington means on or after the Effective Date, The Covington Land Co., LLC. Before the Effective Date of Reorganization, Covington refers to the Delaware Corporation of The Covington Land Company. (Bk. Doc. No. 12696-1 at ¶¶ 138, 158.)

14. The Liquidation Trust is set out and described in Article VI of the Debtor's Plan. (Bk. Doc. No. 12694 at Art. VI.) The Liquidation Trust would be vested of certain litigation claims as detailed in Exhibit 14-B to the Debtor's Plan. (*See* Schedule of Litigation to Vest in the Liquidation Trust, Bk. Doc. No. 11898-16.)

109 (defining Asbestos Trust Assets, Available Plan Funds, and Class 4 Payment).) Finally, under the Debtor's Plan, Sterlite agrees to pay additional amounts as necessary to ensure that allowed claims for Classes 1, 2, and 3, and unclassified claims, are paid in full. (Bk. Doc. No. 12694 at Art. 10.1(d).)

As a deposit for implementation of the Debtor's Plan, Sterlite currently has secured its performance by posting letters of credit totaling $125 million ($50 million of which was apparently left in place after its first failed attempt to buy the assets of ASARCO) [15] and would be required to post additional letters of credit in the amount of $500 million upon either a recommendation of confirmation by the Bankruptcy Court or a confirmation order by this Court. (Bk. Doc. No. 12694 at Art. 10.1(c).) Thus, if the Debtor's Plan had been recommended or confirmed, the plan terms would have obligated Sterlite to secure its future performance by a deposit totaling $625 million in letters of credit. (*Id.*)

### 2. *The Parent's Plan*

Under the Parent's Plan, the Parent agrees to pay $2.2051 billion in cash for the payment in full of allowed claims in Classes 1 through 8.[16] (Conformed Parent's Plan, Bk. Doc. No. 12728–1 at Arts. IV, X; Parent's Glossary, Bk. Doc. No. 12728–27

at ¶ 258.) Class 9, the equity interests in ASARCO, would retain equity in the Reorganized ASARCO. (Bk. Doc. No. 12728–1 at Art. 4.2(i).) In addition to the cash contribution, the Parent would also guarantee a $280 million note [17] for Asbestos Claimants, for which Reorganized ASARCO would be principally liable. (*Id.* at Art. 10.1; *see* also Form of ASARCO Note and Guarantee (Ex. 23 to the Parent's Plan), Bk. Doc. No. 12728–24.) Asbestos claimants would have their claims channeled to a § 524 trust structured similarly to the one set out in the Debtor's Plan. (*Compare* Bk. Doc. No. 12694 at Art. VII *with* Bk. Doc. No. 12728–1 at Art. VI.) Funding of the trusts under these two plans would differ, as discussed later in this opinion. The Parent's Plan also provides a Working Capital Facility under which Reorganized ASARCO would be able to borrow $200 million from the Parent for its working capital needs, and this loan would be secured by an interest in proceeds of "preserved litigation claims." (Bk. Doc. Nos. 12728–1 at Art. 10.1; 12728–27 at ¶ 382; Exs. 9 and 10 to the Parent's Plan, Bk. Doc. Nos. 12728–10 and 12728–11.) [18] Finally, the Parent would agree to waive several claims that the Parent and its affiliates have against the Debtor, including the pending tax litigation. (Bk. Doc. No. 12728–1 at Arts. 10.1, 10.8.)

---

**15.** *See* (New Plan Sponsor PSA, Bk. Doc. No. 12648–4 at Art. 4.2 (*"Deposit.* Purchaser [Sterlite] shall make available to ASARCO funds in the aggregate amount of $125,000,000.00 (the 'Deposit') as follows: (a) *Prior to the execution of this Agreement.* Purchaser posted a letter of credit . . . in the amount of $50,000,000.00.").)

**16.** Under the Parent's Plan, the classes of claims and interests are set out as follows: Class 1 is Priority Claims; Class 2 is Secured Claims; Class 3 is General Unsecured Claims; Class 4 is Asbestos Personal Injury Claims; Class 5 is Convenience Claims; Class 6 is Late-filed Claims; Class 7 is Subordinated

Claims; Class 8 is Environmental Reinstated Claims; and Class 9 is Equity Interests in ASARCO. (Bk. Doc. No. 12728 at Art. 3.2.)

**17.** The net present value of the Asbestos Note is $274.8 million. (Doc. No. 22 at ¶ 272 n. 233; *see* also Ex. P433 at 2.) The term of the note is one year.

**18.** According to Parent's Plan Exhibit 9, these litigation claims do include litigation against Sterlite. (Schedule of Preserved Litigation Claims, Bk. Doc. No. 12728–10 at ¶ 8. (preserving "[a]ny and all pending or potential claims of the Debtors against Sterlite (USA), Inc.").)

The Parent's Plan would also provide the release of liability in several cases, including the Debtor's fraudulent transfer action against the Parent. (Bk. Doc. No. 12728-1 at Art. 10.5; *see* Schedule of Released Litigation (Ex. 2 to the Parent's Plan), Bk. Doc. No. 12728-3.) [19] Consistent with its plan, the Parent deposited $500 million in cash and more than 83.7 million shares of SCC stock into escrow to secure performance of its Plan after the Bankruptcy Court entered the Original Report and Recommendation. (Bk. Doc. No. 12728-1 at Art. 10.2; Doc. No. 55 at 3.) [20]

### B. *Findings by the Bankruptcy Court*

#### 1. *Findings Regarding Confirmability of the Plans*

The Bankruptcy Court found that the Debtor's Plan is a full payment plan, which would be worth about $2.2954 billion in cash and other assets.[21] It found the Parent's Plan to be worth $2.4799 billion.[22] The Bankruptcy Court believed that the Debtor's Plan (along with the Parent's Plan) is confirmable (Doc. No. 22 at 7), and it found that all objections to it, other than the § 1129(c) objection, either had been resolved or were without merit. (*Id.* at ¶¶ 99–124.) Due to the fact that the Bankruptcy Court recommended the confirmation of the Parent's Plan, it did not formally analyze the 11 U.S.C. § 1129 requirements for confirmation with respect to the Debtor's Plan, and it only briefly addressed the objections to the Debtor's Plan. (*See id.* at ¶¶ 85–124.)

The Bankruptcy Court recommended that the Parent's Plan be confirmed. It engaged in a thorough analysis of the Bankruptcy Code's requirements and found that the Parent's Plan satisfied each of the requirements of 11 U.S.C. § 1129(a). (*Id.* at ¶¶ 165–248.) It also found that, if necessary, the Parent's Plan could be confirmed under the provisions of 11 U.S.C. § 1129(b). (*Id.* at ¶¶ 249–50.) Finally, it determined that the objections to the Parent's Plan were without merit, including the Debtor's and Union's argument that the Special Successorship Clause prohibits confirmation of the Parent's Plan. (*Id.* at ¶¶ 251–65.) Based on its comparison of the plans under 11 U.S.C. § 1129(c), which will be discussed below, the Bankruptcy Court ultimately decided to recommend the Parent's Plan for confirmation. (*See id.* at ¶¶ 268–83.)

#### 2. *Findings Regarding Which Plan Should be Confirmed Under Section 1129(c) of the Bankruptcy Code*

Since both the Debtor's Plan and Parent's Plan are confirmable, but only one may be confirmed pursuant to § 1129(c) of

---

**19.** *See ASARCO LLC v. Americas Mining Corp.,* 404 B.R. 150 (S.D.Tex.2009).

**20.** According to counsel, the value of that stock was approximately $2.9 billion at the time of the hearing held on October 19, 2009 and the total value in escrow is thus approximately $3.4 billion. (October 19, 2009 Hrg. Tr., Doc. No. 67 at 27:5–12.) No one has really questioned the value of this stock, although some have questioned how rapidly it could be monetized since it is to date unregistered.

**21.** (*See* Doc. No. 22 at ¶ 272 n. 233.) The Bankruptcy Court reached the $2.2954 billion figure by adding $1.4394 billion cash (the amount the Bankruptcy Court determined would be paid for the assets of ASARCO and monetization of the Class 3 and Class 4 interests in the Sterlite Copper Note), $722 million (to be paid for the Class 3 interests in the SCC Trust), and $134 million (the value that the Bankruptcy Court used for the estimated present value of the asbestos put). (Doc. No. 22 at ¶ 108 n. 233.)

**22.** (Doc. No. 22 at ¶ 272 n. 233.) The Bankruptcy Court reached this figure by adding the cash on closing ($2.2051 billion) to the present value of the Asbestos Note ($274.8 million).

the Bankruptcy Code, in cases where there are multiple confirmable plans, a court "shall consider the preferences of creditors and equity security holders in determining which plan to confirm." 11 U.S.C. § 1129(c). In other cases involving multiple confirmable plans, courts have applied a four-factor analysis, considering "(1) the type of plan; (2) the treatment of creditors and equity security holders; (3) the feasibility of the plan; and (4) the preferences of creditors and equity security holders." *See, e.g., In re River Valley Fitness One Ltd. Partnership,* Civil Action No. 01–12829–JMD, 2003 WL 22298573 at *9 (Bankr.D.N.H. Sept.19, 2003); *In re Internet Navigator Inc.,* 289 B.R. 128, 131 (Bankr.N.D.Iowa 2003); *In re Holley Garden Apartments, Ltd.,* 238 B.R. 488, 493 (Bankr.M.D.Fla.1999).

Applying the four-factor analysis, the Bankruptcy Court determined that the Parent's Plan should be confirmed primarily because of its more favorable treatment towards equity. It found that there was no significant difference between the plans under the first factor (type of plan). (Doc. No. 22 at ¶ 269.) Nor did it find a significant difference as to the third factor (feasibility), although it found the Parent's Plan to be more secure in assurance of performance. (*Id.* at ¶¶ 274, 283.)

Under factor two (treatment of creditors and equity), the Bankruptcy Court found that the plans were essentially equal in their treatment of creditors. (*Id.* at ¶ 270.) The Bankruptcy Court also found that the Parent's Plan gave better treatment to equity and that the Parent's bid is "significantly higher" than Sterlite's bid. (*Id.* at ¶ 272.) In its comparison of the consideration offered by each plan, the Bankruptcy Court found that the Parent would pay $184.5 million more than Sterlite. (*Id.* at ¶ 272.) Thus, the Bankruptcy Court found that the second factor "strongly favors

confirmation of the Parent's Plan over the Debtor's Plan." (*Id.* at ¶ 273.)

With respect to factor four (the preferences of creditors and equity), the Bankruptcy Court found that although the creditors favored the Debtor's Plan (their votes had been taken before the final plans were proposed), the Creditors' Committee was required by agreement to recommend the Debtor's Plan and the text of § 1129(c) "only requires a bankruptcy court 'to consider the preferences of the creditors and equity interest, not obey them.'" (*Id.* at ¶¶ 281–83 (quoting *In re River Village Assoc.,* 181 B.R. 795, 807 (E.D.Pa.1995)).) Obviously, the Bankruptcy Court found that equity supports and is treated more favorably under the Parent's Plan. That being the case and given the "totality of the circumstances," the Bankruptcy Court concluded that "there is insufficient difference in feasibility or type of plan to allow the will of creditors to outweigh the difference in treatment of equity" and that the Parent's Plan should be confirmed. (*Id.* at ¶ 283.)

### C. Objections to the Bankruptcy Court's Findings

Several parties filed comments or objections after the Bankruptcy Court entered its initial Report and Recommendation on August 31, 2009. (*See* Doc. No. 10 (United States), Doc. No. 11 (ASARCO Committee), Doc. No. 12 (Debtors), Doc. No. 13 (Future Claims Representative), Doc. No. 14 (Sterlite), Doc. No. 18 (Union), Doc. No. 32 (Arizona).) These objections were primarily raised to dispute (1) factual findings made regarding the actual value of the Debtors' Plan as compared to the Parent's Plan; (2) the confirmability of the Parent's Plan; and (3) the Bankruptcy Court's analysis under § 1129(c) of the Bankruptcy Code, which resulted in the finding that the Parent's Plan should be confirmed.

The objections are briefly summarized below.

### 1. Objections to the Bankruptcy Court's Findings Regarding the Value of the Debtor's Plan

One of the Debtor's primary objections is that its plan was not properly valued in comparison to the Parent's Plan. The Debtor contends that the Bankruptcy Court's determination that the Parent's Plan should be confirmed is based on a comparison that does not "accurately reflect[ ] the total consideration that would ultimately be paid to creditors" under the Debtor's Plan. (Doc. No. 12 at 11.)

First, the Debtor contends the Bankruptcy Court's determination is in error is because it believes that Sterlite's "open-ended" assumption of liability for full payment of claims of Classes 1, 2, 3, and 5 was not attributed any value by the Bankruptcy Court. (*Id.* at 12.)

Second, the Debtor asserts that the Bankruptcy Court's findings were incorrect with respect to the implications of the pending tax litigation. (*Id.* at 14.) The Debtor claims that under Article 10.1(d) of its plan, Sterlite would pay 100% of the allowed tax amounts assessed against the Debtor. (*Id.*) For this reason, it objects to the Bankruptcy Court's determination that the Debtor "will be required to reserve at least $190 or $250 million" to cover certain tax claims. (*Id.* (citing Doc. No. 22 at ¶ 62).)

Third, it claims that the Bankruptcy Court's Report and Recommendation undervalued what would be paid to the Asbestos Trust under the Debtor's Plan versus the Parent's Plan. (*Id.* at 12–13; *see also* Doc. No. 14 at Annex II.) Under the Debtor's Plan, the Asbestos Trust would receive $700 million in cash plus "interests in litigation trusts to satisfy the remainder of their $ 1 billion claim plus post-petition interest." (Doc. No. 12 at 13.) The Parent's Plan would provide $641 million in cash on the Effective Date, plus a one-year note with a present value of $274.8 million. (*Id.* at 12–13.) The Debtor objects that this difference in treatment, however, should not be the basis of a decision under § 1129(c) "because the record does not support any finding that asbestos claimants are better off under the Parent's Plan." (*Id.* at 14; see also Comment of FCR and Official Committee of Asbestos Claimants, Doc. No. 13 at 2 ("Asbestos Fiduciaries supported confirmation of both plans, without expressing a preference for either").) It contends that the value of the interests in the litigation trust was not properly considered in determining the ultimate value of the Debtor's Plan, and asserts that the litigation trust interests are worth "in excess of $200 million." (*See* Doc. Nos. 12 at 13; 14 at 9–10.)

### 2. Objections to the Bankruptcy Court's Findings Regarding Confirmability of the Parent's Plan

The assertion that the Parent's Plan is not confirmable rests on three main objections: first, that the Parent's chosen method of financing threatens the feasibility of its Plan;[23] second, that confirmation of the Parent's Plan would violate the Special Successorship Clause because of the Parent's lack of a new collective bargaining

---

**23.** The Debtor asserts that the feasibility concern renders the Parent's Plan unconfirmable under § 1129(a)(11) of the Bankruptcy Code, which requires that "[c]onfirmation of the plan is not likely to be followed by the liquidation, or the need for further financial reorganization, of the debtor or any successor to the debtor under the plan, unless such liquidation or reorganization is proposed in the plan." 11 U.S.C. § 1129(a)(11). In the alternative, it claims that the feasibility concern should tip the § 1129(c) analysis in its favor. (Doc. No. 12 at 18.)

agreement with the Union; and third, that the Parent's Plan was not filed in good faith.

First, several parties object that the Parent's use of a revolving debt facility threatens the feasibility of the Parent's Plan. (*See* Doc. Nos. 12 at 16–17 (Debtors); 14 at 22 (Sterlite); 33 at 5–8 (Arizona).) The Debtor and many who support the Debtor's Plan are concerned that the loan contemplated by the Parent's Plan would saddle Reorganized ASARCO with levels of debt that would threaten its operations. Some of this concern is based on the Parent's prior treatment of ASARCO following the leveraged buyout in the original purchase, and the Debtor also raises an argument that the Parent did not file its plan in good faith because of its past bad conduct. (Doc. No. 12 at 18–21.) Concerns about the debt facility are also based on the fear that if copper prices fall or other unanticipated costs arise, Reorganized ASARCO might find itself mired in debt again and neglect its other duties to the environment. (Doc No. 33 at 5–8.)

Second, parties object that the Parent's relationship with the Union threatens the feasibility of and may even bar confirmation of the Parent's Plan. These arguments will be more fully discussed below, but they range from assertions that the Parent's Plan cannot be confirmed because of the Special Successorship Clause to claims that the lack of a CBA will result in a strike if the Parent's Plan is confirmed.

Third, the Debtor objects that the Parent did not propose its plan in good faith. Section 1129(a)(3) of the Bankruptcy Code requires that a plan be "proposed in good faith and not by any means forbidden by law." 11 U.S.C. § 1129(a)(3). This objection is based both on the pre-petition conduct of the Parent with respect to the fraudulent transfer case and the "obstructionist and tactical behavior in the bank-

ruptcy case." (Doc. No. 12 at 18–21.) The Debtor hinges some of its argument on policy concerns as well, urging that confirmation of the Parent's Plan would "set an undesirable precedent for future equity holders to follow." (*Id.* at 21.)

### 3. *Objections to the Bankruptcy Court's Analysis Under Section 1129(c)*

Finally, the Debtor objects to the Bankruptcy Court's § 1129(c) four-factor analysis. First, with respect to the second factor (treatment of creditors and equity), the Debtor argues that the Bankruptcy Court inaccurately found that the Parent's "bid" was higher. (Doc. No. 12 at 11–15.) Second, with respect to the third factor (feasibility), the Debtor asserts that the Bankruptcy Court miscalculated the feasibility risks given the Parent's poor labor relations. (*Id.* at 24–26.) Third, with respect to the fourth factor of the § 1129(c) inquiry (preferences of creditors and equity), it contends that the Bankruptcy Court failed to sufficiently weigh the interests of creditors, who generally preferred the Debtor's Plan. (*Id.* at 8–10.) Sterlite echoes some of these objections, especially those which complained that the Bankruptcy Court did not give enough weight to the interests of creditors and their preferences and that the Bankruptcy Court erred in its determination that the Parent's Plan outbid the Debtor's Plan. (Doc. No. 14 at 6–27.)

### D. *Discussion*

#### 1. *The Value of the Debtor's Plan Is Not Greater Than the Value of the Parent's Plan.*

 This Court adopts the Bankruptcy Court's finding that the Debtor's Plan is confirmable because it would pay all claims of creditors in full and otherwise complies with the requirements of 11 U.S.C. § 1129(a). To the extent that the Bankruptcy Court failed to attribute value to the Debtor's Plan insofar as (a) Sterlite

would pay as much as necessary to ensure that Classes 1, 2, and 3 are paid in full [24] and (b) Sterlite would pay 100% of allowed tax amounts assessed against the Debtors,[25] this Court hereby grants the Debtor's objections and finds that these elements of the Debtor's Plan should be considered in comparing the two plans. The Court finds there is no evidence to support a specific dollar amount with regard to the former. Further, it finds that the tax amounts which would be attributed to the Debtor would correspondingly have to be added to the Parent's Plan as it has agreed to resolve this liability as well.

This Court declines to find that the litigation trust interests that would be distributed to Class 4 Asbestos Claimants are worth "in excess of $200 million." The record simply does not support a finding that the value of the SCC Litigation Trust can be reliably determined, especially based upon the evidence presented at the confirmation hearing, and the Court finds it telling that the two experts both testified as to the value of the SCC Judgment according to the "competent counsel" methodology and their opinions did not even overlap. (*See* Conf. Day 5 Tr., August 17, 2009, Bk. Doc. No. 12556 at 63:13–64:22.)[26] Shannon Ratliff determined that "a reasonable range of discounts from the full amount of the judgment would be 10% to 30%," which would make the judgment worth $5.6 to $7.2 billion according to his analysis. (Ex. P301; Conf. Day 5 Tr.,

August 17, 2009, Bk. Doc. No. 12556 at 64:5.) Professor Klee found an extremely wide range of potential values, from $400 million to $2.94 billion, using several different valuation methodologies. (Ex. D156.) Moreover, this lower estimate of Professor Klee seems more in line with the value actually placed on the judgment by the market place. (*See* Ex. D156 at ¶¶ 60, 63 (implied range of value based on market indications of interest is $400 million to $850 million).) Additionally, before the Court is a sealed exhibit which is very probative of the fact that the actual market place (bidders that might actually buy the judgment) assigns a much lower range of values.[27] Given such wide discrepancies, this Court agrees with the Bankruptcy Court's use of the net present value of the Asbestos Put Option ($137 million) to calculate the certain amount that the Debtor's Plan would pay to the Asbestos Trust. To the extent that the Bankruptcy Court valued the Asbestos Put Option at $134 million rather than $ 137 million, this Court grants the Debtor's objection. (Doc. No. 12 at 15 n. 15.) Both the Debtor and Parent used $137 million in their calculations, and the Court finds that $137 million is the appropriate figure. (*See* Exs. P433; D471.)

The Court's resolution of these value calculation-based objections, however, is not determinative either way with respect to which plan should be confirmed, and it certainly does not result in the conclusion that the Debtor's Plan pays more value.

---

**24.** Article 10.1(d) of the Debtor's Plan states: "to the extent the Cash is not sufficient for all Allowed unclassified Claims and Allowed Claims in Classes 1, 2, and 3 to be Paid in Full, the Plan Sponsor shall be obligated to pay to the Plan Administrator such additional amounts as are necessary for such Claims to be Paid in Full." (Bk. Doc. No. 12694 at Art. 10.1(d).)

**25.** The allowed Tax claims would qualify as "unclassified," and be subject to payment in full by Sterlite according to Article 10.1(d) of the Debtor's Plan.

**26.** The Confirmation Hearing Transcripts will be referenced as ("Conf. Day X Tr.").

**27.** The average value implied by the sealed bids is less than $500 million.

Since both plans are full-payment plans, Sterlite's promise to pay the unfunded claims of Classes 1, 2, and 3 in full does not give them an edge. The record does not support such a finding. The same is true with respect to the tax claims. Under both plans, the claims would be either withdrawn or paid or otherwise resolved. Consequently, they are, at best, a wash. With respect to the difference in asbestos treatment, however, the Bankruptcy Court did not err in refraining from assigning a particular value to the SCC Judgment. Its use of the Asbestos Put Option value (which is at least a stable figure and one that was a product of negotiation) was a logical way of determining how much value the Debtor is paying. (*See* Doc. No. 22 at ¶ 272 n. 233.) The $3 million discrepancy, however, is not enough to give the Debtor's Plan any edge because the Parent's Plan is still paying roughly the same and likely more to the Asbestos Claimants.[28] After considering the objections regarding the value of the Debtor's Plan, this Court concludes that while it should be credited the value it would pay to ensure full payment of creditor Classes 1 through 3 and the tax claims, this does not make the Debtor's Plan worth more than the Parent's Plan.

### 2. The Parent's Plan is Confirmable.

With respect to the first main confirmability objection, that the Parent's financing of its plan is unfeasible, this Court adopts the findings by the Bankruptcy Court regarding the Parent's financial status and ability to satisfy its debt obligations. (Doc. No. 22 at ¶¶ 149–59.) The Parent has more than enough assets in cash and stock to cover its obligations under the financing agreement, and has deposited more than sufficient cash and stock into escrow to secure its Plan. (*Id.*) This Court therefore overrules all objections that assert the Parent's Plan is unfeasible because of its financing arrangement.

Second, as previously mentioned, the Court will address the Special Successorship Clause arguments later in this opinion.

■ Third, with respect to the good faith objection, this Court finds that the Bankruptcy Court properly applied the good faith standard, which requires that "there is a reasonable likelihood that the plan will achieve a result consistent with the objectives and purposes of the Bankruptcy Code." (Doc. No. 22 at ¶¶ 184–85 (citing *In Re Texas Extrusion Corp.*, 68 B.R. 712, 723 (N.D.Tex.1986), *aff'd*, 844 F.2d 1142 (5th Cir.1988)).) This Court also adopts the Bankruptcy Court's conclusion that the Parent's Plan was proposed in good faith "because it achieves the two ultimate objectives of the Bankruptcy Code"—paying creditors in full and enabling the debtor to reorganize and

---

**28.** The Debtor's Plan pays to the Asbestos Creditors: $700 million plus the Class 4 interests in the SCC Litigation Trust (or, if exercised, the $137 million net present value Asbestos Put), plus interests in the liquidation trust and Reorganized Covington. (Bk. Doc. No. 12694 at Arts. 4.2(d), 6.2(h)(1).) The amount paid to the Trust by Sterlite under Debtor's Plan is thus $837 million, plus interests in other entities. The Parent's Plan pays $500 million for the principal, $141 million for the interest, and $274.8 million in the form of a one-year note guaranteed by the Parent (of face value $280 million) (Bk. Doc. No. 12728–27 at ¶ 318 (defining "Section 524(g) Trust Assets")). The amount paid by the Parent under its plan is thus $915.8 million. The Court takes note that under the Debtor's Plan, it is theoretically possible that Asbestos Creditors could eventually be paid more; however, it is also possible that they would eventually be paid less than the Parent's guaranteed $915.8 million. In either case, the Asbestos Creditors have approved both treatments, and the Court views them as roughly equal. (*See* Decl. of the Future Claims Representative, Bk. Doc. No. 12381.)

emerge successfully from the bankruptcy. (Doc. No. 22 at ¶ 185.)

Even considering the Parent's pre-petition conduct, which this Court agrees was not model corporate behavior, the Parent has by a preponderance of the evidence met the good faith standard: its deposit of roughly $1 billion more than the price of its plan in cash and stock into escrow ($3.4 billion) suffices to demonstrate that its plan will at the very *least* allow it to pay off the allowed creditor claims and thereby erase nearly all of the burdensome liabilities that stand between the Debtor and profitability.[29] Thus, this Court adopts the findings and conclusions of the Bankruptcy Court with regard to good faith (*Id.* at ¶¶ 18–21), and overrules any and all objections that the Parent's Plan cannot be confirmed on good faith grounds. Furthermore, as will be discussed later in this opinion, any pre-petition misconduct is at least offset by Sterlite's post-petition conduct.

With respect to the policy concern of the Debtor and Sterlite that confirmation of the Parent's Plan would condone pre-petition misconduct, this Court finds that argument unpersuasive. If this Court were to confirm the Debtor's Plan, the logic of that policy argument would counsel that such a decision sets bad precedent as well because this Court would be rewarding a plan proponent even after it had unilater-

ally terminated a prior agreement, resulting in greater delay of this proceeding than might have otherwise occurred.[30]

This Court also hereby overrules all other objections that the Parent's Plan is not confirmable, and hereby adopts the Bankruptcy Court's conclusions that the Parent's Plan is confirmable either under 11 U.S.C. § 1129(a) or (b).

### 3. The Section 1129(c) Analysis Compels Confirmation of the Parent's Plan.

Since this Court agrees that both the Parent's Plan and the Debtors' Plan are confirmable, it turns to the § 1129(c) analysis, using the four factors (type of plan, treatment of creditors and equity, feasibility, and preferences of creditors and equity holders) described above and applied by the Bankruptcy Court.

#### a. Type of Plan

Under the "type of plan" analysis, "[a] reorganization plan is usually preferable to a liquidation plan." *In re Holley Garden,* 238 B.R. at 495. This Court adopts the Bankruptcy Court's determination with respect to the type of plan, that the Parent's and Debtor's Plans are substantially equal under the first factor, because both are reorganization plans. (Doc. No. 22 at ¶ 269.)[31]

---

**29.** (*See supra* n. 20.) In addition to the $3.4 billion in escrow, this Court further notes that the Parent's likelihood of closing is also secured pragmatically and indirectly by the SCC Judgment. If the Parent does not close as it is now obligated to do, it would not be able to release the SCC Judgment against it, which has been valued at more than $8 billion and which is secured by an estimated $12 billion dollars worth of stock.

**30.** The Court's text with respect to Sterlite's termination of the initial purchase and sale agreement is not a finding of fact or conclusion of law such that it can be used to collat-

erally estop Sterlite in future litigation. The issue was not fully briefed, nor has this Court taken evidence concerning the facts and documents that govern Sterlite's aborted effort to purchase the ASARCO assets in 2008.

**31.** The Court recognizes that the Debtor's Plan is an asset-purchase plan, while the Parent's Plan is an equity-retention plan. Under both plans, however, the business of the reorganized Debtor would continue, thus this Court considers them substantially the same for the purposes of factor one.

### b. *Treatment of Creditors and Equity*

Under this second factor, the Court "should confirm the plan that provides better treatment for the creditors and equity security holders." *In re Holley Garden,* 238 B.R. at 495. Due to the fact that both plans are full-payment plans, their treatment of creditors is essentially the same. Once creditors have been fully paid, the preferences of creditors, while relevant, are not as important as that of the remaining equity holder. Thus, the Bankruptcy Court considered the treatment of equity highly relevant. Under the Debtor's Plan, equity would lose all ownership interests and only receive whatever remains, if anything, in the SCC Litigation Trust after the creditors' claims are paid off. (*See* Bk. Doc. No. 12694 at Arts. 4.2(h), 4.3(b).) The Parent's Plan would allow the Parent to retain its equity ownership in Reorganized ASARCO after all creditor claims are paid off. (Bk. Doc. No. 12728–1 at Art. 4.2(i).) This far exceeds the recovery of equity under the Debtor's Plan.

Since the plan sponsors can be viewed as "purchasing" equity interests in Reorganized ASARCO—with Sterlite acquiring the equity under the Debtor's Plan and the Parent buying back rights to equity under the Parent's Plan—the Bankruptcy Court compared the consideration paid by each plan sponsor to determine which sponsor offers the highest "bid." It concluded that the Parent was paying roughly $184.5 million more than Sterlite. (Doc. No. 22 at ¶ 272.) As stated above, this analysis, however, failed to account for Sterlite's promise to pay any cash shortfall necessary to ensure that Classes 1, 2, and 3 are paid in full, as well as its promise to pay any allowed tax claims. (Bk. Doc. No. 12694 at Art. 10.1(d).) [32] It also did not, perhaps because to do so would be nearly impossible, account for the value of the SCC Trust interests or other less stable assets. Given that, this Court declines to adopt the Bankruptcy Court's findings of fact regarding a *specific* difference (e.g., $184.5 million dollars) in value paid for equity. Nevertheless, it is clear that under the Parent's Plan, the amount being paid in cash, and in other forms of consideration that the Court feels certain will be paid by the Parent, is far greater than that being paid by Sterlite.[33]

Given that both plans are reorganization plans and their sponsors have the means and commitment in place to pay in full all

---

**32.** With respect to the Parent's Plan, the various tax claims (the Tax Claim, Tax Refund, and Deferred Tax Liability, as defined in the Bankruptcy Court's Report and Recommendation (Doc. No. 22 at ¶ 59)), are not additional costs against the value it is paying because the Parent's Plan would withdraw the Tax Claim and Deferred Tax Liability Claims, as well as its claim to the Tax Refund, "thereby making the value of these claims available to the ASARCO estate and its creditors." (Doc. No. 22 at ¶ 61.) As mentioned earlier, since that is the case, it is the functional equivalent of a tie: *i.e.,* under the Debtors' Plan, the cost will be covered and under the Parent's Plan it would not exist, so under both plans Reorganized ASARCO would not be burdened by it.

**33.** At closing under the Parent's Plan, the Parent would pay $2.2051 billion Cash and would guarantee a note worth $174.8 million net present value. (Bk. Doc. Nos. 12728–1 at Arts. IV, X; 12728–27 at ¶ 258; *see also* Ex. P433 at 2.) At closing under the Debtors' Plan, Sterlite would pay $2.1355 billion cash (this is composed of a $1.1 billion Closing Payment plus $224.84 Class 3 Monetization Payment plus $88.66 million Class 4 Copper Note Payment plus $722 million for Class 3 interests in SCC Litigation Trust) and would give Asbestos Creditors a put option worth $137 million net present value. (Bk. Doc. Nos. 12694 at Arts. 4.2(c), 10.1(b); 12648–6 at 12 (Section 4.1); 12445–2 at 9, 12648–6 at 8.) This leads to the conclusion that the Parent would pay at least $100 million more than Sterlite.

creditor claims, this Court finds that their treatment of creditors is essentially the same. The Parent's Plan allows the Parent to retain its full interests in equity. This is enough to find that the Parent's Plan would result in better treatment of the equity holder.[34] Thus, factor two weighs strongly in favor of the Parent's Plan. Accordingly, the Court hereby overrules any and all objections to the conclusion that the Parent's Plan affords better treatment to equity.

### c. *Feasibility*

The feasibility factor dictates that the Court "should give preference to the plan that is more feasible than the other proposed plans." *In re Holley Garden*, 238 B.R. at 496. With respect to objections regarding the feasibility determination, it no secret that the Parent and the Debtor both face feasibility risks. The primary feasibility risks for the Debtor's Plan are the risk of closing and the funding of the SCC Litigation Trust, on which payment of the claims of several classes of creditors depends. The Debtor has backstopped its Plan with only $625 million in letters of credit versus the Parent's stock and cash in escrow sufficient to cover the price of their plan. (Doc. No. 22 at ¶ 274.) Debtor also lacks a formal legal commitment from Sterlite's ultimate parent, Vedanta Resources, to provide support after confirmation. (*Id.* at ¶¶ 274, 279.) Sterlite India

has guaranteed certain obligations of Sterlite USA and has agreed to the jurisdiction of this Court, but it has no assets here in the United States. Debtor's parent, AMC, and ultimate parent, Grupo Mexico, are both subject to the jurisdiction of this Court. The Parent has also put up more security that the plan requires. Thus, this Court adopts the Bankruptcy Court's findings that the Parent's Plan has a greater likelihood of arriving at consummation. (*Id.* at ¶ 274.)

Furthermore, the Debtor's Plan risks the chance that the SCC Litigation Trust would not be sufficiently funded, and thus the creditors might not all be paid in full, because it is dependent upon the final outcome of the SCC litigation. (*Id.* at ¶ 276.) In contrast, the Parent's Plan provides for a cash payment of $2.2051 billion on the Effective Date, which is sufficient to pay off all creditor claims, except those covered by the 1–year Asbestos Note. (*See* Bk. Doc. Nos. 12728–1 at Art. 10.1, 12728–27 at ¶ 258.) This Court therefore adopts the Bankruptcy Court's finding that the Debtor's Plan "involves more risk than the Parent's Plan," as well as the conclusion that this sub-factor—the likelihood that creditors will be paid in full—should be given little weight because "[b]oth the amount and risk is small." (Doc. No. 22 at ¶ 276.)[35]

34. The Court notes that even if the Debtor's September 10th Plan were considered and bidding re-commenced, the Parent would almost certainly be able to bid more than even Vedanta's available cash because of the $8 billion SCC Judgment. Counsel for both plans conceded this in arguments before this Court. (*See, e.g.,* October 19, 2009 Hrg. Tr., Doc. No. 67 at 57–58, 93–94.) Anything up to $8 billion would still be a gain for the Parent because it would release that judgment, and the Parent has indicated that it is ready and willing to bid higher if need be.

35. The total amount at risk would not affect any unclassified creditors or Classes 1, 2, or 3. Furthermore, the Class 4 claimants are still guaranteed $700 million plus their $160 million Asbestos Put Option. Setting aside that they have agreed to the risk involved in the SCC Litigation Trust, in the worst case scenario, they would be paid $860 million out of their $1.0 billion claim, and they would still have rights to the other assets, including the Liquidation Trust and Reorganized Covington. The risk and amount at stake are thus not enough to make the Debtor's Plan infeasible or to really threaten the likelihood that creditors will be paid in full.

The primary feasibility risk for the Parent's Plan is the lack of a collective bargaining agreement with the Union. Sterlite has reached a collective bargaining agreement with the Union under which it would fund ASARCO's employee benefit and retirement plans through December 2013. (Doc. No. 22 at ¶ 96; Ex. D184.) Throughout the confirmation process, labor relations have been a particularly touchy issue. The union has not offered and has indicated that it will not accept a similar offer from the Parent. (October 19, 2009 Hrg. Tr., Doc. No. 67 at 145–47, 174:10–23 (comments by USW's and by Parent's Counsel).) How much of this attitude is cast in stone and how much of it is hard-negotiating is an open question since the Parent has not yet offered to extend the term of the current collective bargaining agreement by three years. The legal implications of the special successorship clause will be addressed more in-depth later in this opinion, but this Court notes for now that the Union's vigorous involvement in the confirmation proceedings and its numerous objections to the Parent's Plan are telling. Even at the October 19, 2009 hearing, more than a month after the Bankruptcy Court issued its Report and Recommendation, the Union and the Parent had still failed to reach an agreement. The Bankruptcy Court did not ultimately find the threat of labor unrest a significant enough feasibility risk to disfavor the Parent's Plan, based on the evidence regarding the unlikelihood of a strike, the costs of a strike, the existence of non-Union labor, and Reorganized ASARCO's ability to withstand a strike. (*See* Doc. No. 22 at ¶¶ 223–43.)

Overall, with regard to feasibility, under the absolute worst-case scenario involving either Debtor's or Parent's feasibility nightmare, the result could be catastrophic for all involved. In Debtor's case, if Sterlite walked away again after the Parent's funding deadline, creditors would be left without any plan and a deposit insufficient to pay the creditors. In the Parent's case, if copper prices tumbled (ruining its ability to repay its loan) and/or the Union decided to strike, future creditors conceivably could be left with insufficient payment and the Debtor could find itself back in Bankruptcy Court. The feasibility risks, while real for each plan, are ultimately low-probability risks and thus do not weigh heavily in favor of either plan, with the exception that the Court notes that Debtor's failure to close has happened before—just last year. All things considered, therefore, the Court overrules any and all objections that assert the Debtor's Plan is more feasible.

d. *Preferences of Creditors and Equity*

According to the statute, "the court shall consider the preferences of creditors and equity security holders in determining which plan to confirm." 11 U.S.C. § 1129(c). In its analysis of this factor, the Bankruptcy Court considered the preferences of creditors but found them not to be controlling because the votes had been taken prior to the announcement of final plans, and because it believed the totality of the circumstances outweigh the significance of the creditors' "will." (Doc. No. 22 at ¶¶ 281, 283.) At the same time, it also noted that none of the creditors asked to change their preference at the confirmation hearing, and the United States and eleven states even expressed preferences for the Debtor's Plan at the closing arguments. (*Id.* at ¶ 281.) The Court will address the governmental compliance issues in Section IX. Even after the Parent proposed its full payment plan, some creditors continued to support the Debtor's Plan. After the Bankruptcy Court filed its Report and Recommendation, the United States filed a limited objection reiterating that it had stated a preference for the Debtor's Plan, (Doc. No. 10); the Official

Committee of Unsecured Creditors filed a statement to the same effect, (Doc. No. 11); the Union, which includes some retiree creditors, filed an objection to confirmation of the Parent's Plan and expressed its preference for the Debtor's Plan, (Doc. No. 18); and the State of Arizona also filed an objection to confirmation of the Parent's Plan, expressing a preference for the Debtor's Plan (Doc. No. 33). The Future Claims Representative and Official Committee of Asbestos Claimants filed a comment indicating that they have no preference. (Doc. No. 13.) Thus, this Court declines to find that the preferences of the creditors are ambiguous.

At the same time, notwithstanding the substance of creditors' preferences, the context in which preferences were developed and stated is also highly relevant. The issue of expression of preferences was dissected by two of the creditors' counsel in argument before this Court:

MR. ESSERMAN: Hello, Your Honor. Sandy Esserman. This is the first time I think I've addressed you. We represent the Asbestos Committee.

I want to address the creditor preference issues and make sure that Your Honor understands, I think you do, the context of these plans.

This was a bidding process that occurred during the confirmation hearing. The plans that were voted on were not the plan's final-day argument that were presented to the Court. So, for example, this payment in full with preimposed petition interest did not exist when the disclosure statement went out, when the creditors, in fact, voted. In fact, if that had happened under the Bankruptcy Code, they wouldn't have voted because they were unimpaired. A creditor that is unimpaired doesn't even vote. That doesn't mean that some of the states wouldn't have—that have continuing relationships would not have expressed, necessarily, preferences one way or another. But a pure creditor that is getting paid full and post-petition interest, which they are in this case, plus attorney's fees, I believe, were applicable, would not even vote at all.

So you had a situation where you had Sterlite made a bid, the parent made a bid, then they kept on going up and up and up and up. For example, as to the asbestos creditors, who I represent, during the confirmation hearing, the parent increased their proposal to the asbestos creditors by approximately $140.5 million additional cash that was to be paid to the asbestos creditors. This was not contained in the disclosure statement which my creditors voted on.

In addition, you heard about the $500 million cash escrow and the $2.9 billion of stock that the parent is putting up. This was not contained in the disclosure statement the people voted on.

Let me look at the other side. Sterlite agreed to put an extra $500 million letter of credit in. That wasn't contained in the disclosure statement either. And Sterlite post-petition for the asbestos creditors agreed, if you will, to cash out the 27–and–a–half percent of the litigation interest for cash and raise the asbestos payment to about 912, $914 million cash plus what I refer to as the bells and whistles, which both sides agreed to do. That wasn't in the disclosure statement. So that was—that the committee viewed as an enhancement and a positive step by Sterlite also because, as Mr. Bartner so eloquently stated, Judge Schmidt did not value the 27–and–a–half percent of the litigation interest that went to the asbestos creditors, and perhaps it cannot be valued. Perhaps it cannot be evaluated. Perhaps he did evaluate it. That was one of

the reasons why we negotiated the $160 million put in the first go-around, because there was concern as to that, and we wanted to make sure that we didn't wind up with a vacated judgment or a reduced judgment or whatever.

*So creditor preferences. I think, are important under the code, but creditor preferences, cast when they were cast in this particular case, may not be as informative as the court would normally like.*

THE COURT: And at least for some classes of creditors, there was no fiduciary out?

MR. ESSERMAN: For—I believe the Creditors Committee had no fiduciary out, that is correct. They agreed to support the Sterlite plan come hell or high water. My committee agreed to support both plans. So I think the context of the payment—of the payments to the creditors, that is, payment in full, creates a little bit different 1129(c) argument that normally would take place in a case. *And, in fact, when those preferences were cast, if the—if the plan had been revoted on. most of those people wouldn't have even voted at all.*

Now, whether the court would have allowed a preference to be stated or not is a different issue. Maybe yes, maybe no. I can see an argument why a state, for instance, that has continuing relationships with the company would be allowed to so state a preference. There's some logic to that.

On the other hand, if someone is walking out with a dollar bill and that's all he's owed from the courtroom and he gets his dollar bill from either side, what difference should it make? And I think that's probably the more logical argument. Thank you.

THE COURT: Okay.

MR. BAKER: Good morning, YOUR HONOR. Derek Baker from Reed Smith on behalf of the Official Committee of Unsecured Creditors. Your Honor, I wanted to just address the one point you made about the fiduciary out, and I wanted to sort of explain to the court how those issues came up.

*They were presented to Judge Schmidt. I think he did understand the ongoing back and forth that was going on that led up to the issues that were ultimately agreed to right before the commencement of the confirmation hearing.*

(October 19, 2009 Hrg. Tr., Doc. No. 67 at 71–74 (emphasis added).) Thus, the creditors' preferences were not uniform, many were made prior to full payment plans being proposed, some were handcuffed by a lack of a fiduciary out, and some, had they known they would be paid in full, would either not have expressed a preference or not have been allowed to vote.

On the other hand, the equity holder clearly supports the Parent's Plan because the Parent is the current owner of equity and its plan would not only release AMC from the SCC judgment, but would allow it to keep its ownership of the Debtor once the creditors are paid off. The Debtor's Plan would only refund to the equity owners whatever portion of the SCC Litigation Trust, if any, is not needed to pay off creditors, but Sterlite would be the new owner of Reorganized ASARCO. Equity under the Debtor's Plan could end up with nothing.

Once one comprehends the timing and sequence of the expression of the preferences, the ultimate full payment of creditors under both plans and the preferences and treatment of equity, the Bankruptcy Court's conclusion is inescapable. This conclusion was finally buoyed by the fact that the Bankruptcy Court (as well as this

Court) found that the Parent's Plan was more likely to close.

The Court, therefore, finds the preferences of creditors, while being considered, should not be a controlling factor because the creditors will be paid in full under either plan. Sterlite's counsel supported its criticism of the Bankruptcy Court by focusing on the text of the statute, which states that the court "shall consider the preferences of creditors," without regard to whether they will be paid in full, and by pointing to the risk of closing. (October 19, 2009 Hrg. Tr., Doc. No. 67 at 49:12–22.) Even giving the creditors their due consideration, this Court finds their preference to be unpersuasive in this case where they are not uniform, and where they get paid in full by either plan. This is especially true in a case in which the Debtor's Plan has a greater risk of not closing.

e. *Synthesis of the Section 1129(c) Test*

The Debtor complains that what the Bankruptcy Court did was effectively rule that a "tie goes to equity." This is not accurate and certainly understates the analysis performed by the Bankruptcy Court. It ignores the fact that the Bankruptcy Court weighed the factors set out in § 1129(c) and it also ignores the fact that in weighing the plans it was faced with two plans—both of which treated the creditors equally—one of which all but disregarded the treatment of equity and one of which is much more generous to equity. This hardly qualifies as a tie. At least one objector suggests that the Code requires the Court balance not the treatment given, but *only* the expressed preferences (*i.e.*, the votes). The Bankruptcy Court did both. It noted that the preferences of the creditors were overwhelmingly for the

Debtor while equity was soundly in the Parent's camp.

If the Court had stopped its analysis there, the complaint that it merely "gave the tie to equity" might be valid. It did not stop there. It analyzed both the preferences of creditors and equity, the treatment of creditors and equity, and the likelihood of closure. With respect to the preferences, it was clear that equity was for the Parent's Plan, while the opposite conclusion as to the creditors was not so discernable.

Under the four-factor analysis, the only factor that is overwhelmingly in favor of Debtor's Plan is the preference of creditors. Every other factor is either neutral or favors the Parent's Plan, with the latter being vastly superior in its treatment of equity. The purposes of bankruptcy proceedings are generally to ensure that creditor claims are paid as close to "in full" as possible and to allow the debtor to emerge with the ability to carry out its business. Given that the Parent's Plan is more likely to close and that each plan will pay creditors in full, the Court finds that the Parent's Plan should be confirmed based upon a weighing of all § 1129(c) factors.

**VII.** *Consideration of the Debtors' September 10th Plan* [36]

A. *The Bankruptcy Court's Findings and Recommendation*

On September 10, 2009, well after the Bankruptcy Court had entered its initial Report and Recommendation, the Debtor filed a modified version of its Sixth Amended Joint Plan of Reorganization. (September 10th Plan, Bk. Doc. No. 12822.) Modifications to the Debtor's plan were made primarily to increase the

---

**36.** This Court shall refer to the amended plan filed by the Debtor on September 10, 2009 as the "September 10th Plan." The plan filed by

the Debtor, last modified on August 27, 2009, shall be referred to as the "Debtor's Plan."

amount of cash paid by Sterlite.[37] (Letter to Bankruptcy Court from Debtor's Counsel Bk. Doc. No. 12830.) The next day, the Bankruptcy Court ordered the Debtor to show cause why the September 10th Plan should even be considered. (Bk. Doc. No. 12849.) On September 14, the Parent filed a Response to the Court's Order to Show Cause. (Bk. Doc. No. 12872.) It argued that the Bankruptcy Court should not consider the September 10th Plan because doing so would disrupt the review process that the District Court established by granting the Joint Agreed Motion to Withdraw the Reference. (*Id.* at 3.) In addition, the Parent argued that even if the Bankruptcy Court were to consider the September 10th Plan, the Parent's Plan remains superior. (*Id.* at 14.)

At the show cause hearing held on September 15, 2009, the Debtor disputed the notion that additional discovery or reopening of the record would be necessary. (September 15, 2009 Hrg. Tr., Bk. Doc. No. 12882 at 36:15–16.) Debtor's counsel specifically stated that no further action would be necessary at the Bankruptcy Court level, and that the September 10th Plan *should simply be available for the District Court's consideration.* (*Id.* at 36:15–37:10 (emphasis added).) In response, Parent's counsel urged that if the September 10th Plan were to be considered, re-opening of the record would be necessary in order to allow for testing of the new plan. (*Id.* at 68:10–69:1.) At the close of the hearing, the Bankruptcy Court ordered each side to submit briefs on the impact that the September 10th Plan would have on the analysis of which plan is superior. (*Id.* at 88:18–89:3.) The Debtor, Sterlite, and Parent submitted briefing.[38] (Doc. Nos. 51 (Debtor), 53 (Sterlite), 54 (Parent Surreply); Bk. Doc. No. 12914 (Parent Response).)

On September 24th, the Bankruptcy Court issued a Report and Recommendation, in addition to the one contemplated by this Court's initial referral, regarding the September 10th Plan. (Doc. No. 55.) The Debtor, Sterlite, the USW, and Arizona filed objections to the September 24th Recommendation, and the Parent filed a response to those objections. (Doc. Nos. 56, 57, 58, 59, and 65.) These are also currently before this Court.

The Bankruptcy Court found that the September 10th Plan should not be considered, and in the alternative, determined that the September 10th Plan is still inferior to the Parent's Plan. (Doc. No. 55 at 4, 14.) First, it found that the September 10th Plan should not be considered because there is no unlimited right to continue to modify a plan of reorganization after it has been rejected. (*Id.* at 4.) Additionally, the Bankruptcy Court was concerned that consideration of the September 10th Plan would: (1) violate both the letter and the spirit of the very review process requested by all parties and established by the District Court's withdrawal of the reference; (2) require further discovery and hearings; and (3) incite an endless cycle of additional plan filings by the Parent and Debtor. (*Id.* at 6–12.) In the alternative, the Bankruptcy Court determined that the Parent's Plan is still superior to the Debtor's September 10th Plan because it pro-

---

**37.** The bulk of the increased cash would be payments made in exchange for Sterlite's purchase of interests in the SCC Litigation Trust. (*See* September 10th Plan, Blacklined, Bk. Doc. No. 12828 at Arts. 4.2–4.3; September 10th Plan Glossary, Blacklined, Bk. Doc. No. 12828-1 at 43.)

**38.** Although not ordered to do so, the Majority Bondholders and State of Arizona also filed responses to the Bankruptcy Court's Order to Show Cause. (Bk. Doc. Nos. 12909, 12912.)

vides better treatment to equity and has provided greater assurances of closing. (*Id.* at 18–19.)

## B. *Arguments of the Parties*

The Debtor (and other proponents of the September 10th Plan) assert that its September 10th Plan was filed "in accordance with 11 U.S.C. § 1127," which permits a plan proponent to "modify such plan at any time before confirmation." (Doc. No. 59 at 3); 11 U.S.C. § 1127. In its objection to the Bankruptcy Court's recommendation against consideration of the September 10th Plan, the Debtor argues that considering the September 10th Plan is essential to ensuring that a full-payment plan "is not only confirmed, but is also timely consummated," and is consistent with the spirit of competition that led to the proposal of full-payment plans by both sides. (Doc. No. 59 at 3.) Additionally, the Debtor urges that the filing of the September 10th Plan was not gamesmanship, but "motivated by the Debtors' good faith desire to ensure that the best possible plan is before the Court and is ultimately consummated." (*Id.*) It further claims that the timing was the result of Sterlite's proposal to improve the terms of the Plan after the Bankruptcy Court issued its initial Report and Recommendation. (*Id.* at 3–5.) In response to concerns about delay, the Debtor contends that the September 10th Plan does not require reopening of the evidence and is not meant to alter the review schedule or delay resolution. (*Id.* at 6.)

The Parent replies that the September 10th Plan should not be considered because § 1127 does not give to a plan proponent an "unfettered right" to modify its plan of reorganization, it would be fundamentally unfair to consider the late-filed plan, and it would disrupt the review process established by this Court and the Bankruptcy Court. (Doc. No. 65–2 at 43–48.) It cites this Court to two cases in which courts declined to allow plan proponents to modify their plans of reorganization. (Doc. No. 65–2 at 54–55 (citing *In re Mid–State Raceway, Inc.*, 343 B.R. 21 (Bankr.N.D.N.Y.2006); *Univ. Creek Plaza, Ltd. v. New York Life Ins. Co.*, 176 B.R. 1011 (S.D.Fla.1995)).) The Parent also asserts that due process and basic fairness, given the nature of the procedures adopted by the Court, would require reopening of the evidence and the taking of discovery on several issues. (Doc. No. 65–2 at 46 n. 152.)

## C. *Discussion*

■ This is a matter of first impression, if for no other reason than the unique circumstances of this bankruptcy and the somewhat unique procedures proposed by and agreed to by all parties and adopted by this Court. Neither counsel nor this Court was able to find any cases in which a plan sponsor filed an amended plan of confirmation after a Report and Recommendation had been made by the Bankruptcy Court, but before the District Court issued a final ruling. The Bankruptcy Code addresses plan amendment prior to confirmation, and provides as a general proposition that such modification is permitted so long as the modifications do not render the plan unconfirmable. *See* 11 U.S.C. § 1127; *see also In re Sentry Operating Company of Texas, Inc.*, 264 B.R. 850, 857 (Bankr.S.D.Tex.2001); *In re One Canandaigua Properties, Inc.*, 140 B.R. 616, 618 (Bankr.W.D.N.Y.1992); *In re Glades Health Care, Ltd.*, 88 B.R. 439, 439 (Bankr.S.D.Fla.1988) (considering a plan modified after the confirmation hearing, but still denying confirmation of the plan). It, of course, assumes that the decision of the Bankruptcy Court as to confirmation is

final.[39] In this unique case, however, the Bankruptcy Court's recommendation as to confirmation is not final. Consequently, it is important to recall the history of these proceedings.

1. *The Procedure Proposed by the Parties and Adopted by the District Court Does Not Provide for Plan Modification Following the Bankruptcy Court's Recommendation.*

Consistent with its general powers to bring to a conclusion a case that has already taken over four years to administer, the Bankruptcy Court together with the parties and with the approval of this Court set out clear procedures to help usher the case forward. *See* 11 U.S.C. § 105; (Doc. Nos. 1, 7; Bk. Doc. Nos. 11698, 11972.) All parties not only agreed to these procedures, but, in fact, urged this Court to adopt them. (Bk. Doc. No. 11972.)[40]

Since June 11, 2009, pursuant to the Bankruptcy Court's Third Order Revising Objection Deadlines and Discovery Procedures to Govern the Disclosure Statement Hearing, the Confirmation Hearing, and Related Matters, the parties were on notice that the Confirmation Hearings were to take place beginning August 10, 2009. (Bk. Doc. No. 11698 at 2.) The June 11th scheduling order set several additional deadlines as well, including dates by which discovery and the filing of objections and briefs were to be completed. (*Id.* at 2–11.) During a status conference held on July 7, 2009, the Debtors submitted the form of an order withdrawing the reference and referring back to the Bankruptcy Court the confirmation issues and § 524(g) injunction issues as a way to resolve the need for a District Court to properly issue the channeling injunction contemplated by all involved. (July 7, 2009 Hrg. Tr., Bk. Doc. No. 11917 at 10:14–13:1.) Parties at the conference expressed general support for the procedure, and on July 15, 2009, the Joint Motion to Withdraw the Reference was filed. (*Id.* at 13:15–16, 14:8–9, 14:22–24, 15:11–16; Bk. Doc. No. 11972.)

The Joint Motion to Withdraw the Reference, signed by the Debtors, was intended to provide for "an efficient process that conserves judicial resources and follows statutory directive," as well as to "accord[ ] with the requirements of both the Debtor's Plan and the Parent's Plan." (Bk. Doc. No. 11972 at ¶¶ 6, 7.) The proposed procedure was to withdraw the reference to "vest responsibility for entering any confirmation order and injunction in the District Court and avoid statutory construction questions" and then refer "confirmation and injunction-related issues back to the Bankruptcy Court to conduct an evidentiary hearing and make findings of fact and conclusions of law." (*Id.* at ¶ 6.) In the Joint Motion, the moving parties recognized that the proposed procedure would provide the jurisdictional basis needed to enter the injunction, while at the same time allowing the parties and system as a whole to benefit from the Bankruptcy Court's expertise in bankruptcy issues, familiarity with the parties, and experience

---

**39.** In a normal case, once the Bankruptcy Court confirms a plan, the confirmed plan binds the debtor and other parties. *See* 11 U.S.C. § 1141. The District Court would ordinarily not review a decision regarding confirmation unless it were a final order. *See* 28 U.S.C. § 158 (granting district courts jurisdiction to hear appeals on final orders); FED. R. BANKR.P. 8001 *et seq.* (outlining appellate procedures).

**40.** No one can question the success that resulted from the adoption of this course of action. These procedures and the Bankruptcy Court's implementation of them directly led to the competition between the plans and facilitated the situation that eventually resulted in two full-payments plans.

with confirmation proceedings. (*Id.*) The Joint Motion also acknowledged the fast-approaching deadlines that the Debtor's Plan imposed, deadlines of which the Bankruptcy Court found "all parties in this case" were cognizant, and to which the Bankruptcy Court agreed. (*See id.* at 4 fn. 3; Doc. Nos. 1, 55 at 6.) To meet these deadlines and avoid "unreasonable delay that might result if a confirmation order were issued by the Bankruptcy Court and appealed to the District Court," the moving parties specifically requested:

> (i) withdrawal of the reference with respect to confirmation and related injunction requests; (ii) referral of these issues back to the Bankruptcy Court for evidentiary hearing and issuance of proposed findings of fact and conclusions of law; (iii) that any objections to the Bankruptcy Court's findings and conclusions be filed within 10 days of entry; and (iv) that, in accordance with the withdrawal of reference, the District Court, after considering the Bankruptcy Court's proposed findings and conclusions and any objections, enter the confirmation order and enter the requested injunction.

(Bk. Doc. No. 11972 at ¶ 9.) On July 21, 2009, the Bankruptcy Court issued a Report and Recommendation, recommending to this Court that the Joint Motion be granted. (Doc. No. 1.) A hearing was held in Brownsville and the attorneys for both plans lectured this Court on the importance of this matter moving forward with some urgency. (*See* August 6, 2009 Hrg. Tr., Bk. Doc. No. 12500 at 16–18, 20–22.) This Court granted the Joint Motion on August 6, 2009. (Doc. No. 7.) In granting the Joint Motion, this Court approved of the expedited, yet systematic and orderly procedure that had been agreed to by the parties and recommended by the Bankruptcy Court. (*Id.*)

The procedure proposed by the parties, recommended by the Bankruptcy Court, and adopted by this Court did not provide for the modification of plans after the Bankruptcy Court's filing of its Report and Recommendation. Indeed, the order only allowed parties to file objections once the Bankruptcy Court ruled. At no time did the Bankruptcy Court or this Court authorize the filing of a new plan for consideration by solely the District Court, without a report by the Bankruptcy Court.[41] Nor did the Debtor file a request for leave to file a new plan. Nothing in the Joint Motion, the Bankruptcy Court's Report and Recommendation on the Joint Motion, or this Court's Order Granting the Joint Motion to Withdraw the Reference ever contemplated that the District Court would be responsible for reviewing anything other than objections and the Bankruptcy Court's recommendation, especially given the speed with which the parties requested this Court to act. For the District Court to consider a plan filed after the Bankruptcy Court's original Report and Recommendation had been made would contradict the very purpose of the withdrawal and referral procedure—there is no point in the Bankruptcy Court using its expertise to review a plan that the Debtor is merely going to replace with a new plan once its old one has been passed over.[42]

---

**41.** The Court notes that while the Bankruptcy Court did analyze the new plan, *sua sponte,* in its September 24th Report and Recommendation, at no time was the September 10th Plan vetted by the confirmation process. (*See* Doc. No. 55.)

**42.** *Cf. Paterson–Leitch Co., Inc. v. Mass. Municipal Wholesale Elec. Co.,* 840 F.2d 985, 990–91 (1st Cir.1988) (holding that, in the similar procedure of referral to magistrate judges, "an unsuccessful party is not entitled as of right to de novo review by the judge of

Given that the September 10th Plan is not properly an "objection" to the Bankruptcy Court's proposed findings of fact and conclusions of law (if anything, one could argue that the Debtor, by the filing of a new plan, impliedly ratified or conceded the accuracy of the Bankruptcy Court's findings), this Court hereby finds that it violates the terms of the Withdrawal of the Reference and the procedure agreed to by the parties and ordered by this Court. (Doc. No. 7.)

Furthermore, the Court finds that the procedure adopted by the parties, in order to insure proper consideration of the September 10th Plan plus due process and fundamental fairness, would require allowing additional time for discovery, presentation of witnesses along with cross-examination, and argument, and would further require allowing the Parent to file modifications to its plan for consideration. According to the parties, this would prove fatal to the financing underlying both plans and could leave all concerned with no confirmable plan instead of the two they have now. The creditors, who have waited at least four years for payment and some much longer, could see their hopes for closure slip away. Further, with billions of dollars at stake in this case, the Court is not comfortable confirming a plan that has not been fully vetted by the parties, and such deliberation requires additional time and procedures beyond the deadlines imposed by the financing. As such, the Court hereby finds that the September 10th Plan should not be considered based upon the procedures proposed and agreed to by all parties. The Court therefore declines to consider the Debtor's September 10th Plan.[43]

an argument never seasonably raised before the magistrate").

**43.** Given this conclusion, the Court need not address the quite viable arguments raised by

## 2. The Bankruptcy Code Does Not Guarantee the Debtors an Absolute Right to Modify Their Plan of Reorganization.

■ Section 1127(a) of the Bankruptcy Code provides:

> The proponent of a plan may modify such plan at any time before confirmation, but may not modify such plan so that such plan as modified fails to meet the requirements of sections 1122 and 1123 of this title. After the proponent of a plan files a modification of such plan with the court, the plan as modified becomes the plan.

11 U.S.C. § 1127(a). Courts have found an exception to this general rule. For example, in *University Creek Plaza*, the District Court upheld the Bankruptcy Court's denial of a debtor's attempt to modify its plan, "even after [the Bankruptcy Court] had announced [its] decision to deny confirmation." *In re University Creek Plaza, Ltd.*, 176 B.R. 1011, 1018 (S.D.Fla.1995). Reasoning that the debtor had already modified or amended its plan four times and been given earlier notice that its plan was not confirmable, the District Court did "not read 11 U.S.C. § 1127(a) as providing [the debtor] with the statutory and unlimited right to modify its Plan." *Id. Cf. In re Mid–State Raceway, Inc.*, 343 B.R. 21, 31–32 (Bankr. N.D.N.Y.2006) ("Without suggesting that the Court is prohibiting any further resort to Code § 1127(a) ..., the Court intends to make it clear that it cannot and will not condone what appears to be continued 'gamesmanship' ... which arguably could go on indefinitely. Thus, the court will

the Parent that allowing a party to wait until it loses and then giving one side, but not the other, a chance to top the winning plan violates any concept of fundamental fairness.

look very skeptically on any subsequent efforts by [plan proponent] Oneida to file another modification of their amended plan in order to gain acceptance.") (citing *In re University Creek Plaza, Ltd.*, 176 B.R. 1011 (S.D.Fla.1995)).

Turning to the facts in this case, this Court notes that both the Debtor and the Parent have had more than ample opportunities to modify their plans.[44] On the first day of the confirmation hearings, the Debtor announced modifications to its Sixth Amended Chapter 11 Plan, and the official modified plan was filed on August 11, 2009. (Conf. Day 1 Tr., August 10, 2009, Bk. Doc. No. 12829 at 19:12–23:5.) The Parent in turn announced modifications to its own plan, which were to increase cash provided at closing and to treat all unsecured creditors under Option C of its plan. (*Id.* at 137:13–141:16; Conf. Day 2 Tr., August 11, 2009, Bk. Doc. No. 12485 at 182:10–189:10.) On the fifth day of confirmation, the Parent announced its intention to file a full-payment plan, and filed its Seventh Amended Plan on August 17, 2009. (Conf. Day 5 Tr., August 17, 2009, Bk. Doc. No. 12556 at 85:6–90:7; Bk. Doc. No. 12534.) The Parent then made and filed additional modifications to its plan on August 20, August 23, and August 27, 2009. (*See* Bk. Doc. Nos. 12578, 12617, 12695, 12728). The Debtor also made and filed additional modifications to its plan on August 20, 23, and 27, 2009. (*See* Bk. Doc. Nos. 12568, 12623, 12694.)

Meanwhile, additional proffers in support of the amendments were submitted and discovery was taken, even while the confirmation hearing was in full swing. (*e.g.,* Final Proffer of Kenneth Klee, filed August 15, 2009, Bk. Doc. No. 12514.) The Bankruptcy Court, in an effort to allow the creditors and other concerned parties to receive the most compensation available, was extremely flexible and accommodating throughout the confirmation proceeding. That Court allowed the parties and counsel maximum flexibility and is to be commended. As a result, prior to, and throughout the confirmation hearings, each side made amendments to the plans that ultimately benefitted the creditors. Nevertheless, it was clear to all that once the confirmation hearing concluded, it was all over, but for the objections. (*See* Doc. No. 7.)

Moreover, it was only after the adverse Report and Recommendation of the Bankruptcy Court that the Debtor filed yet another amended plan. While this Court recognizes the benefits that competition has provided, it is also mindful that at some point, the targets must stop moving and a decision must be made so that a plan of reorganization can actually be implemented. Recognition of an ultimate deadline is fully consistent with the purpose of § 1127(a) of the Bankruptcy Code, which is "designed to implement the negotiation process," *Collier Bankruptcy Manual,* 3d Ed. ¶ 1127.03, but then applies greater restraints to post-confirmation modification in § 1127(b). 11 U.S.C. §§ 1127(a)–(b).

Here, the Bankruptcy Court announced its decision to recommend confirmation of the Parent's, rather than the Debtor's Plan, and ten days later, the Debtor essentially attempted to get a second look from this Court by filing a new plan that had not been fully vetted by the other parties. Even if the Debtor's pre-amendment plan is "confirmable," as adjudged by the Bankruptcy Court, this Court finds that such behavior smacks of the sort of gamesmanship that the *Mid–State Raceway* court refused to condone. *In re Mid–State Raceway,* 343 B.R. 21, 32

---

**44.** The Bankruptcy Court's Amended Report and Recommendation, filed on September 11, 2009, provides a thorough history of the plans. (Doc. No. 22 at 36–39.)

(Bankr.N.D.N.Y.2006). Contrary to the Debtor's declared intent to ensure that a full-payment plan is "timely consummated," its filing of the September 10th Plan has slowed down the review process, not speeded it up. (Doc. No. 59 at 3.) Continued consideration of it would grind the process to a halt. Additionally, as discussed above, the September 10th Plan plainly violates the procedures agreed to and relied on by the parties, established by the Bankruptcy Court pursuant to its statutory power to issue orders to carry out the provisions of the Bankruptcy Code, and adopted by this Court pursuant to its authority to efficiently manage its cases. 11 U.S.C. § 105(a); Fed.R.Civ.P. 16. Thus, to prevent what could amount to "an abuse of process," this Court declines to consider the September 10th Plan. *Cf. Marrama v. Citizens Bank of Massachusetts*, 549 U.S. 365, 374–75, 127 S.Ct. 1105, 166 L.Ed.2d 956 (2007) (finding that "the broad authority granted to bankruptcy judges [and to District Courts] to take any action that is necessary or appropriate 'to prevent an abuse of process' described in § 105(a) of the Code is surely adequate" to deny an otherwise Code-sanctioned motion to convert).

> D. *Even if the Debtor's September 10th Plan Were Considered, the Parent's Plan Remains Superior Under the Section 1129(c) Analysis.*

Even if this Court were to consider the September 10th Plan submitted by the Debtor, its conclusion would remain the same. Regardless of the specific dollar amount attributed to the plans, both plans are full payment plans, and under both plans, cash in excess of that needed to pay off creditors would go back to the plan sponsors. Thus, the treatment of equity and the probability of the plan actually closing are the determinative factors under the 11 U.S.C. § 1129(c) analysis. Since the Parent's Plan is more certain to close and it allows the equity holder to retain its interests in Reorganized ASARCO, whereas the Debtor's Plan divests the equity holder of its interests, the Parent's Plan should be confirmed.[45]

## VIII. *Labor and Special Successorship Objections*

Perhaps the most vociferous objections, or at least the most voluminous, are aimed at the Bankruptcy Court's Report and Recommendation with respect to the treatment of the relationship between the Parent and USW and the contractual provisions between the Debtor and the USW. Both of the issues overlap and a brief factual summary might aid in understanding the positions of the parties.

ASARCO had a relationship with the USW at the time it was acquired in 1999 by the Parent. After the acquisition, that relationship, while not by any means perfect, seemed to at least be "workable." As time progressed and ASARCO's liabilities (and potential liabilities) increased while the available cash to ASARCO management decreased, this relationship, such as it was, began to deteriorate. As ASARCO began to economize to preserve cash, the actions taken by management (many of which have been described in this Court's opinion in *ASARCO LLC v. Americas Mining Corp.*, 396 B.R. 278 (S.D.Tex. 2008)) began to affect the quality of life for the members of USW. It affected some

---

**45.** As previously noted, if this Court were to reopen the bidding at this point, the Parent would be able to bid in the entire amount of the SCC judgment because eventually it would all revert to it. Thus, any plan that the Debtor could file would ultimately be topped by the Parent. This was a fact conceded by counsel for Sterlite in arguments before this Court. (October 19, 2009 Hrg. Tr., Doc. No. 67 at 58.)

directly in terms of jobs and pay; it affected many more in terms of working conditions. Ultimately, this "economizing" led to a strike in 2005, and the strike played a role in forcing ASARCO to file bankruptcy. Both the period preceding the strike and the period during the strike itself embittered the attitudes of some in management (as to its view of labor) and almost all in labor (as to their view of management). This repugnant view of the Parent held by many in labor was reinforced, and perhaps even enhanced, by this Court's opinion in the SCC litigation.[46]

Once the Debtor was in bankruptcy and had protection from the creditors knocking at its door, and the price of copper began to rise, the Debtor's management was able to reach out to the USW. Meaningful talks ensued. A temporary agreement was reached in November 2005 and it was soon followed by a long term agreement in 2007. The latter Collective Bargaining Agreement ("CBA") has been described by some as the "gold standard" agreement from labor's point of view, although counsel for the Union explained orally to this Court that the Union had recently negotiated

some other contracts that it also considered to be of some note.[47] Since the adoption of the CBA, and its subsequent approval by the Bankruptcy Court, in 2007, there has been little or no labor strife (or at least none that is out of the ordinary) and that peace, along with the rise in copper prices, has enabled both the Debtor and the USW members to benefit financially.[48]

At the heart of the objections to the Original Report and Recommendation are certain provisions contained in the CBA of 2007 and related documents. Of equal importance to this Court, but also intertwined with the applicable contractual provisions, is the ability of the Union to call a strike should it deem that course of action appropriate.[49]

The Debtor, Sterlite, and the USW, among others, have objected to the Original Report and Recommendation using three basic approaches. First, they object that the Parent's Plan cannot be affirmed because the Parent has not secured a new CBA with the USW. Second, they argue that the Bankruptcy Court erred when it found that one of the exceptions to the

---

**46.** In fact, the representatives of the Parent indicated that the labor representatives would start every negotiation session in a style calculated to anger management by quoting from this Court's opinion. (*See* Statement of Jorge Lazalde, Conf. Day 7 Tr., August 19, 2009, Bk. Doc. No. 12596 at 115:17–21 ("Since the very beginning, the first thing that they say when we sat down at the table, they just started reading all of the findings of Judge Hanen. So, it was a very nice welcome for a negotiation. And repeatedly in every meeting they used that. . . .").)

**47.** (October 19, 2009 Hrg. Tr., Doc. No. 67 at 147:14–18.)

**48.** The Court, as an aside, should mention that not every aspect of the Union's past gains (or future desires) can be categorized as being strictly monetary in nature. Their goals include job security, safe working conditions and the like. Its counsel made this clear to

the Court in oral argument. These aspects, while important, are not the crux of the dispute this Court must decide. Consequently, this Court, while acknowledging their importance will not address them here.

**49.** This Court recognizes, along with the parties, including the Debtor, the Parent, and the USW, that there are limitations to the ability to strike imposed by law and in certain cases by regulation and contract. Since all parties concede that as being self-evident, this Court feels no need to dwell on the obvious. Consequently, in its discussion of strikes or other action by labor, and specifically the possibility of one in this case, the Court assumes that any strike will be legal, and that the USW will honor its legal and contractual duties—an obligation that this Court has no reason to doubt.

requirements of complying with the special successorship provision ("SSC") was applicable.[50] Finally, they contend that even if the lack of a CBA does not prevent a plan confirmation, it will ultimately lead to a strike which will doom any hope of a successful outcome.[51]

Neither the Code, the applicable Orders controlling this case, nor the CBA (including all amendments) require the "buyer" or the entity whose plan is confirmed to have entered into a new CBA with USW before a plan can be confirmed. Having said that, certainly the prospect of a strike has to weigh on any analysis of feasibility, especially in situations like this one where a prior strike was a factor that led to the very bankruptcy from which Reorganized ASARCO currently hopes to emerge.

The primary provisions in the CBA that are at issue are:

1. The company agrees that it will not sell, convey, assign or otherwise transfer, using any form of transaction, any plant or significant part thereof covered by this Agreement (any of the foregoing, a Sale) to any other party (Buyer), unless the following conditions have been satisfied prior to the closing date of the Sale:

 a. The Buyer shall have entered into an Agreement with the Union recognizing it as the bargaining representative for the Employees working at the plant(s) to be sold; and

 b. *The Buyer shall have entered into an Agreement with the Union establishing the terms and condi-*

*tions of employment to be effective as of the closing date of the Sale.*

2. This Section is not intended to apply to any transactions solely between the Company and any of its Affiliates.

3. This Section shall not apply to a public offering of registered securities.

4. Notwithstanding the provisions of the Term of Agreement, this Section shall expire one (1) year after the Termination Date.

(CBA dated January 1, 2007, Art. 1 § D, Bk. Doc. No. 3617–1 at 20 (emphasis added).)

It was modified by a Letter of Understanding ("LOU") on January 18, 2007, which states in pertinent part:

2. Special Successorship Provision: Notwithstanding the successorship agreement that is set forth at Article 2, Section D of the CBA, the Special Successorship Provision set forth in this paragraph 2 of the LOU shall apply until the effective date of any plan of reorganization in the Company's Case:

 a. The Company agrees that *it will not consummate any transaction resulting in Change of Control of the Company, nor will it sell, convey, assign or otherwise transfer, using any form of transaction, any operating plant or significant part thereof covered by the Agreement (any of the foregoing, a "Sale") to any other party ("Buyer"), unless the* following conditions have been satisfied prior to the closing date of the Sale:

---

**50.** The special successor provision has been abbreviated in the briefing and opinion below as "SSC" instead of "SSP." Presumably, this refers to it as a special successorship clause. Regardless of the reason, this Court will follow suit.

**51.** This last point falls under their argument that the Parent's Plan is not feasible because of the labor issues. This Court addresses that contention in this analysis as well.

i. *the Buyer shall have entered into an Agreement with the Union recognizing it as the bargaining representative for the Employees working at the plant(s) to be sold,* and

ii. *The Buyer shall have entered into an Agreement with the Union establishing the terms and conditions of employment to be effective as of the closing date of the Sale.*

b. The Union agrees to negotiate in good faith for collective bargaining agreements with, and to offer fair reasonable terms and conditions of employment to, each and every prospective Buyer. *The Union will offer each Buyer terms and conditions of employment which are substantially the same as those it has offered to any other prospective Buyer, provided, however, that the Union may offer non-identical terms and conditions to a prospective Buyer so long as such nonidentical terms and conditions reflect differences in the nature of the prospective Buyer.* For instance, and as an example only, the Union may offer different non-economic terms to financial Buyers than strategic Buyers but may not insist on terms that would prevent a Buyer from operating its non-Company facilities with either a work force represented by unions other than the Union or operating such non-Company facilities with a non-union work force. *The Union's commitment to offer fair and reasonable and substantially similar terms, as described above, is expressly conditioned upon the prospective Buyer bargaining in good faith and providing relevant information reasonably requested.*

c. If upon motion of the Company or the Official Committee of Unsecured Creditors, which shall be heard on an expedited basis, the Bankruptcy Court finds that the Union has breached any of its obligations under subparagraph b of this Paragraph 2, or *if the Bankruptcy Court finds, in light of exigent circumstances, that it is necessary to the success of the Chapter 11 process, the Bankruptcy Court shall authorize the Company to terminate application of the Special Successorship provision under Paragraph 2 of this LOU without liability or recourse to the estate and shall order that any pending Sale(s) may continue without any limitation or condition that would have attached under this Paragraph 2.* The parties agree that the proceedings pursuant to this Paragraph 2(c) may take place without any need for the requirements of Section 1113 to be met and that the Section 1113 may be relevant, and to the extent that Section 1113 may be relevant, the Union waives any requirements of Section 1113 that might arguably be necessary in order for proceedings pursuant to this Paragraph 2(c) to take place.

d. In order to give effect to the provisions of Paragraph 2(c), the Union agrees, upon reasonable request of the Company and/or the Official Committee of Unsecured Creditors, to provide copies of all offers and counter-offers provided to each prospective Buyer. In the event that the Union furnishes copies of said offers and counter-offers, the Company and the Official Committee of Unsecured Creditors agree not to distribute such copies to any party, including, but not limited to, any

prospective Buyer other than the prospective Buyer to which the offer has been made.

e. *Change of Control* as used in Paragraph 2(a) above *is defined as any of the following: (i) a plan of reorganization:* (ii) the purchase or acquisition by any person, Group (as defined under Section 13(d) of the Securities Exchange Act of 1934, as amended) or entity of securities that constitute or are exchangeable for a majority of the common equity or voting securities of the Company; (iii) the exchange or conversion of securities or claims by any person, Group or entity for securities that constitute or are exchangeable for a majority of the common equity or voting securities of the Company; or, (iv) in the case of a merger, in which the holders of the Company's equity prior to the merger hold less than fifty percent (50%) of the common equity and voting shares of the succeeding entity.

f. The Company shall furnish the Union with the names of all prospective Buyers who have provided to the Company Letters of Intent or similar expressions of interest and, further, shall furnish any other relevant information reasonably requested by the Unions concerning the sale process.

(Letter of Understanding dated January 18, 2007, Bk. Doc. No. 3617-1 at 3-5 (emphasis added).)

The Bankruptcy Court approved the CBA, the LOU, and the inclusion of the above-quoted language in the CBA after holding a hearing at which time the Parent objected to the inclusion of any language that bound it to the CBA or the SSC. Evidence was adduced and multiple arguments took place in the Bankruptcy Court (and even before the District Court at one point) much of which concerned the meaning, scope of coverage, and parties bound by the CBA and/or SSC.

In the Original Report and Recommendation, the Bankruptcy Court found that: (1) the CBA and the SSC was not binding on any plan proposed by anyone other than the Debtor; and (2) neither prohibited confirmation of the Parent's Plan; and (3) that the SSC did not control due to the existence of exigent circumstances. (Doc. No. 22 at ¶¶ 258-65.) These rulings were objected to by both Sterlite and the Debtor and to a lesser extent by the Union. (*See* Doc. Nos. 14, 12, 18.)

While agreeing with Sterlite and the Debtor, the USW emphasized to this Court that even if the SSC does not bind the Parent, it nonetheless binds the Debtor, and the lack of an agreed upon CBA could result in a strike against the Reorganized ASARCO.[52] As stated above, most

---

**52.** The current CBA is set to expire in June of 2010. Sterlite USA reached an agreement to extend the CBA for another three (3) years. To date, negotiations, such as there have been, between the Parent and USW have not been fruitful. The Bankruptcy Court found that the record does not support a finding of bad faith on either side. (Doc. No. 22 at ¶ 264.) Based upon this record, this Court agrees with that finding, but writes to add that the record does not support a finding of any real effort by either side. Even Judge Head in the May 30, 2007 hearing expressed

dismay that the Parent and Union could not open a dialogue. He stated that the lack of communication between the two "sounds like the United States and Iran." (May 30, 2007 Hrg. Tr., Ex. USW655 at 20.) This Court is not ready to adopt Judge Head's analogy, but it does recognize the same lack of communication problem. While it is very cognizant of the reasons why the USW mistrusts the Parent and is demanding certain extra protections, the Court cannot fathom the reason that the USW has not been more aggressive in

proponents of the Debtor's Plan suggest that such a strike could affect feasibility. The Bankruptcy Court found with regard to this concern that the evidence adduced at the confirmation hearing supported the finding that given all factors (including the strength of the current contract, the Parent's willingness to continue to operate under it for at least a year, and the availability of a substitute labor force), a strike was unlikely, and further found that if one occurs that it would not devastate Reorganized ASARCO. (Doc. No. 22 at ¶¶ 22343.)

### A. The Lack of a CBA Does Not Bar Confirmation of the Parent's Plan.

This Court first turns to the initial question raised by the objections that the lack of a CBA pursuant to the SSC prevents confirmation. This presents to the Court (as it surely did to the Bankruptcy Court) a dilemma. This problem is caused by the fact that the language, at least that of the SSC agreed to by the Debtor and the USW absent the application of an exception, purports to cover the Parent, a non-party to the agreement. The Second Stipulation and Order Regarding Modification to Collective Bargaining Agreement includes the following:

> That, notwithstanding anything to the contrary in the CBA, prior stipulations or any other agreements between the Parties:

(I) Prior to the effective date of any plan of reorganization of or for the Debtor, and provided that the Parent does not exercise control of the Debtor, the *Parent (a) is not a signatory to the CBA, (b) is not a party to the CBA and (c) is not bound by any of the terms of the CBA regardless of its status as a direct or indirect owner of the equity in the Debtor;*

(II) *Under any proposed plan of reorganization that would be a Parent Retained Equity Plan, the Special Successorship Clause shall apply and the obligations of the USW, the Debtor and the Parent shall be governed by such Special Successorship Clause;* however, (a) application of the Special Successorship Clause in these circumstances shall be subject to the provisions of Section III, *infra,* and (b) if the court determines that (I) the USW has failed to satisfy its obligations arising under the Special Successorship Clause, including, as defined therein, the obligation to negotiate with the Parent in good faith, or, (ii) in light of exigent circumstances, that it is necessary to a successful chapter 11 process, then the court may order that the Special Successorship Clause, including but not limited to its provisions limiting a Sale (as the term is defined therein) or plan of reorganization, does not apply; and

moving toward a reasonable middle ground, especially since the Report and Recommendation was entered. By the same token, this Court is somewhat incredulous that the management of the Parent has not pursued, and in some instances has not even responded, to overtures made by the USW. Clearly, this Court is not privy to the inner strategies of either organization. Quite frankly, this would not be the first time in this case that the Court has been at a loss as to detect what a certain party's strategy was. Nevertheless, this Court is not a complete stranger to the problems that exist. After all, this Court was the author of the judgment upon which the Union apparently relies in its arguments with the Parent and it knows the extent of the problems that existed then and that exist now. The Court strongly suggests that while the time for fruitful talks has been wasting away, it is not completely gone. Both sides should set aside their past differences and pursue an accord that is mutually beneficial.

(III) The court shall retain jurisdiction to determine at any hearing on confirmation of any Parent Retained Equity Plan whether any provision of the CBA would violate the rights of the Parent under 11 U.S.C. § 1129(a) or (b) and if the court so finds the court shall have the authority to terminate the CBA.

(Bk. Doc. No. 4177 at 23.)

Clearly as written the Parent does not currently fall under the SSC prior to any exercise of control. At first blush, paragraph (I) provides prior to the effective date of any plan that the SSC does not apply to the Parent if does not exercise control of the Debtor. The Debtor's position (as well as that of the USW) is that:

ASARCO Incorporated and Americas Mining Corporation (collectively the "Parent") *correctly state that the CBA and the SSC do not contractually bind the Parent. In fact, the CBA and the SSC do not contractually bind any other bidder;* however, their obligations have implications for all bidders. As approved by the [Bankruptcy] Court in the CBA order, the CBA and the SSC prohibit ASARCO from selling substantially all of its assets or consummating a plan of reorganization unless the buyer or the Parent reaches a new collective bargaining agreement with the Union. This is true unless one of the narrow exceptions allowing termination of the SSC and/or the CBA apply.... *This does not mean that the Parent is contractually bound by the CBA. On the contrary, the only parties bound by the CBA and the SSC are ASARCO and the Union* ... The Parent is free to decline to enter into a new collective bargaining agreement, as it is attempting to do under its Retained Equity Plan, but if it declines, the Court can refuse [but does not have to refuse] to approve its plan of reorganization.

(Debtor's Response to ASARCO Incorporated Americas Mining Corporation's Brief on Labor Issues, Bk. Doc. No. 12618.)

Pursuant to Paragraph (II) of the Second Stipulation, if there is a Parent Retained Equity Plan (such as the one currently being recommended by the Bankruptcy Court) the Parent's Plan triggers the SSC unless the USW fails to bargain in good faith or unless the Bankruptcy Court finds exigent circumstances exist (which the Bankruptcy Court found below and which this Court will address below). Additionally, under Section III, the Court could void the CBA, including the SSC, if it finds any of the Parent's rights are violated under 11 U.S.C. § 1129(a) or (b).

The Debtor argues that the CBA, together with the related documents, bar confirmation of the Parent's Plan unless the Debtor has an agreement with labor. There are two reasons the Debtor's interpretation not accurate. First, the basic language of the provisions in question does not prohibit a potential owner without a CBA to purchase ASARCO—regardless of how the SSC terms are defined. That purchaser may not have a labor agreement, but it is not prevented from being the buyer because the only parties bound are the Union and ASARCO. The Debtor's own brief to the Bankruptcy Court admits this very fact. (Bk. Doc. No. 12618.)

Second, as mentioned by the Court below, lawyers for the Debtor and the USW, the drafters of the provisions in question on repeated occasions represented to both the Bankruptcy Court and to a sister District Court that the provision did not apply to the Parent. For example, in a hearing before Chief Judge Head pertaining to an appeal (later dismissed) on this issue; counsel for the Debtor told Judge Head that he was "intimately involved in draft-

ing this, [and his] view [was] that the [D]ebtor and the [U]nion [the USW] can't impose liability on a third-party as a matter of law, and so the language says what it says...." (May 30, 2007 Hrg. Tr., Ex. USW655 at 106.) Further, counsel for USW told the District Court that despite "the successorship provision, they [the Parent] can buy the company. There's a consequence to that. They [Reorganized ASARCO owned by the Parent] may not have a contract. They may not-they may have a strike on their hands." (*Id.* at 84). Later counsel said, "they are not signatories, they are not parties, and they are not bound...." (*Id.* at 104.) Near the close of the hearing, counsel for the Debtor concluded that "under the agreement ASARCO can't bind its parent ... I don't think anything in this agreement is going to have a direct impact on the parent. If the parent comes back into control, it may end up in control of a subsidiary or an affiliate that has made an agreement it can't keep." (*Id.* at 108.)

In earlier hearings in front of the Bankruptcy Court before the adoption of the SSC, attorneys for the Debtor represented to the Court:

> the notion is one of the first principals [sic] of this agreement, I think, and of the Debtor's decision to enter into it, that we can't bind Grupo [the Parent]....

(March 2, 2007 Hrg. Tr., Ex. USW653 at 11.)

This point was reiterated to Court by an attorney for the creditors committee:

> The reality is that Grupo doesn't like this contract, but probably more deeply, they don't want any contract. But the way this arrangement is structured, they can pay 100 cents and deal with the

Union or not deal with the Union, however they wish.

(*Id.* at 58.)

The Report and Recommendation goes into much greater detail as to the multiple representations made by the parties during the CBA/SSC approval process that need not be repeated here. Suffice it to say that all of the representations, in addition to the actual language, lead to the ultimate conclusion reached by the Bankruptcy Court, and now by this Court, that the CBA and the SSC does not prohibit confirmation of the Parent's Plan due to the lack of a CBA.

### B. *The SSC Does Not Apply Because Exigent Circumstances Exist.*

While the Parent is not bound by the SSC, the Debtor is, and the SSC was structured to cover an equity-retained confirmation plan. Consequently, the SSC would still apply to the Debtor unless an exception applied. The SSC has two exceptions to its application.[53] The first is if the Court determines the USW has not bargained in good faith.[54] This Court, based upon its review of the record and the arguments of counsel both in their briefs and before this Court, is left with the overriding impression that the USW and the Parent have really not negotiated at all—at least not seriously. Nevertheless, like the Bankruptcy Court, this Court does not find this to be bad faith by the USW as is contemplated by the exception to the SSC. Furthermore, it is arguable that a finding of bad faith could only be reached by the Bankruptcy Court pursuant to a motion by the Debtor or the Official Committee of Unsecured Creditors and not based upon claims of the Parent or

---

**53.** (*See* Second Stipulation, Bk. Doc. No. 4177 at 2, § C(II).)

**54.** (*Id.* at § C(II)(b)(i).)

a *sua sponte* finding by the Court. (LOU, Bk. Doc. No. 3617–1 at § 2c.)

█ The second exception to the SSC is if the Bankruptcy Court found that "exigent" circumstances existed.[55] The Bankruptcy Court has, in fact, found that to be the case—a finding to which there have been objections. Under the wording of the LOU, a finding of exigent circumstances does not have to be triggered by a motion of the Debtor or the Creditors' Committee. The key to this finding of exigent circumstances is, of course, what is meant by "exigent"—a term which is undefined in the documents. When the Bankruptcy Court, and later the District Court, approved this language, both specifically inquired into the meaning of this term. All parties in one manner or another agreed that it was up to the Bankruptcy Court's discretion.

In urging the Bankruptcy Judge to approve the language, counsel for the USW told the Court that "it [exigent circumstances] could mean many things in many circumstances.... I think that in the event that *equity was retaining equity,* that that would have some application to the, what was necessary to the success of the process." (March 2, 2007 Hrg. Tr., Ex. USW653 at 16 (emphasis added).) Thus, the USW referenced this very circumstance as being an exigent circumstance. Debtor's counsel, exercising even more foresight, told the Court in response to a question from the Bench as to whether a price higher than anyone else's would constitute an exigent circumstance:

> MR. KINZIE: *That's what I'm telling you, Judge.* What I'm saying is that they [the Parent] can either—*that they and the Union can agree to this contract [CBA], or they can negotiate another*

contract. *And if both of those—and if they fail both of those—and let's suppose that they've offered $2 billion-more than anybody else has ever even thought of .... "And the $2 billion. Judge, we think are exigent circumstances.* and they're getting ready to go away. They've got 30 days to close this deal, or they're gone." Then Your Honor takes a look at it, and if Your Honor decides exigent circumstances exist and it's necessary for successful Chapter 11 reorganization, then you can order the sale to go forward, and the sale goes forward. There is not a labor contract.

(*Id.* at 21 (emphasis added).)

That is, of course, exactly what has happened. The Parent has offered [over] $2 billion dollars (more than anyone ever thought of) and more than that offered in the other plan. Further, all sides have told both the Bankruptcy Court and this Court that if prompt action is not taken, the money will disappear.

Counsel for the creditors echoed the USW and the Debtor's argument for adoption as well as the breadth of the Court's discretion regarding exigent circumstances:

> "We think that's very significant, because basically it gives the discretion to Your Honor to declare what is an exigent circumstance. And *certainly, some of the examples given [e.g., equity retaining equity: equity paving $2 billion dollars] would be exigent circumstances,* but I don't think there is any limitation to that. And certainly, an increased sales provision might well be an exigent circumstances. And its going to be up to Your Honor to decide that...."

(*Id.* at 63 (emphasis added).) [56]

Finally, the co-author of this very provision also told the Bankruptcy Court before

---

**55.** (*Id.* at § C(II)(b)(ii).)

**56.** Counsel for the USW echoed the latitude that was being given to the Bankruptcy Court

that Court adopted the language that exigent circumstances meant whatever the Court decided it meant and emphasized that: "You'll [the Court] be the one deciding that. We are the ones crafting the language.... But you're the one who will decide whether an exigent circumstance exist." (March 2, 2007 Hrg. Tr., Ex. USW653 at 17.)

The very proponents of this language, the ones who asked the Bankruptcy Court to approve its adoption based upon giving the Bankruptcy Court full discretion, are now (after the Bankruptcy Court has exercised that very discretion) complaining that the Court did exactly what they told it it could do before it approved the provision.

Indeed, two of the very examples given to the Bankruptcy Court of an exigent circumstance were: (1) equity retaining equity; and (2) equity offering $2 billion dollars—more than has been offered by anyone else. Now, those very circumstances exist (except equity is offering substantially more than $2 billion dollars). This Court finds that exigent circumstances, as contemplated by the parties, exist. As such, it adopts the finding of the Bankruptcy Court below with respect to this exception and finds that the SSC has no application here. All objections relating to the CBA (or lack thereof) and the SSC are hereby overruled.[57]

### C. The Possibility of a Strike Does Not Make the Parent's Plan Infeasible.

■ Finally, the Court finds it appropriate to address the Bankruptcy Court's discussion regarding the likelihood of a strike. The Bankruptcy Court's findings were certainly supported by the record and this Court will not overrule them. Obviously, the number of those who can predict the future with certainty is very limited. It should be clear to both the Parent and the USW from this opinion and from their appearances before this Court—that while this Court finds the Bankruptcy Court's findings to be supported by the evidence and legally relevant with regard to confirmation and the requirements of § 1129(a)(11), it finds them practically irrelevant to the future conduct of these two entities. The Court is familiar with the long-standing tension between the Parent and USW and would strongly suggest that both the Parent and the Union re-evaluate their long-held beliefs about the other and make an attempt to reach a compact—even if it is only one based in tolerance and economics as opposed to one based on cordiality and mutual respect.

Nevertheless, for purposes of addressing the question of feasibility and the effect

---

when he told the District Court that the "exigent" circumstance exception gives the Bankruptcy Court "tremendous oversight." (May 30, 2007 Hrg. Tr., Ex. USW655 at 81–82.)

57. The Bankruptcy Court did not address whether this provision violated 11 U.S.C. § 1129. The SSC provided that if the Court found that the provision violated either § 1129(a) or § 1129(b) it could set aside the entire CBA. It is certainly arguable that the SSC does indeed violate § 1129(a) if one reads the SSC to give the USW total veto power over what plan prevails to the detriment of a certain class (in this case equity). It is also arguable that the SSC violates § 1129(c) in that if read as a veto power, it would tie the Court's hands and prohibit it from complying with this section. Given the rulings above, this Court need not decide either of these issues. This Court does, however, wish to address statements made by the Parent in its "veto" arguments. It correctly argued that the USW cannot by its contract with a third-party get to decide who owns the Debtor. However, the Parent has incorrectly argued that the Union cannot choose for whom it works. The Court's ruling should not be read as a validation of this latter argument.

that a labor dispute might have on Reorganized ASARCO, this Court will assume the Parent and the Union have not reached an agreement, without any speculation as to fault or blame. The Court adopts the findings of the Bankruptcy Court with regard to the feasibility of the Parent's Plan—even assuming an appropriate labor agreement is not reached. Copper prices remain at profitable levels. A majority of the copper mines in the United States are non-union. (Supplemental Lazalde Proffer, Ex. P427 at ¶ 43.) Consequently, there are non-union copper miners available to be hired and the price that the Parent can obtain for the copper affords it an opportunity to expend the resources necessary to hire a substitute labor force. A strike would be costly to both sides, but the evidence supports the conclusion that it is not fatal to the confirmation of the Parent's Plan.

The Court in making this finding does not wish to be interpreted as holding that the Union will not (or that it cannot) strike subject to its contractual obligations and applicable laws and regulations. Even the Bankruptcy Court's findings of fact are not couched in these terms. Finally, the Court emphasizes that while the Parent's Plan remains feasible, it does not wish to suggest that it finds the lack of an appropriate CBA to be an advisable plan of action.

## IX. *Objections of Governmental Entities*

Many of the governmental entities objected to the choice of the Parent's Plan not because of the plan, but because of the plan's sponsor. In fact, at one point in the October 19, 2009 hearing before this Court, counsel for the State of Arizona agreed that their preference was being voiced based on a belief that they would prefer the "devil they don't know, as opposed to the devil they do." (October 19, 2009 Hrg. Tr., Doc. No. 67 at 122.) Their concerns in some ways constitute legal objections, but in many aspects are more the expression of a desire and a need for Reorganized ASARCO to be a better corporate citizen than it has been in the past.

To the extent these constitute legal objections to the adoption of the Bankruptcy Court's Report and Recommendation, the Court hereby overrules them. One cannot be deprived of its property (equity) merely because others find it to be difficult in business dealings. To the extent any of these parties have the need for some reassurance that ASARCO will fulfill its duties and obligations as a member of the various communities in which it operates, the only meaningful means to restore such confidence is for Reorganized ASARCO, through its management and employees, to make it a goal to become a productive corporate citizen. Clearly, to the extent their failure to do so violates a law, regulation, or contract, courts are available to assure that compliance.

One of the goals of a bankruptcy is to give a person or entity a fresh start. While the Code is written in terms of a fresh start financially, courts have seen innumerable cases where the new start clearly amounts to more than economic gains. As it emerges from the bankruptcy, Reorganized ASARCO has the potential to be a wildly successful company. This stems from the fact that copper prices seem to be holding their own at a level that allows even ASARCO's more costly production to be profitable. It also stems from the fact that Reorganized AS-ARCO has its debt at manageable levels, it environmental problems under control,[58]

---

**58.** The Court is well aware of the Parent's response to the objections regarding commu-

and its asbestos problems behind it. (It was a combination of these factors, in addition to low copper prices and the aforementioned strike that led to its downfall earlier in this decade.) Perhaps this was a perfect storm and perhaps that storm caused it to be a less than perfect manager to its labor force, a less than perfect steward to the environment, and a less than perfect customer for its creditors. Certainly this Court has seen evidence that suggests that many of the cuts ASARCO made were not necessarily by choice, but were forced upon them by some stark economic realities.

It is also important to note that the environmental and asbestos problems existed when the Parent bought ASARCO. It (or its subsidiaries) had for decades been involved in the mining and asbestos industry. The remediation problems created by mining have been a source of discussion in this country for some time. The challenge is finding the right balance between the business interests of the industry, the need of the public for the product mined (in this case obviously, copper), and the need to repair the damage done by the mining process. These problems preexisted the Parent's purchase of ASARCO in 1999 and they continue today across the mining industry. The asbestos problems were also long-standing. ASARCO (or more accurately its subsidiaries) had been in the asbestos business for years (since the early 1950's), both before and after the health effects of asbestos became known. Had the Parent known of the extent of

these problems, it might not have plunged into the bidding war for ASARCO when it did. It is hard to imagine anyone in corporate America or Mexico going to great lengths, not to mention great expense, to become the proud owner of Lac D'Amiante—better known to the parties as Lake Asbestos. The Court points this history out not to excuse past misdeeds, but by way of explanation that the Parent may indeed turn out to be a better corporate steward that these governmental entities anticipate.[59]

Nevertheless, given the fresh start this bankruptcy has afforded it, it is incumbent on those in management to mend the fences among those that work for it, among those who belong to the surrounding communities and among those who regulate it.

## X. *Clean Hands*

Finally, in response to the Bankruptcy Court's Report and Recommendation, a variety of objections/arguments have been made that the Parent's Plan should not be confirmed given its prepetition conduct. These arguments are based if not entirely, almost solely, on this Court's findings and ultimate judgment in *ASARCO LLC v. Americas Mining Corp.*, 396 B.R. 278 (S.D.Tex.2008). Consequently, this Court, while normally not given to hyperbole, feels confident that it can state it is more familiar with that judgment than any other entity or lawyer connected with this case.

---

nity concerns and the resources that Parent has already invested to start with the right foot forward in terms of environmental compliance should its plan be selected. (Doc. No. 65 at 42.) The Court looks forward to what it hopes will be continued sound labor and environmental management practices by the Parent once its plan is implemented.

**59.** Some individuals might fear the "devil you don't know" more. The Court notes this only to point out that there is little or no information in the record about the environmental, safety, and labor history of Sterlite in India or other places it operates. It is a matter of conjecture by many of the objectors that Sterlite will be more labor friendly, more environmentally attuned, or more safety conscious than the Parent.

The Court finds no merit to this argument. Past conduct might be indicative of future performance; it certainly can affect the confidence one might have in another's future performance. This Court finds that it has little or no bearing in this context for two reasons: (1) the past performance (or lack thereof) of the other bidder, Sterlite; and (2) the impetus that the Parent has to close.

The Bankruptcy Court was faced with two plans—one sponsored by the Debtor and one sponsored by the Parent, who this Court found to be guilty of perpetrating a fraudulent transfer. The Debtor's Plan, however, is backed by Sterlite. Sterlite previously entered into a contract to purchase these very assets in 2008, and it walked away from that contract leaving the parties high and dry. In doing this, it not only walked away from the deal, it walked away from the security it gave to insure its performance. As a consequence, neither the Bankruptcy Court nor this Court finds that the record supports a finding based upon any degree of certainty that Sterlite would close. It currently has at risk only $75 million of new money to insure its plan completion.

Additionally, this Court finds no merit in arguments that have attempted to quantify the levels of the two bidders' bad acts in an attempt to characterize the conduct of the Parent as being somehow more nefarious than Sterlite or vice-versa. This Court is not assigning either entity to a specific level of Dante's Inferno—so it need not engage in this exercise. Neither has necessarily engaged in conduct which inspires blind confidence. Nevertheless, if forced to assess the relative de merits of each, it is important to this Court that Sterlite's conduct was much closer in time, involved the same management, and involved the very same assets currently before the Court.

This Court has a second, perhaps more compelling, reason that it finds no merit to the suggestion that the Parent's past conduct will lead it to walk away before closing. The Parent has already put up cash and stock in an amount that will more than insure its performance. Furthermore, the Court has under its jurisdiction, the Southern Peru Copper Corporation stock that has been pledged to cover the judgment in *ASARCO LLC v. Americas Mining Corp.*, and that stock is worth many multiples of the $2 plus billion at stake in this closing. This Court will not hesitate to review its bond ruling on that matter if the Parent does not close. Further, if it does not close the Parent will still have to deal with the outstanding judgment in that case—which may be worth as much as $9 billion.

Finally, as an aside this Court notes that in both plans, the real party in interest (or the real power behind the throne) is not the company putting forth the plan. In the Parent's case, it is not Americas Mining, it is Grupo Mexico. In the Debtor's case, it is not Sterlite USA, or even Sterlite India, it is Vedanta Resources. While this Court has been given jurisdiction over the proponents of each plan, as to the two ultimate powers, it only has jurisdiction over Grupo Mexico. Jurisdiction over a plan proponent's parent company is not set out anywhere in the Bankruptcy Code as a factor in choosing between two competing plans, but it is an additional factor which gives this Court assurance that the Parent will actually close.

### XI. *Conclusion*

The Court adopts the findings of fact and conclusions of law subject to any rejections or revisions noted in this opinion. This Court agrees that the Parent's Plan is both feasible and confirmable. It offers the creditors full payment and is more likely to close than the Debtor's Plan. While this

Court does not minimize the damage that a strike could do should one occur, the Court has a record which supports the finding that a strike is unlikely, and it hopes that reason will prevail and that both sides will decide that mining copper, while the price remains high, makes money for equity holders and pays good wages for both labor and management. Finally, this Court finds the Original Report and Recommendation not only accurately describes the requirements placed upon it by the Bankruptcy Code, but also finds that the Bankruptcy Court complied with those requirements. The Court has noted above the reasons for this conclusion and sees no need to summarize them here.

## XII. *Order of Confirmation. Injunctions, and Matters Incident to Confirmation*

This Court hereby reconfirms that it has subject-matter jurisdiction to confirm the Parent's Plan pursuant to 28 U.S.C. § 1334. Venue is proper before this Court pursuant to 28 U.S.C. §§ 1408, 1409. Confirmation of the Parent's Plan is a core proceeding determined by this Court pursuant to 28 U.S.C. § 157(b)(2)(L). Additionally, the Court hereby adopts the Bankruptcy Court's findings of fact and conclusions of law with respect to the Section 524(g) Injunctions. (Doc. No. 22 at ¶¶ 284–306, 33546.) Asbestos-related demands are therefore channeled to the Section 524(g) Trust established by the Parent's Plan, in accordance with the injunctions ordered below.

It is hereby DECREED and ORDERED: [60]

1. The Parent's Plan fully complies with 11 U.S.C. §§ 1122, 1123, and the requirements for confirmation set forth in § 1129 of the Bankruptcy Code.

2. The Parent has complied with the disclosure requirements set forth in § 1125 of the Bankruptcy Code.

3. All conditions to confirmation as per Article IX of the Parent's Plan are satisfied.

4. The Provisions of the Parent's Plan, except for Articles 15.1–15.4, and all Findings of Fact, Conclusions of Law, and Rulings made or adopted in this order are hereby incorporated by reference.

5. Pursuant to § 1141(a) of the Bankruptcy Code, on the Effective Date, the provisions of the Parent's Plan and this Confirmation Order (the *"order"*), shall bind the Debtors, the Estates, the ASARCO Committee, the Asbestos Claimants Committee, the Asbestos Subsidiary Committee, the FCR, the Indenture Trustees, all Governmental Units and Environmental Agencies, the Section 524(g) Trust, all holders of Claims and Demands (whether known or unknown) against and Interests in the Debtors including such holders, heirs, successors, assigns, trustees, executors, administrators, affiliates, officers, directors, agents, representatives, attorneys, beneficiaries, or guardians, whether or not the Claims, Demands, or Interests of these entities are impaired under the Parent's Plan, whether or not these entities have

---

**60.** For the purposes of this order, this Court hereby incorporates the Glossary filed by the Parent as Exhibit 26 to its Plan (Bk. Doc. No. 12728–27), except for terms already defined herein and except Paragraph 127 (defining Debtors' Plan as Debtors' Fifth Amended Joint Plan of Reorganization, as filed on April 27, 2009). The Debtor's Plan shall be defined as set forth above in this order, and shall mean the Sixth Amended Joint Plan of Reorganization, with modifications as filed August 27, 2009. (Bk. Doc. No. 12694.)

For the purposes of this final section, the Court shall define "Debtors" in the same manner as the Parent's Glossary. The term "Debtor" from this point forward will no longer refer to the collective debtors.

voted to accept or reject the Parent's Plan, and whether or not these entities have filed Proofs of Claim in the Reorganization Cases.

6. Except as otherwise ordered herein, each term and provision of the Parent's Plan, as it may be interpreted in accordance with the Parent's Plan, is valid and enforceable.

7. The Parent's Plan provides in Article 11.3 for the issuance of a Permanent Channeling Injunction pursuant to § 524(g)(1) of the Bankruptcy Code. The Parent's Plan comports with the Bankruptcy Code's requirements for the issuance of the Permanent Channeling Injunction.

8. Pursuant to solicitation and tabulation of votes on the Parent's Plan, the Asbestos Claimants have accepted the Parent's Plan by the requisite number of votes required by § 524(g) of the Bankruptcy Code for the issuance of the Permanent Channeling Injunction. All other classes are unimpaired.

9. Confirmation of the Debtors' Plan is denied.

10. The Second Amended Chapter 11 Plan Filed by Harbinger Capital Partners Master Fund I, Ltd. is hereby stricken and voided.

11. The Parent's Plan, except as detailed below with respect to jurisdictional matters contained in Articles 15.1–15.4 of the Parent's Plan is CONFIRMED.

### A. *Treatment of Claims*

12. Each holder of an Allowed Priority Claim shall receive Cash in an amount equal to the principal of such Allowed Priority Claim plus Post–Petition Interest on such Claim, on the later of the Effective Date or the date on which such Priority Claim becomes an Allowed Claim.

13. Each holder of an Allowed Secured Claim shall receive, at the election of the Parent, one of the following treatments: (1) Cash in an amount equal to the principal of such Allowed Secured Claim plus Post–Petition Interest on such Claim, on the later of the Effective Date or the date on which such Secured Claim becomes an Allowed Claim; (2) Reinstatement; (3) from Reorganized ASARCO, all Collateral securing such Allowed Secured Claim; or (4) such other treatment as may be agreed upon between the Parent and the holder of such Allowed Secured Claim.

14. The Secured Claims of the United States relating to the East Helena, Montana facility and the Globe, Colorado facility, and any Secured Claims relating to the Prepetition ASARCO Environmental Trust shall be satisfied by having the holders of such Claims retain the Liens securing such Claims, unless a holder agrees to different treatment.

15. Upon the Effective Date, the causes of action asserted by the Debtors against the United States of America on behalf of the United States Environmental Protection Agency, the United States Department of Agriculture, the United States Department of the Interior, and the International Boundary and Water Commission in Adversary Proceeding No. 07–02076 (and only those causes of action) shall be dismissed without prejudice.

16. Any Asbestos Personal Injury Claimant with a Lien against any property of the Debtors, other than proceeds of an Asbestos Insurance Policy, shall retain the Lien securing such Claim, subject to the Parent's election. Secured Asbestos Personal Injury Claims which are secured by Liens against proceeds of an Asbestos Insurance Policy shall be included in the treatment accorded Class 4 Asbestos Personal Injury Claims, shall be determined, processed, liquidated, and paid pursuant to the terms and conditions of the Asbestos

TDP and the Section 524(g) Trust Agreement; *provided, however,* that the Section 524(g) Trust may assert rights (including, but not limited to, avoidance rights and rights of setoff and recoupment), defenses (including, but not limited to, affirmative defenses), and objections that the Debtors have against or with respect to such Claims, which rights, defenses, and objections are transferred to the Section 524(g) Trust pursuant to the Parent's Plan.

17. Each holder of an Allowed General Unsecured Claim (except any holder that agreed to a lesser and otherwise different treatment) shall receive Cash in an amount equal to the principal amount of such Allowed General Unsecured Claim plus Post–Petition Interest on such Claim.

18. Any objection by the Parent to the ability of a holder of an Environmental Unsecured Claim to receive Post–Petition Interest is waived.

19. Asbestos Personal Injury Claims and Demands against any of the Debtors shall together be allowed in the aggregate amount of one billion dollars ($1.0 billion). On the Effective Date, the Section 524(g) Trust shall be established and funded with the Section 524(g) Trust Assets (which shall include an amount of Cash representing Post–Petition Interest, which shall be determined at the Plan Rate only, on a principal amount of $780 million). Any and all Administrative Claims under the Secured Intercompany DIP Credit Facility shall be waived on the Effective Date.

20. Holders of Asbestos Personal Injury Claims and Demands against any of the Debtors shall not be entitled to any other recovery under the Parent's Plan and shall look solely to the Section 524(g) Trust for the purpose of, directly or indirectly, collecting, recovering, or receiving payment of, on or with respect to any Asbestos Personal Injury Claim or demand.

21. Each holder of a Convenience Claim shall receive the Allowed Amount of such holder's Claim, in Cash, on the later of the Effective Date or the date on which such Convenience Claim becomes an Allowed Claim. Election by the holder of an Allowed General Unsecured Claim otherwise treated under Class 3 of the Parent's Plan to reduce the Claim of such holder to $1,000 and to receive distribution as a Class 5 Convenience Claim shall constitute a waiver of the right to recover any amount in excess of $1,000 from any of the Debtors.

22. Each holder of an Allowed Late–Filed Claim, on the later of the Effective Date or the date on which such Late–Filed Claim becomes an Allowed Claim, shall receive Cash in an amount equal to the principal amount of such Allowed Late–Filed Claim plus Post–Petition Interest on such Claim.

23. Each holder of an Allowed Subordinated Claim (except any holder that agrees to lesser or otherwise different treatment), on the later of the Effective Date or the date on which such Subordinated Claim becomes an Allowed Claim, shall receive Cash in an amount equal to the principal amount of such Allowed Subordinated Claim plus Post–Petition Interest on such Claim.

24. On the Effective Date, Environmental Reinstated Claims shall be Reinstated and, from and after the Effective Date, Reorganized ASARCO shall assume, pay, perform and discharge when due all of its Assumed Environmental Liabilities.

25. Each holder of Class 9 Interests in ASARCO shall retain 100% of its Interest in ASARCO, which Interests shall automatically convert into Interests in Reorganized ASARCO on the Effective Date.

26. On the Effective Date, except as otherwise provided in the Parent's Plan, all

unexpired leases and executory contracts not previously assumed or rejected by any Debtor pursuant to an order of the Bankruptcy Court are hereby deemed assumed by such Debtor under §§ 365(a) and 1123 of the Bankruptcy Code. All executory contracts and unexpired leases that are listed on Exhibit 3 to the Parent's Plan are hereby deemed rejected. Any motions to reject executory contracts and unexpired leases pending on the Effective Date shall be subject to approval by the Bankruptcy Court on or after the Effective Date by a Final Order.

27. As used in this order, *"Post–Petition Interest"* shall mean interest on the Allowed Amount of a Claim from August 9, 2005 to and including five business days immediately prior to the date a distribution is made on account of such Claim, and after the Effective Date, interest on any unpaid portion of such Allowed Amount and any unpaid post-petition interest (*"Post–Petition Interest"*). Except as established pursuant to the procedure set forth in the following two paragraphs, Post–Petition Interest on Claims other than Class 2 Secured Claims shall be calculated at the federal judgment rate in accordance with § 1961 of Title 28 of the United States Code (the *"Plan Rate"*) and on Claims in Class 2 at the rate provided by § 506(b) of the Bankruptcy Code. Post–Petition Interest for Class 4 shall be determined as set forth in Article 4.2(d) of the Parent's Plan.

28. Any Claimant seeking (a) payment of Post–Petition Interest on such holder's Claim at a rate other than the Plan Rate or (b) reimbursement of attorneys' fees and other costs and expenses associated with such holder's Claim (or both) shall file a motion seeking such relief within 30 days after the Effective Date. Any such motion must include all of the documentation upon which the Claimant relies to establish the Claimant's entitlement to (a) Post–Petition Interest at a rate other than the Plan Rate and (b) attorneys' fees and other costs and expenses.

29. The inclusion of the entitlement to these types of claims in Proofs Of Claim shall *not* be sufficient to establish such claims without a supplemental filing by a claimant within the specified time period. The Parent's Plan Administrator shall have 60 days after the Effective Date to resolve any such objection without need of Bankruptcy Court approval in which case the Parent's Plan Administrator shall file with the Bankruptcy Court a notice that the matter has been resolved; *provided, however,* that this District Court or, by referral, the Bankruptcy Court retains jurisdiction to resolve such matters in the event the Parent's Plan Administrator and the Claimant cannot reach an agreement. Notwithstanding anything to the contrary herein, Bondholder Claims shall receive Post–Petition Interest in accordance with the Bondholder Settlement.

## B. *Section 524(g) Trust*

30. On the Effective Date, the Section 524(g) Trust shall be established in accordance with the Parent's Plan Documents. When established, the Section 524(g) Trust shall be empowered in accordance with the Parent's Plan and the Parent's Plan Documents.

31. On the Effective Date, the Parent's Plan Administrator shall transfer and assign to the Section 524(g) Trust for the benefit of the Section 524(g) Trust Beneficiaries the Section 524(g) Trust Assets.

32. Liability of the Debtors for all Asbestos Personal Injury Claims and Demands shall be assumed by, and channeled to, the Section 524(g) Trust without further act or deed, and satisfied as set forth herein. All Asbestos Personal Injury Claims and Demands shall be processed,

liquidated and paid pursuant to the terms and provisions of the Section 524(g) Trust Distribution Procedures and the Section 524(g) Trust Agreement. ASARCO's Administrative Claims under the Secured Intercompany DIP Credit Facility shall be credited against the Cash component of the Section 524(g) Trust Assets to be contributed to the Section 524(g) Trust on the Initial Distribution Date.

33. With respect to any ASARCO Protected Party only, the sole recourse of the holder of an Unsecured Asbestos Personal Injury Claim or Demand shall be to the Section 524(g) Trust and the Section 524(g) Trust Distribution Procedures, and such holder shall have no rights whatsoever at any time to assert such holder's Claim or Demand against any ASARCO Protected Party. Without limiting the foregoing, on the Effective Date, all Persons shall be permanently and forever stayed, restrained, and enjoined from taking any enjoined actions against any ASARCO Protected Party (or against the property or interest in property of the Debtors and their Estates or of any ASARCO Protected Party, or against any Designated Property) for the purpose of, directly or indirectly, collecting, recovering, or receiving payment of, on or with respect to any Asbestos Personal Injury Claim or Demand.

34. The right to control the Asbestos Insurance Actions and all Asbestos Insurance Recoveries, including negotiations relating thereto and settlements thereof, are hereby vested in the Section 524(g) Trust on and after the Effective Date, and Reorganized ASARCO, the Parent's Plan Administrator and the Parent shall cooperate with the Section 524(g) Trustees in pursuing the Asbestos Insurance Actions.

35. On and after the Effective Date, Judge Robert C. Pate shall serve as the FCR, as such term is defined in the Section 524(g) Trust Agreement, and shall have and exercise the functions, rights, duties, powers and privileges provided in the Section 524(g) Trust Documents.

36. Al Wolin, David Levi, and Ellen Pryor shall serve as Section 524(g) Trustees. Steve Baron (co-chair), Steve Kazan (co-chair), Robert Phillips, Al Brayton, and Bryan Blevins shall be the members of the Section 524(g) Trust Advisory Committee. They shall consult with and advise the Section 524(g) Trustees regarding the administration of the Section 524(g) Trust and the liquidation and resolution of Asbestos Personal Injury Claims and Demands in accordance with the provisions of the Parent's Plan and the Section 524(g) Trust Documents.

37. The Section 524(g) Trust will be a "qualified settlement fund" within the meaning of Treasury Regulation § 1.468B–1. The purposes of the Section 524(g) Trust shall be to, among other things, (i) liquidate, resolve, pay, and satisfy all Asbestos Personal Injury Claims and Demands in accordance with the Parent's Plan, the Section 524(g) Trust Distribution Procedures, the Section 524(g) Trust Agreement, and the order; (ii) receive, preserve, hold, manage, and maximize the Section 524(g) Trust Assets for use in paying and satisfying Allowed Asbestos Personal Injury Claims and Demands in accordance with the terms of the Section 524(g) Trust Agreement; and (iii) take other actions deemed by the Section 524(g) Trustees to be in the best interests of the holders of the Asbestos Personal Injury Claims and Demands, who are the sole beneficiaries of the Section 524(g) Trust.

38. Notwithstanding anything to the contrary in this order, the Parent's Plan or the Section 524(g) Trust Distribution Protocol, the Section 524(g) Trust shall provide, in accordance with the Confidential Settlement Agreement & Release (the

"*LMI Agreement*") dated July 13, 2006, by and between ASARCO and certain Participating London Market Companies (the "*Participating LMI*"). to the Participating LMI or their representative, detailed reports concerning Asbestos Claims (as defined in the LMI Agreement) in the form and manner required by the LMI Agreement (the "*Reports*") on at least a quarterly basis, with the first Report to be provided to the Participating LMI or their representative within 90 days of the Effective Date.

39. Alternatively, the Section 524(g) Trust may provide the Participating LMI or their representative with access to any database(s) that the Section 524(g) Trust maintains for asbestos-related bodily injury claims provided that such databases(s) contain the data required to be contained in the Reports and provided further that such database(s) can be operated by the Participating LMI or their representative to produce data reports reasonably equivalent to the Reports.

40. The Participating LMI and their representative shall exercise their reasonable best efforts to maintain the confidentiality of the Reports, including, without limitation, seeking a confidentiality pledge from any auditor, regulator, or reinsurer to which they provide the Reports and seeking a protective order in any proceeding in which they use the Reports, but the Participating LMI's right to disclose any portion of the Reports to their auditors, regulators, or reinsurers shall not be affected if their reasonable best efforts do not result in a confidentiality pledge being given or a confidentiality order being entered. A Report or information contained in any Report shall only be disclosed to another party by a Participating LMI for the purpose of seeking reimbursement from reinsurers in connection with the LMI Agreement or to respond to inquiries

made by its auditor or by a regulatory authority in connection with the LMI Agreement; provided, that nothing herein shall prevent the Participating LMI from using the Reports for their own internal purposes, so long as such purposes relate to ASARCO and/or the Subject Insurance Polices (as defined in the LMI Agreement) but shall not be used in relation to other insureds of the Participating LMI.

C. *Environmental Custodial Trusts*

41. The Environmental Custodial Trusts and the trust created by the Residual Environmental Settlement Agreement, including the Montana Custodial Trust Settlement Agreement filed March 13, 2009 (Bk. Doc. No. 10539–4), the Texas Custodial Trust Agreement filed March 19, 2009 (Bk. Doc. No. 10567–4), the Multi–State Custodial Trust Settlement Agreement filed March 13, 2009 (Bk. Doc. No. 10542–4), and the Residual Environmental Settlement Agreement shall be implemented with only such ministerial non-substantive changes as are required to reflect the Parent's Plan and shall be implemented on or before the Effective Date exactly in accordance with the Debtors' Environmental 9019 Motion and orders approving such motion except for ministerial non-substantive changes.

42. Le Petomane XXV, in its representative capacity, is appointed as Custodial Trustee for the Multi–State Custodial Trust to administer the Custodial Trusts and the Custodial Trust Accounts, by and through Jay A. Steinberg, not individually but as president of the Custodial Trustee. Montana Environmental Trust Group, LLC, in its representative capacity, is appointed as the Custodial Trustee to administer the Custodial Trust and the Custodial Trust Accounts for the Montana Custodial Trust. Dan Silver is appointed as Trustee to administer the Successor Coeur d'Alene

Custodial and Work Trust. The trustee or trustees for the Texas Custodial Trust and any other Environmental Custodial Trusts shall be the entity or entities designated by the United States Department of Justice ("DOJ") or other appropriate governmental entity no later than 10 days before the Effective Date, in accordance with the Parent's Plan and the Environmental Custodial Trust Agreements.

### D. The Special Successorship Clause of the Collective Bargaining Agreement

43. The Court finds that the existing Collective Bargaining Agreement remains in effect until June 30, 2010, and that the Parent has agreed to extend the existing Collective Bargaining Agreement until June 30, 2011. The Parent is hereby ordered to keep open for acceptance by USW until 5:00 p.m. (Central) on February 26, 2010:(a) its offer to extend the CBA for one year (until June 30, 2011) *and* (b) all other offers or stipulations made during the bankruptcy process (e.g., a seat on the Board of Directors of Reorganized ASARCO for a representative of the Unions). The USW for its part will, by accepting that offer, be bound by its stipulation and offers made during this bankruptcy process (e.g., that the neutrality clause shall be limited to Canada and the United States). This condition on both parties is in addition to, and not in lieu of, the requirements imposed upon them by any law, regulation, rule, or contract which govern(s) labor relationships.

44. It is hereby ordered that the Special Successorship Clause, contained in the Letter of Understanding between the Debtors and the Unions (Bk. Doc. No. 3617, Exhibit A, at 2) and incorporated by reference into the Collective Bargaining Agreement between the Debtors and the Unions, as discussed above, does not bind the Parent, and that the Parent, subject to the provisions of this order and any future orders by this Court, is not required to secure a new Collective Bargaining Agreement with the Unions as a condition precedent to the confirmation of the Parent's Plan.

### E. Employee Benefit Plans and Other Benefits

45. On the Effective Date, Reorganized ASARCO shall be responsible for all benefits and liabilities with respect to the Employee Benefit Plans.

46. Reorganized ASARCO shall be responsible for all of each Debtor's obligations under the Coal Act, including the obligations (1) to provide retiree health benefits to eligible beneficiaries and their dependents pursuant to § 9711 of the Coal Act, 26 U.S.C. § 9711; (2) to pay the annual prefunding premium and the monthly per beneficiary premium required pursuant to § 9712(d)(1)(A) and (B) of the Coal Act, 26 U.S.C. § 9712(d)(1)(A) and (B); and (3) to provide security to the UMWA 1992 Benefit Plan pursuant to § 9712(d)(1)(C) of the Coal Act, 26 U.S.C. § 9712(d)(1)(C).

47. Reorganized ASARCO shall assume and be responsible for all of the Debtors' obligations to pay retiree benefits, as defined in § 1114 of the Bankruptcy Code, for the duration of the period the applicable Debtor has obligated itself to provide such benefits. Reorganized ASARCO shall retain rights to amend, modify, or terminate retiree benefits in accordance with all relevant agreements and applicable law, including any collective bargaining agreement that may exist or be entered into between the USW and Reorganized ASARCO.

48. All Surety Bonds shall be retained or deemed Reinstated, as the case may be,

on the Effective Date and shall revest to the benefit of Reorganized ASARCO.

49. The two pension plans sponsored by the Debtors, the Retirement Income Plan for Hourly–Rated Employees of AS-ARCO, Inc. and the Retirement Income Plan for Salaried Employees of ASARCO, Inc. (collectively, the *"Pension Plans"*), which are covered by Title IV of the Employee Retirement Income Security Act of 1974 (*"ERISA"*), shall continue to be operated and sponsored by Reorganized ASARCO. Accordingly, Reorganized AS-ARCO is hereby required to make contributions to the Pension Plans in the amounts necessary to meet the minimum funding standards prescribed by 29 U.S.C. § 1082 and 26 U.S.C. § 412, and for the payment of any PBGC premiums prescribed by 29 U.S.C. §§ 1306 and 1307.

### F. *Preservation of Causes of Action*

50. Notwithstanding anything else to the contrary in the Parent's Plan or this order, these provisions will govern the treatment of the claims of the Texas Comptroller of Public Accounts (the *"Texas Comptroller"*): (1) to the extent the Texas Comptroller has valid, enforceable setoff rights under applicable law, such setoff rights are expressly preserved; (2) nothing provided in the Parent's Plan or this order shall affect or impair any rights of the Texas Comptroller to pursue any non-debtor third parties for tax debts or tax claims to the extent otherwise permitted under applicable law; (3) nothing provided in the Parent's Plan or this order shall be construed to preclude the payment of interest on the Texas Comptroller's Allowed Administrative Expense tax claims or Allowed Secured tax claims to the extent, and at the interest rate, otherwise

required under applicable state law; and (4) Article 12.2 of the Parent's Plan shall not apply to the Texas Comptroller. The provisions of the Parent's Plan and order supplement these terms where not inconsistent herewith.

51. Notwithstanding anything else to the contrary in the Parent's Plan or this order, this paragraph will govern the treatment of the dispute between the Debtors and Ron and Linda Deen (the *"Deens"*) regarding the Deens' contention that they own by adverse possession under Arizona law approximately 12.067 acres of land in Pinal County, Arizona, as generally described in their filed proof of claim (the *"Property"*) and the Deen's filed proof of claim (together the *"Deen Disputes"*): (1) to the extent the Deens have a valid, enforceable right of adverse possession under Arizona State law to the Property, such right is expressly preserved and will not be impacted by confirmation of the Parent's Plan or this order; (2) the Deen Disputes will be determined by separate litigation or by settlement, and not by confirmation of the Parent's Plan; and (3) Confirmation of the Parent's Plan will not affect jurisdiction or venue of where the Deen Disputes may be heard or determined.

52. To the extent and as provided by Paragraphs 93–95 of this order, such additional rights shall be preserved.

### G. *Authorizations*

53. Upon confirmation of the Parent's Plan, in accordance with this order, the Debtors, the Estates, Reorganized ASAR-CO, the Parent, the Parent's Plan Administrator, and the trustees (the *"Trustees"*) for the trusts to be established under the Parent's Plan,[61] as the case may be, are

---

61. The trusts to be established under the Parent's Plan (the *"Trusts"*) include, without limitation, the Section 524(g) Trust, the Environmental Custodial Trusts and the trust created

authorized and directed to take all necessary or appropriate steps, and perform all necessary or appropriate acts, to consummate the terms and conditions of the Parent's Plan. In addition to the provisions set forth elsewhere in the Parent's Plan, the following shall constitute the means for implementation of the Parent's Plan.

54. Each of the Debtors, the Estates, Reorganized ASARCO, the Parent, the Parent's Plan Administrator, and the Trustees, as the case may be, is authorized and directed to execute and deliver, adopt, assign, or amend, as the case may be, any and all agreements, documents, and instruments and take any and all actions necessary or desirable to implement the Parent's Plan and this order and to effect any other transactions contemplated therein or thereby. To effectuate the Parent's Plan and such transactions, the Parent's Plan Administrator and the officers or responsible representatives of the Debtors, the Estates, Reorganized ASARCO, the Parent, and the Trusts are authorized and directed—without further notice or application to or order of the Court—to execute, deliver, file, or record such agreements or documents, and to take such other actions as any such individual may determine to be necessary or desirable to effectuate the Parent's Plan, this order, and such transactions, regardless of whether such actions or documents are specifically referred to in the Parent's Plan or this order.

55. Without limiting the foregoing, the Debtors are authorized and directed to execute all deeds, bills of sale, assignments of general intangibles, title company affidavits respecting parties in possession, and mechanics liens as requested by the Parent. To the extent that, under applicable non-bankruptcy law, any of these actions otherwise would require the consent or approval of the shareholders or boards of directors of the Debtors, this order constitutes such consent, approval, and direction. On the Effective Date, all documents and all other agreements entered into or issued pursuant to the Parent's Plan, including, but not limited to, any documents entered into in connection with the Trusts and the Working Capital Facility, shall become effective, binding, and enforceable upon the parties thereto in accordance with their respective terms and conditions and shall be deemed to become effective simultaneously. The provisions of Bankruptcy Rule 7070 are specifically made applicable for such a situation and may be used in an appropriate situation.

56. All matters provided for under the Parent's Plan involving the corporate structure of the Debtors or Reorganized ASARCO, or any corporate action to be taken by, or required of the Debtors or Reorganized ASARCO, shall be deemed to have occurred and be effective as of the Effective Date, and are authorized and approved in all respects without any requirement for further action by the holders of Interests in, or directors of, any of such entities, except as otherwise provided in this order or the Parent's Plan.

57. Entry of this order shall constitute approval of the reorganization of ASARCO, as of the Effective Date, into Reorganized ASARCO, and Reorganized ASARCO shall continue its existence after the Effective Date. All property and assets of ASARCO and its Estate shall, except as otherwise set forth in this order or in the Parent's Plan, vest in Reorganized ASARCO, on the Effective Date, free and clear of any and all Liens, Claims, charges, encumbrances, or Interests of any kind except as provided by this order or the Parent's Plan. On or as soon as reasonably practicable after the Effective Date, Reor-

by the Residual Environmental Settlement Agreement.

ganized ASARCO shall file an amended LLC Agreement with the Secretary of State of the State of Delaware. The Amended LLC Agreement shall, in compliance with § 1123 of the Bankruptcy Code, prohibit the issuance of nonvoting equity securities and provide for an appropriate distribution of voting powers among classes of securities. Each director and officer of Reorganized ASARCO shall serve pursuant to the terms of the amended Limited Liability Company Agreement, and applicable law.

58. Carlos Ruiz Sacristan, Agustin Santamarina, and Jorge Lazalde Psihas are appointed to serve as members of the Board of Directors of Reorganized ASARCO from and after the Effective Date. The Board of Reorganized ASARCO is to be expanded to include a representative of USW, to be chosen by the USW, if USW elects to accept the Parent's offer to extend the Collective Bargaining Agreement to June 30, 2011.

59. Manuel E. Ramos Rada and Oscar Gonzalez Barron are appointed to serve as officers of Reorganized ASARCO from and after the Effective Date.

H. *Consideration*

60. On the Effective Date, (i) the Parent Contribution shall be delivered to the Parent's Plan Administrator; (ii) Reorganized ASARCO shall transfer the Distributable Cash to the Parent's Plan Administrator; and (iii) the Environmental Custodial Trusts shall be established and funded.

61. On the Effective Date, the Parent and the Parent's Affiliates shall waive all Administrative and General Unsecured Claims held by the Parent or the Parent's Affiliates against any of the Debtors through the Effective Date, including, without limitation, Claims for reimbursement pursuant to the Tax Sharing Agreement for any period prior to the Effective Date.

62. On the Effective Date or as soon thereafter as practicable (i) the Tax Refund shall be delivered to the Parent's Plan Administrator; (ii) Reorganized ASARCO shall deliver the ASARCO Note, the ASARCO Security Agreement and the ASARCO Deed of Trust to the Section 524(g) Trust; (iii) the Parent and Grupo Mexico shall deliver their respective guarantees of the ASARCO Note; and (iv) ASARCO USA Incorporated or its designee that holds the equity interests in Reorganized ASARCO shall deliver the Parent Pledge Agreement to the Section 524(g) Trust.

63. On the Effective Date, the Parent and Reorganized ASARCO shall enter into the Working Capital Facility. Proceeds drawn from the Working Capital Facility and the Working Capital Reserve, and proceeds of Reorganized ASARCO's Litigation Trust Interests, if any, shall be used to fund Reorganized ASARCO's working capital needs. Claims that will be Reinstated under the Parent's Plan shall be paid out of Reorganized ASARCO's operating cash flows unless otherwise provided in this order or the Parent's Plan.

64. On the Effective Date, in accordance with the terms of the Fourth Amended and Restated Escrow Agreement (the *"Escrow Agreement"*, attached as Exhibit 25 to the Parent's Plan), the Parent may direct the Escrow Agent to disburse the Cash Deposit, the SCC Shares and all other assets on deposit and held by the Escrow Agent under the Escrow Agreement to or as directed by the Parent. Such delivery shall occur simultaneously with the delivery of the Parent Contribution to the Parent's Plan Administrator.

### I. Parent's Plan Administrator

65. Mark Roberts of Alvarez & Marsal Holdings, LLC is appointed to serve as the Parent's Plan Administrator in accordance with the Parent's Plan. The Parent's Plan Administrator shall have and perform all of the duties, responsibilities, rights and obligations set forth in the Parent's Plan Administration Agreement. The Parent's Plan Administrator shall serve without bond, and may employ or contract with other Persons to assist in the performance of the Parent's Plan Administrator's duties, as set forth in the Parent's Plan Administration Agreement. The Parent's Plan Administrator shall receive, without further Bankruptcy Court approval, reasonable compensation for such services and reimbursement of reasonable out-of-pocket expenses incurred in connection with such services.

66. The Parent's Plan Administrator shall establish and fund the Parent's Plan Administration Account with sufficient Cash to pay the Parent's Plan Administrator's estimated compensation and expenses, and all other anticipated costs of administration of the Parent's Plan. The Parent's Plan Administrator shall also establish and fund Miscellaneous Parent's Plan Administration Accounts, including the Disputed Claims Reserve, and the Undeliverable and Unclaimed Distribution Reserve, and may also establish such general accounts as the Parent's Plan Administrator deems necessary and appropriate. The Parent's Plan Administrator shall (i) fund the Section 524(g) Trust with the Section 524(g) Trust Assets, (ii) fund the Environmental Custodial Trusts with the Environmental Custodial Trust Assets, and (iii) fund the Disputed Claims Reserve. The Parent's Plan Administrator shall allocate the funds in the Parent's Plan Administration Account to subaccounts corresponding to the enumerated functions of the Parent's Plan Administrator. Until the Parent's Plan Administrator has discharged its obligations, the funds in those subaccounts and the Miscellaneous Parent's Plan Administration Accounts may only be used for the purpose designated for that particular account or subaccount. To the extent there are any excess funds in the Parent's Plan Administration Account (or any subaccount thereof) or any Miscellaneous Parent's Plan Administration Account, the Parent's Plan Administrator shall distribute such funds, Pro Rata, first to holders of Claims in Class 3 until such holders are Paid in Full, second to holders of Claims in Class 6 until such Claims are Paid in Full, third to holders of Claim in Class 7 until such Claims are Paid in Full, and fourth to Reorganized ASARCO to fund its working capital needs.

67. On the Effective Date, the Parent's Plan Administrator shall pay the Allowed Claims that are to be paid on the Effective Date. No later than ten days prior to the anticipated Effective Date, the Parent's Plan Administrator shall distribute to the ASARCO Committee a schedule of anticipated distributions on the Effective Date. The Parent, the Parent's Plan Sponsor, the Debtors, and the ASARCO Committee shall attempt to resolve any discrepancies or disputes. No later than five days prior to the anticipated Effective Date, the Parent's Plan Administrator shall file such report with the Bankruptcy Court. Any such disputes are hereby referred to, and thus shall be presented, to the Bankruptcy Court for resolution.

### J. Deemed Substantive Consolidation

68. By entry of this order, the Debtors shall be deemed consolidated under the Parent's Plan, solely for the limited purposes of voting and distribution under the Parent's Plan. Each and every Claim filed

or to be filed against any of the Debtors shall be deemed filed against the deemed consolidated Debtors and shall be deemed one Claim against all Debtors and (a) any obligation of any Debtor and all guarantees thereof executed by one or more of the Debtors shall be deemed to be one obligation of all of the consolidated Debtors; (b) any Claims filed or to be filed in connection with any such obligation and such guarantees shall be deemed one Claim against the consolidated Debtors; (c) all duplicative Claims (identical in amount and subject matter) filed against one or more of the Debtors will be automatically expunged so that only one Claim survives against the consolidated Debtors; and (d) the consolidated Debtors will be deemed, for purposes of determining the availability of the right of set-off under § 553 of the Bankruptcy Code, to be one entity, so that, subject to other provisions of § 553 of the Bankruptcy Code, the debts due to a particular Debtor may be offset against the Claims against such Debtor or Debtors.

69. Entry of this order shall constitute approval of the wind down of the Subsidiary Debtors. On the Effective Date, or as soon thereafter as is reasonably practicable, and concurrently with payment of all Allowed Claims that are to be paid on the Effective Date and funding of the Disputed Claims Reserve, (a) the Subsidiary Debtor Assets shall be transferred to Reorganized ASARCO free and clear of any and all Liens, Claims, charges, encumbrances, or Interests of any kind other than and except as provided by this order or the Parent's Plan; (b) all assets of the Subsidiary Debtors other than the Subsidiary Debtor Assets shall be transferred to the Plan Administrator for the benefit of Reorganized ASARCO free and clear of any and all Liens, Claims, charges, encumbrances, or Interests of any kind other than except as provided by this order or the Parent's

Plan; and (c) all Interests in the Subsidiary Debtors shall be canceled. As soon as practicable after the Effective Date, the Plan Administrator shall liquidate all assets of the Subsidiary Debtors other than the Subsidiary Debtor Assets and shall transfer the proceeds of such liquidation to Reorganized ASARCO free and clear of any and all Liens, Claims, charges, encumbrances, or Interests of any kind other than except as provided by this order or the Parent's Plan. The wind down of the Subsidiary Debtors shall not affect the treatment of Claims against the Subsidiary Debtors provided by this order or the Parent's Plan.

### K. *Other Implementation Provisions*

70. From and after the Effective Date, upon notification by the Parent's Plan Administrator of any Distribution Deficiency, Reorganized ASARCO shall satisfy such Distribution Deficiency from its working capital and from drawing upon the Working Capital Facility and the Working Capital Reserve. The Parent's Plan Administrator shall be vested with the right to enforce, on behalf of the holders of Allowed Claims, the amount of any such Distribution Deficiency against Reorganized ASARCO, including enforcement of rights pursuant to the Guarantee Agreement.

71. For the avoidance of doubt, on the Effective Date, all causes of action identified in the Schedule of Released Litigation (Parent's Plan Exhibit 2) shall be deemed, without any notice, the entry of any other order, or any other action by any party, to have been released and dismissed or withdrawn with prejudice. The Schedule of Released Litigation is attached hereto as Confirmation Order Exhibit 1. All other causes of action or counts thereof of the Debtors and their estates, including, without limitation, those under Chapter 5 of

the Bankruptcy Code (or similar state or federal law), and the Asbestos Insurance Actions, shall continue and be pursued as provided in Article 10.13 but subject to Article 6.4 of the Parent's Plan, as applicable.

72. The Prepetition ASARCO Environmental Trust shall remain in existence, and shall be unaffected by the Reorganization Cases or any related settlements. The Parent's Plan Administrator shall succeed to ASARCO's administrative role, and will, in its sole discretion, act as Performing Entity (as defined in the Prepetition ASARCO Environmental Trust) from time to time, but will assume no affirmative liabilities or obligations associated with that role. In accordance with the documents governing it, the funds in the Prepetition ASARCO Environmental Trust shall continue to be available for, among other things, (i) identified work sites; (ii) interim costs prior to the effectiveness of the Parent's Plan; and (iii) any shortfalls or unanticipated costs or any other use permitted by the terms of the Prepetition ASARCO Environmental Trust (it being understood that the terms of certain environmental settlements were based on the assumption that certain previously identified, additional environmental response actions to be performed by ASARCO, the Parent's Plan Administrator, or the United States would be reimbursed from the Prepetition ASARCO Environmental Trust). The Parent will make any remaining required contributions to the Prepetition ASARCO Environmental Trust in the ordinary course. The funds remaining in the Prepetition ASARCO Environmental Trust shall be separate from and without prejudice to the distributions to be made to holders of Claims, as described in Article IV of the Parent's Plan.

73. Unless the Tax Refund Adversary Proceeding has been determined by Final Order prior to the Effective Date, on the Effective Date or as soon thereafter as reasonably practicable, the Tax Refund shall be transferred to the Plan Administrator. The Parent will, on the Effective Date, waive its claim to collect the Tax Refund for its own account and shall cooperate with Reorganized ASARCO to cause the Internal Revenue Service to pay the Tax Refund to the Plan Administrator for distribution to holders of Allowed Claims. To the extent that, on the Effective Date, the DOJ or any agency represented by the DOJ maintains a claim that it is entitled to setoff environmental claims held by such agency against the Tax Refund, then the Plan Administrator shall include the Tax Refund in the Environmental Custodial Trust Assets, releasing an equivalent amount of Cash to fund other distributions required under the Parent's Plan.

74. Any and all claims and causes of action that were owned by ASARCO or its Estate as of the Effective Date, other than those actions listed on the Schedule of Released Litigation (Exhibit 1 hereto) as per Paragraph 71 of this order, and the Asbestos Insurance Actions, including, without limitation, for indemnity and contribution for environmental damages, harm, or injury, which PRP claims have not been discharged or settled as of the Effective Date, shall vest in Reorganized ASARCO on the Effective Date, and Reorganized ASARCO shall be the only Entity entitled to pursue such claims or causes of action. The Asbestos Insurance Actions shall vest in the Section 524(g) Trust and may be pursued or compromised as deemed fit by the Section 524(g) Trustees, in their sole discretion, without need for approval of the Bankruptcy Court.

75. The Trusts shall be established on or prior to the Effective Date.

76. The Mission Mine Settlement Agreement is hereby binding upon all

landowners and allottees who own interests in the lands affected by the Mission Mine Settlement Agreement. Nothing in this order or in the Parent's Plan shall in any way limit or affect the rights or obligations of any party to the Mission Mine Settlement as provided therein.

### L. *Operations from Confirmation Date to Effective Date*

77. During the period from the Confirmation Date through and until the Effective Date, the Debtors shall continue to operate as debtors-in-possession, subject to the oversight of the Bankruptcy Court as provided in the Bankruptcy Code, the Bankruptcy Rules, and all orders of the Bankruptcy Court that are then in full force and effect, except as otherwise provided by this order or the Parent's Plan; *provided*, that during the period from the Confirmation Date through and until the Effective Date, the Debtors shall not enter into or seek approval of any settlement(s) of any Claim(s) where the amount of such settlement, or the Allowed Amount of such Claims, individually or in the aggregate, would be in excess of $10 million, without prior written approval of the Parent.

78. Entry of this order shall constitute approval pursuant to Bankruptcy Rule 9019 of all Asbestos Insurance Settlement Agreements executed as of the Confirmation Date and shall cause such Asbestos Insurance Settlement Agreements, and all terms within such agreements, to be fully binding upon all parties to such agreements (including, without limitation, their successors and assigns).

79. On and after the Effective Date, Reorganized ASARCO may operate its businesses; may use, acquire, and dispose of property; may retain, compensate, and pay any professionals or advisors; and may compromise or settle any causes of action, claims, or interests without supervision of or approval by the Bankruptcy Court and free and clear of any restrictions of the Bankruptcy Code or the Bankruptcy Rules other than restrictions expressly imposed by this order and the Parent's Plan.

### M. *Injunctions. Releases, and Discharge*

80. *Discharge and Release.* Except as otherwise expressly provided in this order, the Parent's Plan, or in any contract, instrument, indenture, or other agreement, or document expressly incorporated by reference in the Parent's Plan, on the Effective Date all mortgages, deeds of trust, liens, or other security interest against the property of the Debtors are fully released and discharged; *provided, however,* that this provision shall not prevent Liens from attaching to Reorganized ASARCO's Assets as provided for by the Parent's Plan.

81. Except as otherwise expressly provided in this order or the Parent's Plan, the rights afforded in the Parent's Plan and the treatment of all Claims, Demands, and Interests shall be in exchange for and in complete satisfaction, discharge, and release of all Claims, Demands, and Interests of any nature whatsoever, against any Debtor or its Estate, assets, properties, or interests in property. Except as otherwise provided herein, all Claims and Demands against and Interests in the Debtors are hereby satisfied, discharged, and released in full, except that Reorganized ASARCO shall remain liable to the Parent's Plan Administrator, for the benefit of the holders of Allowed Claims, for the full amount of the Distribution Deficiency. The ASARCO Protected Parties shall not be responsible for any obligations of the Debtors except those expressly assumed by them in the Parent's Plan.

82. *Discharge Injunction.* Except as otherwise expressly provided in this order

or in the Parent's Plan, the discharge and release set forth in the previous paragraphs shall also operate as an injunction permanently prohibiting and enjoining the commencement or continuation of any action or the employment of process with respect to, or any act to collect, recover from, or offset (a) any Claim or Demand discharged and released in the previous paragraph, and (b) any cause of action, whether known or unknown, based on the same subject matter as any Claim or Demand discharged and released in the previous paragraph. Except as otherwise expressly provided in this order or in the Parent's Plan, all Persons and Entities shall be precluded and forever barred from asserting against the ASARCO Protected Parties, their successors or assigns, or their assets, properties, or interests in property any other or further Claims or Demands, or any other right to legal or equitable relief regardless of whether such right can be reduced to a right to payment, based upon any act or omission, transaction, or other activity of any kind or nature that occurred prior to the entry of this order, whether or not the facts of or legal bases therefor were known or existed prior to the entry of this order.

83. *Permanent Channeling Injunction: Terms.* In order to induce, preserve, and promote the settlements contemplated by and provided for in the Parent's Plan, and pursuant to § 524(g) of the Bankruptcy Code, all Asbestos Personal Injury Claims and Demands shall be channeled to the Section 524(g) Trust for a remedy under the Section 524(g) Trust Distribution Procedures, and all holders of Asbestos Personal Injury Claims and Demands and all Entities which have held or asserted, which hold or assert, or which may in the future hold or assert, any Asbestos Personal Injury Claim or Demand shall be permanently and forever stayed, restrained, and enjoined from taking any action against any ASARCO Protected Party (or any property or interest in property of an ASARCO Protected Party) with respect to such Asbestos Personal Injury Claim or Demand, including, without limitation, for the purpose of directly or indirectly obtaining a judgment, collecting, recovering, or receiving payments, satisfaction, or recovery with respect to such Asbestos Personal Injury Claim or Demand, including, without limitation:

(i) commencing, conducting, or continuing in any manner, directly or indirectly, any suit, action, or other proceeding of any kind (including a judicial, arbitration, administrative, or other proceeding) in any forum with respect to any Asbestos Personal Injury Claim or Demand against any of the ASARCO Protected Parties, or against the property or interests in property of any ASARCO Protected Parties;

(ii) enforcing, levying, attaching (including by prejudgment attachment), collecting, or otherwise recovering, by any manner or means, whether directly or indirectly, any judgment, award, decree, or other order against any of the ASARCO Protected Parties, or against the property or interests in property of any ASARCO Protected Parties, with respect to any Asbestos Personal Injury Claim or Demand;

(iii) creating, perfecting, or otherwise enforcing in any manner, directly or indirectly, any Lien of any kind against any ASARCO Protected Parties, or the property or interests in property of any ASARCO Protected Parties, with respect to any Asbestos Personal Injury Claim or Demand;

(iv) except as otherwise specifically provided in the Parent's Plan, asserting or accomplishing any setoff, right of subrogation, indemnity, contribution, reimbursement, or recoupment of any kind and in any manner, directly or indirectly, against any obligation due any ASARCO Protected Parties, or against the property or interests in property of any ASARCO Protected Parties, with respect to any Asbestos Personal Injury Claim or Demand; and

(v) proceeding or taking any action, in any manner, in any place whatsoever, that does not conform to, or comply with, the provisions of the Parent's Plan, the Parent's Plan Documents, or the Section 524(g) Trust Documents relating to any Asbestos Personal Injury Claim or Demand.

84. *Reservations.* Notwithstanding anything to the contrary above or in the Parent's Plan, neither this Permanent Channeling Injunction nor the Parent's Plan shall enjoin, alter, diminish, or impair:

(i) the rights of Entities to the treatment accorded to them under Articles II and IV of the Parent's Plan, as applicable, including the rights of Entities with Asbestos Personal Injury Claims or Demands to assert such Asbestos Personal Injury Claims or Demands in accordance with the Section 524(g) Trust Distribution Procedures;

(ii) the rights of Entities to assert any Claim, Demand, debt, obligation, or liability for payment of Section 524(g) Trust Expenses against the Section 524(g) Trust;

(iii) the enforceability of any of the Asbestos Insurance Policies or any Asbestos Insurance Settlement Agreement;

(iv) the rights of the Section 524(g) Trust, if any, with regard to any Asbestos Insurance Company that is not a Settling Asbestos Insurance Company (with the Section 524(g) Trust being, and deemed to be, for all purposes of insurance and indemnity, the successor to the Debtors and other recoveries from an Asbestos Insurance Company, in its capacity as such); or

(v) the rights of Entities to assert any Claim, Demand, debt, obligation, or liability for payment against an Asbestos Insurance Company that is not an ASARCO Protected Party, unless otherwise enjoined by order of the Bankruptcy Court or the District Court or estopped by a provision of the Parent's Plan.

85. *Asbestos Insurance Company Injunction: Terms.* In order to preserve and promote the property of the Estate, as well as the settlements contemplated by and provided for in the Parent's Plan, and to supplement where necessary the injunctive effect of the discharge and releases provided for in the Parent's Plan, pursuant to §§ 524(g) and 105(a) of the Bankruptcy Code, all Entities which have held or asserted, which hold or assert, or which may in the future hold or assert any Claim, Demand, or cause of action (including, without limitation, any Asbestos Personal Injury Claim or Demand or any Claim for or respecting any Section 524(g) Trust Expense) against a Settling Asbestos Insurance Company based upon, relating to, arising out of, attributable to, or in any way connected with any Asbestos Personal Injury Claim or Demand, Asbestos In-Place Insurance Coverage, or an Asbestos Insurance Policy, shall be permanently and forever stayed, restrained, and enjoined

from taking any action against such Settling Asbestos Insurance Company for the purpose of directly or indirectly collecting, recovering, or receiving payments, satisfaction, or recovery with respect to any such Claim, Demand, or cause of action, including, without limitation:

(i) commencing, conducting, or continuing, in any manner, directly or indirectly, any suit, action, or other proceeding of any kind (including a judicial, arbitration, administrative, or other proceeding) in any forum with respect to any such Claim, Demand, or cause of action against any Settling Asbestos Insurance Company, or against the property or interests in property of any Settling Asbestos Insurance Company;

(ii) enforcing, levying, attaching, collecting, or otherwise recovering, by any manner or means, whether directly or indirectly, any judgment, award, decree, or order against any Settling Asbestos Insurance Company or against the property or interests in property of any Settling Asbestos Insurance Company with respect to any such Claim, Demand, or cause of action;

(iii) creating, perfecting, or otherwise enforcing, in any manner, directly or indirectly, any Lien of any kind against any Settling Asbestos Insurance Company or the property or interests in property of any Settling Asbestos Insurance Company with respect to any such Claim, Demand, or cause of action;

(iv) except as otherwise specifically provided in the Parent's Plan, asserting or accomplishing any setoff, right of subrogation, indemnity, contribution, reimbursement, or recoupment of any kind and in any manner, directly or indirectly, against any

obligation due any Settling Asbestos Insurance Company or against the property or interests in property of any Settling Asbestos Insurance Company with respect to any such Claim, Demand, or cause of action; and

(v) taking any act, in any manner, in any place whatsoever, that does not conform to, or comply with, the provisions of the Parent's Plan Documents relating to such Claim, Demand, or cause of action.

86. *Reservations.* Notwithstanding anything to the contrary above or in the Parent's Plan, neither this Asbestos Insurance Company Injunction nor the Parent's Plan shall enjoin, alter, diminish, or impair:

(i) the rights of Entities to the treatment accorded them under Articles II and IV of the Parent's Plan, as applicable, including the rights of Entities with Asbestos Personal Injury Claims or Demands to assert Asbestos Personal Injury Claims or Demands against the Section 524(g) Trust in accordance with the Section 524(g) Trust Distribution Procedures;

(ii) the rights of Entities to assert any Claim, Demand, debt, obligation, or liability for payment of Section 524(g) Trust Expenses against the Section 524(g) Trust;

(iii) the enforceability of any of the Asbestos Insurance Policies or any Asbestos Insurance Settlement Agreement;

(iv) the rights of the Section 524(g) Trust, if any, with regard to any Asbestos Insurance Company that is not a Settling Asbestos Insurance Company (with the Section 524(g) Trust being, and deemed to be, for all purposes of insurance and indemnity, the successor to the Debt-

ors in respect of all Asbestos Personal Injury Claims, Demands, and other recoveries from an Asbestos Insurance Company, in its capacity as such);

(v) the rights of Entities to assert any Claim, Demand, debt, obligation, or liability for payment against an Asbestos Insurance Company that is not an ASARCO Protected Party unless otherwise enjoined by order of the Bankruptcy Court or the District Court or estopped by a provision of the Parent's Plan; or

(vi) the rights of the Section 524(g) Trust or the Section 524(g) Trustees to seek relief from the Asbestos Insurance Company Injunction should a Settling Asbestos Insurance Company fail to fulfill all obligations under an Asbestos Insurance Settlement Agreement.

87. *Limitation of Injunctions.* Notwithstanding any other provision of the Parent's Plan to the contrary, the releases and Injunctions set forth above shall not serve to satisfy, discharge, release, or enjoin Claims by any Entity against the Section 524(g) Trust for payment of (a) Asbestos Personal Injury Claims and Demands in accordance with the Section 524(g) Trust Distribution Procedures, or (b) Section 524(g) Trust Expenses, and such releases and/or Injunctions shall not enjoin Reorganized ASARCO or the Section 524(g) Trust from enforcing any Asbestos Insurance Policy or any Asbestos Insurance Settlement Agreement.

88. *Winding Down of Subsidiary Debtors:* On the Effective Date, all Interests in the Subsidiary Debtors will be cancelled, annulled, and extinguished and will be of no further force or effect, without any further action by any party. Entities holding Interests in the Subsidiary Debtors will retain no rights and receive no consideration on account of those Interests, except as expressly provided in the Parent's Plan.

89. *Additional Discharge of Debtors:* Except as otherwise provided in the Parent's Plan or this order, this order shall as of the Effective Date: (i) act to discharge the Debtors, Reorganized ASARCO, and any of their Assets from all Claims, Demands, liabilities, other debts, and Interests that arose on or before the Effective Date, including, without limitation, all debts of the kind specified in §§ 502(g), 502(h), or 502(i) of the Bankruptcy Code, whether or not (A) a Proof of Claim based on such debt is filed or deemed filed pursuant to § 501 of the Bankruptcy Code, (B) a Claim based on such debt is Allowed pursuant to § 502 of the Bankruptcy Code, or (C) the Holder of a Claim based on such debt has accepted the Parent's Plan; and (ii) preclude all Persons from asserting against the Debtors, Reorganized ASARCO, or any of their Assets any other or further Claims or Interests based upon any act or omission, transaction, or other activity of any kind or nature that occurred prior to the Effective Date, all pursuant to §§ 524 and 1141 of the Bankruptcy Code. This discharge shall void any judgment obtained against any of the Debtors at any time, to the extent that such judgment relates to a discharged Claim or cancelled Interest.

90. *Additional Permanent Injunction:* Except as otherwise expressly provided in the Parent's Plan or this order, all entities that have held, currently hold, or may hold Claims or other debts or liabilities against the Debtors or an Interest or other right of an equity security Holder in any or all of the Debtors that are discharged pursuant to the terms of the Parent's Plan are permanently enjoined, on and after the Effective Date, from taking any of the following actions on account of any such

Claims, debts, liabilities, Interests, or rights: (i) commencing or continuing in any manner any action or other proceeding of any kind with respect to any such Claim, debt, liability, Interest, or right other than to enforce any right to a Distribution pursuant to the Parent's Plan; (ii) enforcing, attaching, collecting, or recovering in any manner any judgment, award, decree, or order against the Debtors, Reorganized ASARCO, or any of their Assets on account of any such Claim, debt, liability, Interest, or right; (iii) creating, perfecting, or enforcing any Lien or encumbrance against the Debtors, Reorganized ASARCO, or any of their Assets on account of any such Claim, debt, liability, Interest, or right; (iv) asserting any right of setoff, subrogation, or recoupment of any kind against any debt, liability, or obligation due to the Debtors, Reorganized ASARCO, or any of their Assets on account of any such Claim, debt, liability, Interest, or right; and (v) commencing or continuing any action in any manner or in any place that does not comply with or is inconsistent with the provisions of the Parent's Plan or this order. Such injunction shall extend to any successor of the Debtors, Reorganized ASARCO, and any of their Assets. Any entity injured by a willful violation of such injunction may recover actual damages, including costs and attorneys' and experts' fees and disbursements, and, in appropriate circumstances, may recover punitive damages from the willful violator.

91. *Approval of 11.7 Additional Releases:* The releases, waivers, preservations of rights of action, and injunctions related to releases contained in Article 11.7 of the Parent's Plan are appropriate pursuant to § 1123(b) of the Bankruptcy Code, are approved, and shall be effective in accordance with their terms. Any and all entities specified therein are permanently enjoined thereunder from commencing or prosecuting, directly, derivatively, or otherwise, any claims, obligations, suits, judgments, damages, demands, debts, rights, causes of action, or liabilities released or exculpated pursuant to these provisions and any other provisions of the Parent's Plan, including claims, obligations, suits, judgments, damages, demands, debts, rights, causes of action, or liabilities released under the Parent's Plan.

92. *Approval of Exculpation:* The exculpation contained in Article 11.8 of the Parent's Plan is appropriate, approved, and shall be effective in accordance with its terms. Pursuant to Article 11.8 of the Parent's Plan, among other things, no ASARCO Protected Party (acting in any capacity whatsoever), shall be liable, other than for gross negligence or willful misconduct, to any Holder of a Claim or Interest or any other Entity with respect to any action, omission, forbearance from action, decision, or exercise of discretion taken at any time prior to the Effective Date. Any such action by a non-Governmental Unit shall be brought in the Bankruptcy Court within 90 days after the Effective Date. Nothing in Article 11.8 of the Parent's Plan will prevent the enforcement of the terms of the Parent's Plan.

93. *Preservation of Certain Contribution Claims by Non–Settling Asbestos Insurance Companies:* This paragraph and the next paragraph of this order apply with respect to any Asbestos Insurance Company that is not a Settling Asbestos Insurance Company (a *"Non–Settling Asbestos Insurance Company"*) and that is named as a defendant in (a) an Asbestos Insurance Action, which includes without limitation an action pursued by the Section 524(g) Trust post-confirmation under the Parent's Plan and Plan Documents, or (b) an action brought post-confirmation against a Non–Settling Asbestos Insur-

ance Company by the holder of an Unsecured Asbestos Personal Injury Claim who contends that the claim is covered by an Asbestos Insurance Policy and who was or is permitted by the Section 524(g) Trust pursuant to the Trust Distribution Procedures to liquidate such claim in the tort system (except for Asbestos Premises Liability Claims subject to Asbestos In–Place Insurance Coverage) (collectively, an *"Insurance Action"*). The purpose of this paragraph and the next paragraph is to establish a procedure for a Non–Settling Asbestos Insurance Company that is barred by any of the Injunctions or other protections against suit granted under the Parent's Plan, this order, or an order of the Bankruptcy Court from prosecuting a Contribution Claim (as defined below) against a Settling Asbestos Insurance Company or other ASARCO Protected Party nevertheless to obtain the full economic benefit of any Contribution Claim that is found to be valid by a court of competent jurisdiction.

94. Except as permitted in subparagraphs (a), (b), (d), and (i), below, nothing in this order shall in any way operate to impair, or have the effect of impairing, any of the Injunctions or other protections against suit granted under the Parent's Plan, this order, or an order of the Bankruptcy Court. Nothing in this order shall in any way subsequent to plan confirmation operate to provide, or have the effect of providing, grounds for a Non–Settling Asbestos Insurance Company to file a lawsuit, except as permitted in subparagraphs (b) and (d) below, and/or assert judgment reduction, except as permitted in subparagraphs (a) and (d) below, based on any Contribution Claim (as defined below). In all other respects, notwithstanding anything to the contrary in this order, the Parent's Plan, any of the Plan Documents, or any order of the Bankruptcy Court (including without limitation any other pro-

vision that purports to be preemptory or supervening):

(a) If, in an Insurance Action, a Non–Settling Asbestos Insurance Company asserts that it has, or but for any of the Injunctions or other protections against suit granted under the Parent's Plan, this order, or an order of the· Bankruptcy Court, would have, rights to contribution, indemnity, reimbursement, subrogation, equitable subrogation, recoupment, or other similar rights (collectively, *"Contribution"* or *"Contribution Claims"*) against a Settling Asbestos Insurance Company or other ASARCO Protected Party in connection with a judgment that has been or may be rendered against the Non–Settling Asbestos Insurance Company, the Non–Settling Asbestos Insurance Company may assert such Contribution Claims in the Insurance Action as grounds for seeking a judgment reduction, without adding the Settling Asbestos Insurance Company or other ASARCO Protected Party to such Insurance Action.

(b) If judgment reduction is unavailable because no Insurance Action is pending, and the Non–Settling Asbestos Insurance Company incurred attorneys' fees and expenses in connection with defending in the tort system against an action by a holder of an Unsecured Asbestos Personal Injury Claim who was or is permitted by the Section 524(g) Trust pursuant to the Trust Distribution Procedures to liquidate such claim in the tort system (except for Asbestos Premises Liability Claims subject to Asbestos In–Place Insurance Coverage), which action was resolved without the entry of judgment or with the entry of a defense judgment, the Non–Settling As-

bestos Insurance Company may seek reimbursement of such attorneys' fees and expenses (*"Defense Costs"*) by bringing an action against the Section 524(g) Trust in any non-bankruptcy forum of competent jurisdiction (a *"Defense Cost Action"*).

(c) In response to any assertion of a Contribution Claim in accordance with subparagraphs (a) or (b) above by a Non–Settling Asbestos Insurance Company, the party from whom judgment reduction in the case of subparagraph (a) above, or reimbursement of Defense Costs in the case of subparagraph (b) above, is sought may assert all legal or equitable defenses or rights, if any, that the Settling Asbestos Insurance Company or other ASARCO Protected Party would have been able to assert thereto if no Injunction or other protection against suit had been granted to the Settling Asbestos Insurance Company or other ASARCO Protected Party.

(d) If any Contribution Claim asserted in accordance with subparagraphs (a) or (b) above is determined to be valid under applicable non-bankruptcy law, in whole or in part, by the court presiding over the Insurance Action or the Defense Cost Action, then:

(i) in the case of subparagraph (a), the amount of any judgment against such Non–Settling Asbestos Insurance Company shall be reduced by the full amount so determined of such Contribution Claim, without application of any Payment Percentage; and

(ii) in the case of subparagraph (b), the Non–Settling Asbestos Insurance Company shall be entitled to recover from the Section 524(g) Trust the full amount so determined of such Defense Costs, without application of any Payment Percentage.

(e) This order is in addition to, and not in lieu of, the "insurance neutrality" provision in Article 12.4 of the Parent's Plan, which is incorporated as if fully set forth at length herein, specifically including without limitation the insurance company protections set forth in subparagraphs (a) and (c) of the "insurance neutrality" provision.

(f) For the avoidance of doubt, the Asbestos Insurance Company Injunction shall not be construed to impair or affect any Contribution Claims between or among Non–Settling Asbestos Insurance Companies.

(g) Within 30 days after the Effective Date, the Fireman's Fund Insurance Company shall take all reasonable actions to dismiss the appeal currently pending before the United States District Court for the Southern District of Texas, styled *Fireman's Fund Insurance Company v. ASARCO, LLC, et al.,* Case No. 2:09–cv–00175.

(h) This paragraph and the preceding paragraph, and the procedures therein, will supplant any and all provisions regarding Contribution Claims in any order of the Bankruptcy Court approving any Asbestos Insurance Settlement Agreement.

(i) Cause No. 07–5899–G, *Mt. McKinley Insurance Company and Everest Reinsurance Company v. ASARCO Inc., et al.,* in the 319th Judicial District Court of Nueces County, Texas (the "State Court Action") is expressly not released, discharged, or enjoined by the Parent's Plan or this order. The claims and defenses asserted in the State Court Action are preserved and may continue to be litigated in the State Court Action, and any remedies or judgments resulting from such liti-

gation may be enforced in an appropriate forum other than the Bankruptcy Court. The Parent reserves its right to assert defenses in the State Court Action (other than any defenses asserting that the claims in the State Court Action are released, discharged, or enjoined by the Parent's Plan or this order), including defenses relating to percentage distributions to creditors under the Parent's Plan or this order. For the avoidance of doubt, the claims preserved in this subparagraph (i) are such claims as have been or may be asserted in the State Court Action against the defendants that are named therein as of the date of this order.

95. *Agreement with Chartis Companies:* The Parent and Chartis Companies have reached an agreement as set forth in this Section entitled "Agreement with Chartis Companies," and accordingly, (i) this Section constitutes an Asbestos Insurance Settlement Agreement, as such term is defined in the Glossary to the Parent's Plan and (ii) Chartis Companies are included within the definition of Settling Asbestos Insurance Companies:

(a) Chartis Companies acknowledge, and waive any and all rights to dispute, that on the Effective Date all rights to pursue and receive the benefits and proceeds of any of the Chartis Premises Settlement Agreements shall be transferred and assigned in their entirety to the Section 524(g) Trust in accordance with Article 6.3 of the Parent's Plan and shall vest thereafter in the Section 524(g) Trust in accordance with Article 6.4 of the Parent's Plan, assuming that the Parent's Plan is confirmed by the Bankruptcy Court without modification of such Articles.

(b) Chartis Companies acknowledge, and waive any and all rights to dispute, that following the Effective Date, the Section 524(g) Trust shall stand wholly in the shoes of the Debtors with regard to the Chartis Premises Settlement Agreements, as if the Section 524(g) Trust had been the party with whom such agreements were executed originally. The Section 524(g) Trust shall be substituted entirely for the Debtors with regard to any and all prepetition rights and obligations of the Debtors to the Chartis Companies under the Chartis Premises Settlement Agreements as well as any and all prepetition rights and obligations of the Chartis Companies to the Debtors under these agreements. Chartis Companies specifically agree not to take the position that any prepetition rights and obligations of and to the Debtors with respect to Asbestos Premises Liability Claims have been discharged by confirmation of the Parent's Plan. Also, to the extent that any actions are taken in the future with regard to the Chartis Premises Settlement Agreements, including any changes or modifications to any terms or conditions therein, all such actions will take place between the Chartis Companies and the Section 524(g) Trust, and without any involvement of Reorganized ASARCO.

(c) Chartis Companies wholly and entirely release the Debtors and Reorganized ASARCO, for now and until the end of time, of any rights, liabilities, responsibilities, involvements, obligations or otherwise with regard to the Chartis Premises Settlement Agreements; provided, however, that Reorganized ASARCO shall provide reasonable access to its personnel, its information, and its premises, authorize all former experts and/or corpo-

rate representatives to assist with defense, cooperate with discovery, and provide witnesses and documents reasonably needed for Chartis Companies to defend Asbestos Premises Liability Claims, all without any requirement that defense counsel seek or obtain a subpoena. Further, Reorganized ASARCO shall not voluntarily assist any claimant to assert any claim or suit covered by the Chartis Premises Settlement Agreements.

(d) Chartis Companies confirm that, prepetition, they had assumed their obligations to pay defense and indemnification in accordance with, and to the extent limited by, the Chartis Premises Settlement Agreements. They acknowledge, and waive any and all rights to dispute, that post-confirmation they will continue to be bound by the Chartis Premises Settlement Agreements, along with the order, the Parent's Plan and all related documents, including the Asbestos TDP, except for the following:

(i) the designation in the Chartis Premises Settlement Agreements of contact personnel and agents of the Parties shall be adjusted as appropriate, including but not limited to the possible substitution of Porzio Bromberg & Newman, M. Elizabeth Medaglia, Kevin McCaffrey, and Christopher Eskeland;

(ii) post-confirmation, Chartis Companies will have the option, together with other involved insurers, if any, to select and retain defense counsel and control the defense of such claims;

(iii) for those suits for which Chartis Companies opt to select and retain defense counsel and control the defense of such claims as set forth in subsection (d)(ii) above, the Billing Guidelines set forth in Exhibit A to the Defense Funding Agreement shall be rendered moot and unenforceable; and

(iv) nothing in the order, the Parent's Plan or the supporting documents, including but not limited to any and all injunctions, shall preclude the operation of the seventh paragraph of Section 5.3(c) of the TDP, revised in accordance with this agreement, which establishes a procedure for resolution of "the situation where the Asbestos Insurance Company does not respond to the tender of the lawsuit consistent with the terms and conditions of the Asbestos In–Place Insurance Coverage and/or CIP Agreements."

(e) Nothing herein shall be deemed to enlarge or diminish in any way the dollar amount of the obligations of Chartis Companies under the Chartis Premises Settlement Agreements. For the avoidance of doubt, it is acknowledged that to the extent the Chartis Premises Settlement Agreements provide for allocation of payment for defense or indemnity, those allocations of payment will continue to be applicable under the agreement set forth herein, including but not limited to any obligation of the Section 524(g) Trust to pay the portion of defense costs that would have been borne by Debtors under the Defense Funding Agreement.

(f) If Reorganized ASARCO exercises the right reserved in the Parent's Plan to retain the Asbestos Insurance Recoveries, which includes the right to pursue and receive the benefits and proceeds of the Chartis Premises Settlement Agreements, then Chartis Companies acknowledge, and waive any and all rights to dispute, that the

right to pursue and receive the benefits and proceeds of these agreements will remain in their entirety with Reorganized ASARCO.

(g) Further, the Chartis Companies acknowledge, and waive any and all rights to dispute, that all insurance policies that are identified in the Chartis Premises Settlement Agreements shall continue to be Asbestos Insurance Policies as defined in the Parent's Plan, but only with regard to Asbestos Premises Liability Claims and subject to the Chartis Premises Settlement Agreements.

(h) Except as expressly set forth in this Section entitled "Agreement with Chartis Companies," the parties reaffirm and agree they are bound by all the provisions of all the Chartis Premises Settlement Agreements and all Parent's Plan provisions, specifically including the Asbestos TDP and Article 12.4 of the Parent's Plan. Nothing herein shall be construed to require Chartis Companies to pay any amount not required by the Chartis Premises Settlement Agreements or pay any such amount sooner than due under the Chartis Premises Settlement Agreements. Also, post-confirmation, neither Reorganized ASARCO nor Chartis Companies will have, or will attempt to assert, any rights or obligations pursuant to the Chartis Products Settlement Agreements, and Chartis Companies will not have any rights or obligations with regard to any asbestos products liability claims, whether past, present, future, paid or unpaid.

(i) Chartis Companies are to be ASARCO Protected Parties under the terms of the Parent's Plan. The parties have agreed that the entire agreement embodied in this Section entitled "Agreement with Chartis Companies" is contingent upon a confirmation order that approves the protections afforded to ASARCO Protected Parties as set forth in the Parent's Plan.

(j) Nothing herein shall alter the Stipulation and Order Regarding Partial Disallowance of, and Preservation of Rights in Connection with, Various Proofs of Claim Filed by AHAC, et al. ("*POC Stipulation 11248*") (Bk. Doc. No. 11248), except that to the extent any claim or any part of a claim that is preserved by POC Stipulation 11248 arises from or relates to either the Chartis Premises Settlement Agreements or the Chartis Products Settlement Agreements, such claim or part of such claim is hereby withdrawn with prejudice.

(k) Reorganized ASARCO or the Section 524(g) Trust, as the case may be, shall, within 60 days after the Effective Date, take such actions that are reasonably necessary to dismiss with prejudice AHAC and Lexington from any avoidance actions brought by any of the Debtors, including:

- *ASARCO LLC v. American Home Assurance Company*, Adv. Pro. No. 07–2065;
- *ASARCO LLC v. Lexington Insurance Company*, Adv. Pro. No. 07–2067; and
- *Lac D'Amiante du Québec Ltée, et al. v. Allstate Insurance Company, et al.*, Adv. Pro. No. 07–2025.

It is further agreed that the Debtors or Reorganized ASARCO, as the case may be, hereby release all avoidance claims against the Chartis Companies.

(*l*) Any and all disclosures herein of terms or conditions of the Chartis Premises Settlement Agreements are necessary to this order, are made with the consent of all parties, and do not

waive or alter the governing nature of any and all confidentiality provisions in the agreements for all purposes.

(m) This Section entitled "Agreement with Chartis Companies" is binding upon the Chartis Companies, the Parent, the FCR, the Asbestos Claimants' Committee, and it shall be binding upon the Section 524(g) Trust after such trust is formed. To the extent any provision of the TDP is inconsistent with this Section of the order, this Section shall govern.

96. *Release of Fraudulent Transfer Claims Against Settling Asbestos Insurance Companies:* Except as otherwise addressed in the above paragraphs, ¶¶ 93–95, all fraudulent transfer claims against any Settling Asbestos Insurance Company arising under §§ 544(b), 548, 549, or 550 of the Bankruptcy Code or otherwise with respect to the Claims, rights, or interests released under the Asbestos Insurance Settlement Agreement shall be released, and the Section 524(g) Trust shall have no authority to bring any fraudulent transfer actions arising under any applicable state or other non-bankruptcy law against any Settling Asbestos Insurance Company with respect to the Claims, rights, and interests released under the Asbestos Insurance Settlement Agreement. This provision does not apply to any of the existing Avoidance Actions against certain Asbestos Insurance Companies that entered into prepetition settlement agreements.

97. *No Release With Respect to Pension Plans and Other Employee Benefit Plans:* Notwithstanding any provision in this order, or otherwise in the Parent's Plan, no claims, obligations, suits, judgments, damages, demands, debts, rights, causes of action, or liabilities whatsoever against any entity with respect to statutory liabilities arising under ERISA concerning the Pension Plans or fiduciary liabili-

ties arising under ERISA concerning other Employee Benefit Plans shall be released, exculpated, discharged, enjoined, or otherwise affected by the Parent's Plan, nor shall the entry of this order constitute the approval of any release, exculpation, discharge, injunction, or other impairment of any claims, obligations, suits, judgments, damages, demands, debts, rights, causes of action, or liabilities whatsoever against any entity with respect to statutory liabilities arising under ERISA concerning the Pension Plans or fiduciary liabilities arising under ERISA concerning other Employee Benefit Plans.

98. *Term of Injunctions and Automatic Stay:* All of the injunctions and/or stays provided for in or in connection with these Reorganization Cases, whether pursuant to §§ 105, 362, 524, or any other provision of the Bankruptcy Code, other applicable law, or court order, in effect immediately prior to the entry of this order shall remain in full force and effect until the Injunctions become effective, and thereafter if so provided by the Parent's Plan, this order, or by their own terms. In addition, the Parent may seek such further orders as it may deem necessary to preserve the status quo during the time between the Confirmation Date and the Effective Date. Each of the Injunctions shall become effective on the Effective Date and shall continue in effect at all times thereafter, and may not be vacated, amended, or modified after the Effective Date, except as otherwise provided herein. Notwithstanding anything to the contrary contained in this order or the Parent's Plan, all actions in the nature of those to be enjoined by the Injunctions shall be enjoined during the period between the Confirmation Date and the Effective Date.

99. *No Liability for Tax Claims:* Unless a taxing authority has asserted a Claim against any of the Debtors prior to

the applicable Bar Date, no Claim of such taxing authority shall be Allowed against such Debtor or Reorganized ASARCO for taxes, penalties, interest, additions to tax, or other charges arising out of the failure, if any, of the applicable Debtor or Reorganized ASARCO, or any other Entity to have paid taxes or to have filed any tax return (including, without limitation, any income tax return or franchise tax return) in or for any taxable period ending before the Petition Date or arising out of an audit of any return for a taxable period ending before the Petition Date.

100. *No Successor Liability:* Except as otherwise expressly provided in the Parent's Plan or this order, none of the Released Parties shall be determined to be successors to any of the Debtors or to any Entity for which the Debtors or Reorganized ASARCO may be held legally responsible, by reason of any theory of law or equity, and none can be responsible for any successor or transferee liability of any kind or character, except to the extent that the Section 524(g) Trust, Reorganized ASARCO, or both, is or are the successor or successor in interest to ASARCO solely with regard to the Asbestos Insurance Policies, the Asbestos Insurance Settlements, the Asbestos In–Place Insurance Coverage, the Asbestos Insurance Actions, or the Asbestos Insurance Recoveries. The ASARCO Protected Parties shall not have any obligation, responsibility, or liability to perform, pay, or indemnify creditors or otherwise have any responsibilities for any liabilities or obligations of the Debtors or Reorganized ASARCO, whether arising before, on, or after the Confirmation Date, except as otherwise expressly provided in the Parent's Plan.

101. *Insurance Neutrality:* Entry of this order shall not be binding upon, and shall not have any res judicata or collateral estoppel effect on or against, any Asbestos Insurance Company that is subject to insurance neutrality under the Bankruptcy Court's May 29, 2008 Order Extending Scope of Insurance Neutrality Addendum Attached to Order Approving Compromise and Settlement Regarding Resolution of Derivative Asbestos Claims (the *"Insurance Neutrality Order"*) regarding its insurance coverage obligations in any pending or subsequent insurance coverage litigation, arbitration, Alternative Dispute Resolution-type proceeding, or other dispute concerning the existence and/or scope of its rights and/or obligations regarding asbestos-related liabilities, if any, and shall not have any impact, effect, or consequence in any such other context. Neither the Debtors, the Asbestos Subsidiary Debtors, the Asbestos Claimants' Committee, the ASARCO Committee, the FCR, an Asbestos Insurance Company, nor the Section 524(g) Trust may argue or assert, in any court proceeding, arbitration, Alternative Dispute Resolution-type proceeding, or other dispute involving an Asbestos Insurance Company that is subject to insurance neutrality under the Insurance Neutrality Order and concerning issues related to insurance coverage, that any findings or conclusions concerning 11 U.S.C. § 524(g) and/or constituting any estimation of asbestos-related liabilities contained in or referenced in any decision, order, finding, conclusion, or judgment of the Bankruptcy Court relating to Confirmation of the Parent's Plan: (1) constitutes a "judgment," "adjudication," "final order," "settlement," or "finding of liability" related to, based on, or relying on the principles enunciated in *UNR Indus., Inc. v. Continental Cas. Co.,* 942 F.2d 1101 (7th Cir.1991) and/or *Fuller–Austin Insulation Co. v. Fireman's Fund Ins. Co.,* Civil No. BC116835, 2002 WL 31005090 (Cal.Super.Ct. Aug. 6, 2002); and (2) is binding upon such an Asbestos Insurance Company for any purpose con-

cerning insurance coverage under any policies issued to any of the Debtors and transferred to the Section 524(g) Trustees in accordance with the provisions hereof. Nothing herein shall limit the ability of the Debtors, the Asbestos Subsidiary Debtors, the Asbestos Claimants' Committee, the ASARCO Committee, the FCR, an Asbestos Insurance Company, or the Section 524(g) Trust to offer the Parent's Plan, any of the Parent's Plan Documents, this order, or any part of the confirmation process (including, without limitation, any evidentiary hearings or any findings or conclusions therein) in any court, including any court resolving any insurance coverage litigation, as evidence that the Debtors, Reorganized ASARCO, or the Section 524(g) Trust are so bound. Nothing in this order or in the Parent's Plan shall operate to expand the rights of the Debtors, any of the Asbestos Subsidiary Debtors, the Asbestos Claimants' Committee, the ASARCO Committee, the FCR, an Asbestos Insurance Company, or the Section 524(g) Trust, or diminish any of their respective duties and obligations as to those rights, duties, and obligations that exist under any policies issued by an Asbestos Insurance Company that is subject to insurance neutrality under the Insurance Neutrality Order as of the Petition Date except as set out in Article 12.4(f) of the Parent's Plan. Moreover, nothing in this order shall in any way operate to, or have the effect of, impairing, prejudicing, or expanding such Asbestos Insurance Company's legal, equitable, or contractual rights in any respect, or of increasing, accelerating, creating, or triggering such Asbestos Insurance Company's insurance coverage obligations, if any, in comparison to what those respective rights or obligations would have been if the Parent's Plan had not been confirmed except as set out in Article 12.4(f) of the Parent's Plan; and all of such Asbestos Insurance Com-

pany's rights are expressly reserved and preserved. Such Asbestos Insurance Company's rights shall be determined pursuant to its insurance policies with the applicable Debtors, and under applicable law. Such Asbestos Insurance Company's rights to conduct discovery, either written or oral, in any future proceeding in any insurance coverage litigation relating to the Debtors' asbestos-related liabilities for or such Asbestos Insurance Company's obligations to indemnify the applicable Debtors on account of any or all of such asbestos-related liabilities, if any, shall not be affected, restricted, expanded, altered, or modified by anything in or part of this order, the Parent's Plan, or the Confirmation process. No proceedings undertaken pursuant to or otherwise as part of the Confirmation process (including without limitation, any evidentiary hearings or any findings or conclusions constituting or relating to the determination of any alter ego theories, contained in or referenced in any decision, order, finding, conclusion, or judgment of the Bankruptcy Court) shall constitute a trial or hearing on the merits, or an adjudication, Final Order, settlement, or finding of liability binding on such Asbestos Insurance Company for any purpose concerning insurance coverage for asbestos-related liability, or be used as evidence or offered into evidence in any proceeding to prove that such Asbestos Insurance Company participated in and/or consented to the procedures undertaken pursuant to the Parent's Plan. Any ruling by the Bankruptcy Court on any issue upon which such Asbestos Insurance Company does not involve itself and this order shall not be binding on such Asbestos Insurance Company in any insurance coverage litigation. While the court and the finder of fact in any insurance coverage litigation may be advised of this order and while the Debtors, the Asbestos Subsidiary Debtors, the Asbestos Claimants'

Committee, the ASARCO Committee, the FCR, an Asbestos Insurance Company, or the Section 524(g) Trust may offer the Parent's Plan, any of the Parent's Plan Documents, any of the Confirmation proceedings, or this order as evidence of the reasonableness of a settlement between or among the Debtors, the ASARCO Committee, and the FCR, the court and the finder of fact in any insurance coverage litigation shall be informed or instructed that such proceedings in the Bankruptcy Court and this order are not binding on such Asbestos Insurance Company and that it is up to the court or the finder of fact in any insurance coverage litigation to make its own independent determination as to the reasonableness of that settlement as to such Asbestos Insurance Company.

102. With regard to any Asbestos Insurance Company that is subject to insurance neutrality under the Insurance Neutrality Order, neither this order nor any provision in or part of the Parent's Plan shall be deemed to be an "adversarial process" as that concept was enunciated in *State Farm Fire & Cas. Co. v. Gandy,* 925 S.W.2d 696 (Tex.1996). To the extent of any insurance coverage obligation under any policies issued by such Asbestos Insurance Company, all such Asbestos Insurance Companies reserve all of their rights, if any, to adjudicate in a fully "adversarial" trial or hearing on the merits any or all of the Debtors' asbestos-related liabilities, including, without limitation, any liability with respect to any individual asbestos claim; and any other party reserves all of its rights, if any, to oppose such Asbestos Insurance Company's assertion of any such right. That an Asbestos Insurance Company that is subject to insurance neutrality under the Insurance Neutrality Order did not participate in the Confirmation Process that led to the entry of this order shall not be held against or in favor of any person or entity in any pending or subsequent insurance coverage litigation, arbitration, Alternative Dispute Resolution-type proceeding, or other dispute concerning the existence and/or scope of such Asbestos Insurance Company's rights and/or obligations regarding asbestos-related liabilities, if any, except to rebut any argument affirmatively raised by such Asbestos Insurance Company that such Asbestos Insurance Company's absence from the reorganization proceedings reflects collusion against and/or a lack of cooperation with such Asbestos Insurance Company. Notwithstanding the foregoing, such Asbestos Insurance Company may assert in any such pending or subsequent insurance coverage litigation, arbitration, Alternative Dispute Resolution-type proceeding, or other dispute concerning the existence and/or scope of such Asbestos Insurance Company's rights and/or obligations regarding asbestos-related liabilities, if any, any coverage defenses based on collusion against and/or lack of cooperation with such Asbestos Insurance Company on any basis other than such Asbestos Insurance Company's absence from the Reorganization Cases.

103. Any of the Debtors, the Asbestos Subsidiary Debtors, the Asbestos Claimants' Committee, the ASARCO Committee, the FCR, an Asbestos Insurance Company, or the Section 524(g) Trust may offer in any court, including any court resolving any insurance coverage litigation, any relevant portion of the Parent's Plan and any of the Parent's Plan Documents and/or this order for any purpose, including, without limitation, that the Parent's Plan was a reasonable settlement; *provided, however,* such offer shall be subject to the rights, defenses (including affirmative defenses) and objections, if any, of the Debtors, the Asbestos Subsidiary Debtors, the Asbestos Claimants' Committee, the ASARCO Com-

mittee, the FCR, an Asbestos Insurance Company, and the Section 524(g) Trust.

104. Regardless of whether ASARCO, Reorganized ASARCO, Asbestos Subsidiary Debtors, and/or the Section 524(g) Trust (and/or any of their successors and/or assigns) prosecutes the Avoidance Actions against Century, any claim of Century (and/or any of their successors and/or assigns) against ASARCO, Reorganized ASARCO, Asbestos Subsidiary Debtors, and/or the Section 524(g) Trust (and/or any of their successors and/or assigns) resulting from the resolution of such Avoidance Action, as determined by a court or other authority of competent jurisdiction by final order, judgment, or decision, shall be an obligation of the Section 524(g) Trust and shall be paid in full and not subject to any payment percentage.

## N. *Plan Distributions*

105. All distributions or payments required or permitted to be made on the Effective Date under the Parent's Plan, other than to holders of Asbestos Personal Injury Claims and Demands and/or Professional Persons, shall be made by the Parent's Plan Administrator on the Effective Date and thereafter by the Parent's Plan Administrator at the time or times and in the manner provided herein, unless otherwise ordered by the Bankruptcy Court. Distributions to holders of Asbestos Personal Injury Claims and Demands shall be made by the Section 524(g) Trust in accordance with the Section 524(g) Trust Documents. Distributions to Professional Persons shall be made by the Parent's Plan Administrator on the Effective Date and thereafter by the Parent's Plan Administrator pursuant to order of the Bankruptcy Court. Distributions to be made on the Effective Date shall be deemed actually made on the Effective Date if made either (a) on the

Effective Date or (b) as soon as reasonably practicable thereafter. Except as otherwise expressly provided in this order or the Parent's Plan, distributions to holders of Allowed Claims shall be made at the address of the holder of such Claim as indicated in the claims register maintained by the Claims Agent. Nonetheless, if such holder holds such Claims through a Nominee, distributions with respect to such Claims shall be made to such Nominee, and such Nominee shall, in turn, make appropriate distributions and book entries to reflect such distributions to such holders. All Cash distributions on account of Allowed Bondholder Claims shall be made to the appropriate Indenture Trustee and further distributions on account of such Claims by the Indenture Trustee to the record holders of Bondholder Claims shall be accomplished in accordance with the Indentures and the policies and procedures of the Depository Trust Company (the *"DTC"*).

106. *Distribution Record Date:* The record date for purposes of administering distributions shall be November 13, 2009 (the *"Distribution Record Date"*). Reorganized ASARCO and the Parent's Plan Administrator shall have no obligation to recognize the transfer of, or the sale of any participation in, any Allowed Claim that occurs after the Distribution Record Date, and shall be entitled for all purposes herein to recognize and make distributions only to those holders of Allowed Claims that are holders of such Claims or participants therein, as of the Distribution Record Date. As of the close of business on the Distribution Record Date, each transfer register for the Bonds, as maintained by the applicable Indenture Trustee, shall be closed. Reorganized ASARCO and the Parent's Plan Administrator shall have no obligation, and are not permitted, to recognize the transfer or sale of any Bondholder Claim that occurs after the close of busi-

ness on the Distribution Record Date and shall be entitled for all purposes herein to recognize and make distributions only to those holders who are holders of such Claims as of the close of business on the Distribution Record Date; provided, however, that with respect to Bondholder Claims, further distributions on account of such Claims by the Indenture Trustees to the record holders of the Bondholder Claims shall not be made as of the Distribution Record Date but rather shall be accomplished in accordance with the respective Indentures and the policies and procedures of the DTC.

107. Any Cash, assets, or other property to be distributed under the Parent's Plan by the Section 524(g) Trust that remains unclaimed (including by a Claimant's failure to draw upon a check issued to such Claimant) or otherwise is not deliverable to the Claimant entitled thereto one year after the initial distribution is made or attempted shall become vested in, and shall be transferred and delivered to, the Section 524(g) Trust for use in accordance with the terms of the Section 524(g) Trust Documents.

108. If the distribution to any holder of an Allowed Claim is returned to Reorganized ASARCO or the Parent's Plan Administrator as undeliverable or is otherwise unclaimed (including by a Claimant's failure to draw upon a check issued to such Claimant), no further distributions shall be made to such holder unless the Parent's Plan Administrator is timely notified in writing of the holder's then current address, at which time, all missed distributions shall be made to such holder without interest. The amounts in respect of such undeliverable and/or unclaimed distributions shall be returned to the Parent's Plan Administrator until such distributions are claimed. The Parent's Plan Administrator shall segregate and deposit into an escrow account (the *"Undeliverable and Unclaimed Distribution Reserve"*) all undeliverable and/or unclaimed distributions for the benefit of all such similarly situated Persons until such time as a distribution becomes deliverable or is claimed or such Claimant's right to the distribution is waived pursuant to Article 13.4(b)(2) of the Parent's Plan. Nothing contained in this order shall require Reorganized ASARCO or the Parent's Plan Administrator to attempt to locate any holder of an Allowed Claim.

109. Any funds in the Undeliverable and Unclaimed Distribution Reserve that remain unclaimed (including by a Claimant's failure to negotiate a check issued to such Claimant) or otherwise are not deliverable to the Claimant entitled thereto one year after the initial distribution is made or attempted (the "Forfeited Distributions") shall become vested in, and shall be transferred and delivered to, the Parent's Plan Administrator. In such event, such Claimant shall be deemed to have waived its rights to such payments or distributions under this order pursuant to § 1143 of the Bankruptcy Code, shall have no further Claim in respect of such distribution, and shall not participate in any further distributions under the Parent's Plan with respect to such Claim. The Parent's Plan Administrator shall distribute the Forfeited Distributions to Reorganized ASARCO as a Subsequent Distribution.

110. Reorganized ASARCO, the Parent's Plan Administrator and the Section 524(g) Trust shall comply with all applicable withholding and reporting requirements imposed by any federal, state, local, or foreign taxing authorities, and all distributions hereunder or under this order or any Parent's Plan Document shall be subject to such withholding and reporting requirements, if any. Notwithstanding any other provision of this order, each Person

receiving a distribution pursuant to this order, or any Parent's Plan Document, shall have sole and exclusive responsibility for the satisfaction and payment of any tax obligations imposed by any Governmental Authority, including income and other tax obligations, on account of that distribution.

111. Subject to the limitations provided in § 553 of the Bankruptcy Code, Reorganized ASARCO or the Parent's Plan Administrator, as the case may be, may, but shall not be required to, offset against or recoup from the holder of any Allowed Claim on which payments or other distributions are to be made pursuant to this order any Claims of any nature whatsoever the Estate of the applicable Debtor may have against the holder of such Claim, but neither the failure to do so nor the allowance of any Claim hereunder shall constitute a waiver or release by Reorganized ASARCO or the Parent's Plan Administrator, as the case may be, of any such Claim against such holder or right of setoff or recoupment that the applicable Estate may have against the holder of such Allowed Claim.

112. With respect to each Allowed Bondholder Claim, each holder of an instrument evidencing such Allowed Bondholder Claim (a "*Certificate*") shall surrender such Certificate to the Indenture Trustee or the Parent's Plan Administrator, as the case may be, and such Certificate shall be cancelled solely with respect to the Debtors and such cancellation shall not alter the obligations or rights of any non-Debtor parties as between or among such persons pursuant to such instruments. No distribution of property hereunder shall be made to such holder unless and until such Certificate is received by the Indenture Trustee or the Parent's Plan Administrator, as the case may be, or the unavailability of such Certificate is established to the reasonable satisfaction of such Indenture Trustee or the Parent's Plan Administrator. Any holder who fails to surrender or cause the surrender of such Certificate, or fails to execute and deliver an affidavit of loss and indemnity reasonably satisfactory to the Indenture Trustee or the Parent's Plan Administrator, as the case may be, prior to the second anniversary of the Effective Date shall be deemed to have forfeited all rights and Claims in respect of such Certificate and shall not participate in any distribution under this order or the Parent's Plan, and all property in respect of such forfeited distribution shall be subject to distribution to all other holders of Claims under such Indenture who have duly surrendered or caused the surrender of their Certificates or reasonably established the unavailability thereof. Any holder of an Allowed Bondholder Claim with respect to which the underlying Certificate has been lost, stolen, mutilated, or destroyed must, in lieu of surrendering such Certificate, deliver to the Indenture Trustee or the Parent's Plan Administrator, as the case may be: (i) evidence satisfactory to the Indenture Trustee or the Parent's Plan Administrator, as the case may be, of the loss, theft, mutilation, or destruction; and (ii) such security or indemnity as may be required by the Indenture Trustee or the Parent's Plan Administrator, as the case may be, to hold it and the Debtors harmless from any damages, liabilities, or costs incurred in treating such individual as a holder of such Certificate. Upon compliance with this provision by a holder of an Allowed Bondholder Claim, such holder shall, for all purposes under this order, be deemed to have surrendered the applicable Certificate. Any holder of a Certificate that fails to surrender or is deemed not to have surrendered the applicable Certificate shall be deemed to have had its right to distributions pursuant to this order on account thereof discharged, and shall be

forever barred from asserting any such Claim against any of the Parent, the Debtors, Reorganized ASARCO, the Parent's Plan Administrator, the Indenture Trustees, or any of the foregoing's respective property. Notwithstanding the foregoing, if the record holder of a Bondholder Claim is the Depository Trust Company or its nominee or such other securities depository or custodian thereof, or if a Bondholder Claim is held in book-entry or electronic form pursuant to a global security held by the Depository Trust Company, then the beneficial holder of such an Allowed Bondholder Claim shall be deemed to have surrendered such holder's security, note, debenture, or other evidence of indebtedness upon surrender of such global security by the Depository Trust Company or such other securities depository or custodian thereof.

113. On the Effective Date, once all Allowed Bondholder Claims with respect to any Bond Issuance have been satisfied by the payment under the Parent's Plan, then, on the Effective Date, all promissory notes, instruments, indentures, bonds, agreements, or other documents evidencing, giving rise to, or governing any Claim against any Debtor (including the applicable Indenture and the Bonds) with respect to such Bond Issuance shall be deemed cancelled and shall represent only the right to participate in the distributions hereunder. Notwithstanding the foregoing and anything else contained in the Parent's Plan, the Indentures for each Bond Issuance will continue in effect solely for the purposes of (i) allowing distributions to be made under the Parent's Plan pursuant to the Indentures and the Indenture Trustees to perform such other necessary functions with respect thereto and to have the benefit of all the protections and other provisions of the applicable Indentures in doing so; (ii) permitting an Indenture Trustee to maintain or assert any

right or Charging Lien it may have with respect to distributions pursuant to the terms of the Parent's Plan for Indenture Trustee Fee Claims; (iii) permitting the Indenture Trustees to assert, in accordance with the terms of the Parent's Plan and this order, any right to indemnification, contribution, or other Claim any one of them may have under the applicable Indentures, subject to any and all defenses the Debtors may have under this order and applicable law to any such asserted right or Claims; and (iv) permitting each Indenture Trustee to exercise, in accordance with the terms of the Parent's Plan and this order, its rights and obligations relating to the interests of the holders of Bondholder Claims, and its relationship with the holders of Bondholder Claims pursuant to the applicable Indenture, including its right to appear and be heard in these Chapter 11 cases and any appeals.

114. The issuance, transfer, or exchange of any of the securities issued under, or the transfer of any other assets or property pursuant to, or in connection with, this order or the Parent's Plan or the making or delivery of an instrument of transfer under, or in connection with, the Parent's Plan shall not, pursuant to § 1146 of the Bankruptcy Code, be taxed under any law imposing a stamp tax, transfer tax, or other similar tax.

O. *Bar Date Provisions*

115. All applications for final allowances of compensation or reimbursement of expenses under § 330 of the Bankruptcy Code or applications for allowance of Administrative Claims arising under subsections (b)(2) through (b)(6) of § 503(b) of the Bankruptcy Code must be filed on or before 90 days after the Effective Date, unless otherwise ordered by the Bankruptcy Court; save and except that any application under § 503(b)(3)(D) of the Bank-

ruptcy Code or any application for a fee enhancement or success fee under the Bankruptcy Code must be filed on or before 60 days after the Effective Date, unless otherwise ordered by the Bankruptcy Court. Objections to applications of such Professional Persons or other Entities for compensation or reimbursement of costs and expenses or for substantial contribution Claims must be filed within 20 days after the applicable application for compensation or reimbursement was filed.

116. Claimants, other than Professional Persons, holding Administrative Claims against any of the Debtors that arise after the Initial Administrative Claims Bar Date (a *"Subsequent Administrative Claim"*) that remain unpaid on the Effective Date must file a request for payment of Subsequent Administrative Claim on or before 45 days after the Effective Date (*"the Subsequent Administrative Claims Bar Date"*), unless otherwise ordered by the District Court or the Bankruptcy Court. Any holder of a Subsequent Administrative Claim that is required to file a request for payment of such Claim and that does not file such request prior to the Subsequent Administrative Claims Bar Date will be forever barred from asserting such Subsequent Administrative Claim against any of the Debtors, Reorganized ASARCO or their respective properties, and such Subsequent Administrative Claim will be deemed discharged as of the Effective Date. Objections to Subsequent Administrative Claims must be filed with the Bankruptcy Court within 20 days after the applicable Subsequent Administrative Claim was filed, unless such objection deadline is extended by the Bankruptcy Court or this Court. Any Subsequent Administrative Claims of the United States or any individual state under civil Environmental Laws relating to the Designated Properties shall be addressed through the Environmental Custodial Trusts.

117. If, prior to the Effective Date, the Parent receives from the Indenture Trustees statement(s) of their respective Indenture Trustee Fee Claims incurred through such date and projected to be incurred through the Effective Date, together with such detail as may be reasonably requested by the Parent, then the Parent or Reorganized ASARCO, as appropriate, shall pay, on the Effective Date, the Indenture Trustee Fee Claims, in full, in Cash. Subject to the payment of the Indenture Trustee Fee Claims and the payment of all other fees and expenses (including fees and expenses of counsel and other professionals) incurred by the Indenture Trustees in administering distributions to the Bondholders, to the extent payment of the foregoing fees and expenses is permitted by the Indentures, all Charging Liens of the Indenture Trustees in any distributions shall be forever released and discharged. Once the Indenture Trustees have completed performance of all of their duties set forth in this order or the Parent's Plan or in connection with any distributions to be made under this order, if any, the Indenture Trustees, and their successors and assigns, shall be relieved of all obligations as Indenture Trustees effective as of the Effective Date.

*P. Disputed Claims*

118. After the Effective Date, Reorganized ASARCO and the Parent's Plan Administrator shall have the exclusive right to file objections to Claims (other than objections to Asbestos Personal Injury Claims and Demands, and objections to Claims that have been Allowed by Final Order) and litigate to judgment, settle, or withdraw such objections to Disputed Claims (including any Claims subject to a pending estimation motion). Without limiting the preceding, Reorganized ASARCO and the Parent's Plan Administrator shall

have the right to litigate any Disputed Claim either in the Bankruptcy Court or in any court of competent jurisdiction. After the Effective Date, only the Section 524(g) Trust shall have the authority to file objections to Asbestos Personal Injury Claims and Demands and litigate to judgment, settle, or withdraw such objections, and Asbestos Personal Injury Claims and Demands, whether or not a Proof of Claim is filed, shall be satisfied exclusively in accordance with the Parent's Plan, the Section 524(g) Trust Agreement, and the Section 524(g) Trust Distribution Procedures. For the avoidance of doubt, no objection to Asbestos Personal Injury Claims or Demands shall be filed in the Bankruptcy Court. Within the later of (a) 90 days after the Confirmation Date or (b) 90 days after a Proof of Claim is filed, objections to Claims (other than Asbestos Personal Injury Claims and Demands, which shall be Allowed or disallowed as provided in the Section 524(g) Trust Distribution Procedures) shall be filed with the Bankruptcy Court; *provided, however,* that Reorganized ASARCO and/or the Parent's Plan Administrator may seek to extend such period (or any extended period) for cause.

119. Any Administrative Claim or other Claim (except for an Asbestos Personal Injury Claim or a Demand) for which the filing of a motion for allowance is required shall be disallowed if such filing is not timely and properly made, subject to the right of the Claimant to seek permission under applicable law to file a late claim. Any Administrative Claim timely filed on the Proof of Administrative Claim (found in Exhibit B to Bk. Doc. No. 8549) pursuant to Bk. Doc. No. 8549 shall not require a motion for allowance.

120. If a Claim or any portion of a Claim is disputed, no payment or distribution will be made on account of the disputed portion of such Claim (or the entire Claim, if the entire Claim is disputed), unless such Disputed Claim becomes an Allowed Claim. No estate funds will be expended by the Parent's Plan Administrator to support or defend settlements achieved by the Debtors prior to the Effective Date where the order approving such settlement has not become a final order.

121. The Parent's Plan Administrator shall maintain, in accordance with its powers and responsibilities under the Parent's Plan, a Disputed Claims Reserve. On the Effective Date (or as soon thereafter as is reasonably practicable), Reorganized AS-ARCO or the Parent's Plan Administrator, as the case may be, shall deposit Cash and/or other forms of consideration in the Disputed Claim Reserve that would have been distributed to the holders of Disputed Claims if such Disputed Claims had been Allowed Claims on the Effective Date. This amount will be determined based on the lesser of (1) the asserted amount of the Disputed Claims in the applicable Proofs of Claim, (2) the amount, if any, estimated by the Bankruptcy Court for purposes of distribution pursuant to § 502(c) of the Bankruptcy Code, or (3) the amount otherwise agreed to by the applicable Debtor and the holders of such Disputed Claims. The Parent, Reorganized ASARCO, and/or the Parent's Plan Administrator may seek Bankruptcy Court approval to reduce the size of the Disputed Claims Reserve based upon the amount of the remaining Disputed Claims or other changed circumstances. In the case of objections to allegedly Secured Claims, any Lien asserted by the holder of such a Claim against assets that revest in or are transferred to Reorganized ASARCO shall remain in place, pending resolution of the objection to the allegedly Secured Claim. The Parent's Plan Administrator (at such time as determined to be practicable by the Parent's Plan Administrator) shall distribute from

the Disputed Claims Reserve to the holder of any Disputed Claim that has become an Allowed Claim, not later than the tenth Business Day after the end of the calendar month in which such Disputed Claim becomes an Allowed Claim, an amount equal to such Claim as if such Claim had been an Allowed Claim on the Effective Date.

122. If a Disputed Claim is disallowed, in whole or in part, the Parent's Plan Administrator shall (at such time as determined to be practicable by the Parent's Plan Administrator) distribute the Cash reserved in respect of such disallowed Disputed Claim, Pro Rata: first, to holders of Claims in Class 3 (and, pending resolution of Disputed Claims in Class 3, the Disputed Claims Reserve); second, upon Payment in Full of Claims in Class 3, to holders of Claims in Class 6 (and, pending resolution of Disputed Claims in Class 6, the Disputed Claims Reserve); third, upon Payment in Full of Claims in Class 6, to holders of Claims in Class 7 (and, pending resolution of Disputed Claims in Class 7, the Disputed Claims Reserve); and fourth, upon payment in Full of Claims in Class 7, to Reorganized ASARCO; *provided that,* in no event shall any holder of an Allowed Claim in Class 3, 6, or 7 receive distributions which exceed the Allowed amount of such Claim. To the extent there are any excess funds in Disputed Claims Reserve after all distributions required by the Parent's Plan have been made, the Parent's Plan Administrator shall make a Subsequent Distribution of such funds to Reorganized ASARCO.

123. The Disputed Claims Reserve is intended to be treated as a "disputed ownership fund" within the meaning of Treasury Regulation § 1.468B–9(b)(*l*), and hence as a taxable entity for federal income tax purposes, and the Parent's Plan Administrator will be the "administrator" of the Disputed Claims Reserve pursuant to Treasury Regulation § 1.468B–9(b)(2). In general, the Disputed Claims Reserve will be treated in the same manner as a "qualified settlement fund" for federal income tax purposes. The Parent's Plan Administrator will cause all taxes imposed on the Disputed Claims Reserve to be paid using assets of the Disputed Claims Reserve and will comply with all tax reporting and withholding requirements imposed on the Disputed Claims Reserve under applicable tax laws, and in particular the rules applicable to a disputed ownership fund.

### Q. *Objections to Parent's Plan*

124. Each of the Objections not otherwise granted by this opinion and order, withdrawn prior to the entry of this order, resolved by written agreement or by oral argument and made a part of the record of the Confirmation Hearing, or discussed in the text of this order is OVERRULED and DENIED. All withdrawn objections are deemed withdrawn with prejudice.

125. The objections of the Debtors to the Parent's Plan are hereby overruled to the extent they are not resolved by the Parent's Plan or this opinion.

126. The objections of the United Steelworkers to the Parent's Plan are hereby overruled to the extent they are not resolved by the Parent's Plan or this opinion.

127. The Official Committee of Unsecured Creditors has withdrawn its objection to the Parent's Plan. (Bk. Doc. No. 12611.)

128. The objection of Century Indemnity Company has been resolved by the language in Paragraph 104 of this order.

129. Plainfield Special Situations Master Fund Limited's objection has been resolved because the Parent's Plan no longer relies on the new value exception and pays

all creditors in full plus post petition interest. Plainfield Special Situations Master Fund Limited's objection is hereby overruled to the extent it is not resolved by the Parent's Plan.

130. The objection of the Indenture Trustees (Deutsche Bank Trust Companies Americas, Wells Fargo Bank Nation Association, and Wilmington Trust Company) has been resolved because the Parent's Plan treats Bondholder Claims in accordance with the Bondholder Settlement. The Indenture Trustees' objection is hereby overruled to the extent it is not resolved by the Parent's Plan.

131. The objection of Harbinger Capital Partners Master Fund I, Ltd. and Citigroup Global Markets, Inc. (*"Majority Bondholders"*) has been resolved in accordance with the Bondholder Settlement. To the extent that the objection of the Majority Bondholders is not resolved, it is hereby overruled.

132. The City of El Paso's objection is resolved by Stipulation filed on August 12, 2009. (Bk. Doc. No. 12466.)

133. The London Market Companies' objection has been resolved by the inclusion of the language in Paragraphs 38–40 of this order.

134. The Texas Comptroller of Public Accounts' objection is resolved by the inclusion of the language in Paragraph 50 of this order.

135. The Fireman's Fund Insurance Company's objection is resolved by Stipulation filed on August 2, 2009. (Bk. Doc. No. 12590.)

136. The objection of First State is resolved by Stipulation filed on August 2, 2009. (Bk. Doc. No. 12590.)

137. The objection of Mitsui & Co. (U.S.A.), Inc., Mitsui & Co., Ltd., Ginrei, Inc., and MSB Copper Corp. is resolved by Stipulation filed on August 20, 2009. (Bk. Doc. No. 12589.)

138. The objection of Ron and Linda Deen is resolved by the inclusion of the language in Paragraph 51 of this order.

139. The objection of certain insurers, including Mt. McKinley Insurance Co. and Everest Reinsurance Company, is resolved by the inclusion of the language in Paragraphs 51 and 93 of this order, and by the Stipulation filed on August 25, 2009. (Bk. Doc. No. 12659.)

140. The objection of the Asbestos Judgment Creditors is resolved by language in Article 4.2(d) of the Parent's Plan.

141. The objection of Montana Resources, Inc. is resolved by the Stipulation filed on August 25, 2009. (Bk. Doc. No. 12660; Adversary No. 07–02024, Doc. No. 212.)

142. The objection of Halcyon Master Fund L.P. (*"Halcyon"*) is resolved per an announcement by Halcyon in Court during the Confirmation Hearing on August 25, 2009.

143. The objection of Chartis Companies is resolved by the inclusion of the language in Paragraph 95 of this order.

R. *Miscellaneous*

144. *Modification:* Upon entry of this order, the Parent or Reorganized ASARCO, as the case may be, may, under § 1127(b) of the Bankruptcy Code, seek District Court, or, upon referral by the District Court, Bankruptcy Court approval to remedy any defects or omissions or reconcile any inconsistencies in the Parent's Plan or this order in such manner as may be necessary to carry out the purposes and intent of the Parent's Plan, so long as the proposed alteration, amendment or modification does not adversely

affect the treatment of Claims or Interests under the Parent's Plan.

145. Following the Effective Date, other than the ASARCO Protected Parties, who shall receive notices of all pleadings filed in the Reorganization Cases without any further action, all parties in interest who wish to receive, or continue to receive, notices of all pleadings filed in the Reorganization Cases must file a new request for special notice and serve it on Reorganized ASARCO. Reorganized ASARCO shall maintain and keep current the post-Effective Date special notice list, and make it available to all parties in interest upon written request. All pleadings, notices, and other papers filed in the Reorganization Cases following the Effective Date (other than the notice of Effective Date) must be served on the parties on the post-Effective Date special notice list maintained by Reorganized ASARCO.

146. In the event of any inconsistency between the Parent's Plan and this order, this order shall govern.

147. Headings utilized herein are for convenience and reference only and shall not constitute a part of the Parent's Plan or this order for any other purpose.

148. The Parent's Plan except for Articles 15.1–15.4 is confirmed and hereby incorporated into this order by reference. The failure to include or specifically reference any particular provision of the Parent's Plan in this order shall have no effect on the validity, binding effect, and enforceability of such provision, and each provision of the Parent's Plan shall have the same validity, binding effect, and enforceability as if fully set forth in this order.

149. Any orders, findings of fact, or conclusions of law entered in connection with confirmation of the Parent's Plan are for purposes of only (i) confirmation of the Parent's Plan and (ii) the Reorganization Cases, and shall not have any preclusive effect on any governmental unit, party, or court in any other proceeding.

150. The District Court shall retain jurisdiction over every aspect of the order including all matters of compliance, and to the extent that this order conflicts with Articles 15.1–15.4, such Articles are hereby abrogated:

(a) Until the Reorganization Cases are closed, the District Court shall retain the fullest and most extensive jurisdiction possible, including, without limitation, that necessary (i) to ensure that the purposes and intent of the Parent's Plan are carried out; (ii) to enforce and interpret the terms and conditions of the Parent's Plan Documents; and (iii) to enter such orders or judgments, including, without limitation, injunctions necessary to enforce the rights, title, and powers of the Debtors, Reorganized ASARCO, a Settling Asbestos Insurance Company, the Parent, and/or other ASARCO Protected Party.

(b) Except as otherwise provided in the Parent's Plan or this order, the Bankruptcy Court, if the matter is referred thereto, shall retain jurisdiction to hear and determine all Claims and Interests in the Debtors and to adjudicate and enforce all other causes of action that may exist on behalf of the Debtors.

(c) Nothing contained herein shall prevent Reorganized ASARCO, the Parent's Plan Administrator, the Parent, the Section 524(g) Trustees, or the Environmental Custodial Trustee (as appropriate) from taking such action as may be necessary in the enforcement of any cause of action that such Entity has or may have and that may not have been enforced or prosecuted by the applicable Debtor, which cause

of action shall survive entry of this Confirmation Order and occurrence of the Effective Date and shall not be affected thereby except as specifically provided herein.

(d) The Section 524(g) Trust shall be subject to the continuing jurisdiction of this Court, and by referral, to the Bankruptcy Court in accordance with the requirements of § 468B of the Internal Revenue Code and the regulations issued pursuant thereto.

(e) *Specific Purposes:* Without limiting the effect of the above provisions of this Paragraph, the District Court shall retain jurisdiction after Confirmation to:

(i) modify the Parent's Plan after entry of the Confirmation Order, pursuant to the provisions of the Parent's Plan, the Bankruptcy Code, and the Bankruptcy Rules;

(ii) correct any defect, cure any omission, reconcile any inconsistency, or make any other necessary changes or modifications in or to the Parent's Plan, the Parent's Plan Documents, or the Confirmation Order as may be necessary to carry out the purposes and intent of the Parent's Plan;

(iii) hear and determine any cause of action, and to enter and implement such orders as may be necessary or appropriate, to execute, interpret, implement, consummate, or enforce the Parent's Plan, the Parent's Plan Documents and the transactions contemplated thereunder;

(iv) hear and determine disputes arising in connection with the execution, interpretation, implementation, consummation, or enforcement of the Parent's Plan, including, without limitation, the Parent's Plan Documents, and to enforce, including by specific performance, the provisions of the Parent's Plan and the Parent's Plan Documents;

(v) hear and determine disputes arising in connection with the execution, interpretation, implementation, consummation, or enforcement of the settlement agreements, asset purchase agreements or other agreements entered into by any of the Debtors during the Reorganization Cases (the *"Other Agreements"*), or to enforce, including by specific performance, the provisions of the Other Agreements;

(vi) enter and implement orders or take such other actions as may be necessary or appropriate to restrain interference by any Entity with the consummation or implementation of the Parent's Plan, including, without limitation, to issue, administer, and enforce injunctions, releases, assignments, transfers of property or property rights, or other obligations contained in the Parent's Plan and the Confirmation Order;

(vii) assure the performance by Reorganized ASARCO, the Parent's Plan Administrator, and the Trustees of their respective obligations to make distributions under the Parent's Plan and other Parent's Plan Documents;

(viii) enter such orders or judgments, including injunctions, as necessary to enforce the title, rights, and powers of any of the Debtors, Reorganized ASARCO, the Parent, the Parent's Plan Administrator or the Trusts;

(ix) hear and determine any and all motions, applications, or adversary proceedings brought by or against the Trusts related to (A) enforce-

ment or interpretation of the Trust Documents and (B) amendment, modification, alteration, or repeal of any provision of the Trust Documents, if such hearing and determination by the Bankruptcy Court is required pursuant to the Parent's Plan;

(x) hear and determine any and all motions, applications, or adversary proceedings brought by Reorganized ASARCO against Sterlite and Sterlite's affiliates;

(xi) hear and determine any and all adversary proceedings, applications, and contested matters, including any remands after appeal;

(xii) ensure that distributions to holders of Allowed Claims and Demands are accomplished as provided herein;

(xiii) alter the size of the Disputed Claims Reserve based upon the amount of the remaining Disputed Claims or other changed circumstances;

(xiv) hear and determine any timely objections to or motions or applications concerning Claims or the allowance, classification, priority, compromise, setoff, estimation, or payment of any Claim, to the fullest extent permitted by the provisions of § 157 of Title 28 of the United States Code;

(xv) enter and implement such orders as may be appropriate in the event the Confirmation Order is for any reason stayed, revoked, modified, reversed, or vacated;

(xvi) hear and determine any motions, contested matters, or adversary proceedings involving taxes, tax refunds, tax attributes, tax benefits, and similar or related matters with respect to any of the Debtors,

Reorganized ASARCO, the Parent's Plan Administrator, and/or the Trusts arising on or prior to the Effective Date, arising on account of transactions contemplated by the Parent's Plan Documents, or relating to the period of administration of the Reorganization Cases;

(xvii) hear and determine all applications for compensation of Professional Persons and reimbursement of expenses under §§ 330, 331, or 503(b) of the Bankruptcy Code;

(xviii) hear and determine any causes of action relating to any of the Debtors, Reorganized ASARCO, or the Trusts to the fullest extent permitted by § 157 of Title 28 of the United States Code;

(xix) hear and determine any cause of action in any way related to the Parent's Plan Documents or the transactions contemplated thereby, against the ASARCO Protected Parties;

(xx) recover all assets of each of the Debtors and property of their Estates, wherever located, including actions under Chapter 5 of the Bankruptcy Code;

(xxi) hear and determine any and all motions pending as of the Confirmation Date for the rejection, assumption, or assignment of executory contracts or unexpired leases and the allowance of any Claim resulting therefrom;

(xxii) hear and determine such other matters and for such other purposes as may be provided in the Confirmation Order;

(xxiii) consider and act on the compromise and settlement of any Claim against, or Interest in, any of the Debtors or their respective Es-

tates including, without limitation, any disputes relating to any Administrative Claims, any Bar Date, or Bar Date Order;

(xxiv) hear and determine all questions and disputes regarding title to the assets of any of the Debtors, their respective Estates, or the Trusts;

(xxv) hear and determine any other matters related hereto, including the implementation and enforcement of all orders entered by the Bankruptcy Court in the Reorganization Cases;

(xxvi) retain continuing jurisdiction with regard to the Section 524(g) Trust sufficient to satisfy the requirements of Treasury Regulation § 1.468B;

(xxvii) hear and determine any and all applications brought by the Section 524(g) Trustees to amend, modify, alter, or repeal any provision of the Section 524(g) Trust Agreement or the Section 524(g) Trust Distribution Procedures pursuant to the Section 524(g) Trust Agreement and to declare or resolve all issues or disputes contemplated by the Section 524(g) Trust Agreement;

(xxviii) enter and implement orders extending the Asbestos Insurance Company Injunction to insurance companies that become Settling Asbestos Insurance Companies after the Effective Date;

(xxix) enter such orders as are necessary to implement and enforce the Injunctions or any other part of this memorandum opinion and order;

(xxx) hear and determine any other matter not inconsistent with the Bankruptcy Code and Title 28 of the United States Code that may

arise in connection with or are related to the Parent's Plan;

(xxxi) hear and determine all disputes that arise from the CBA, any document related thereto, any new CBA being offered, the Debtor's relationship with USW, Reorganized ASARCO's relationship with USW as it pertains to any duties under the CBA, or any stipulations or representations made either before, during, or after the ongoing negotiations that led up to this order.

(xxxii) hear and determine any violation of and/or lack of compliance with this order.

(f) The District Court shall, without regard to the amount in controversy, retain exclusive jurisdiction after Confirmation over matters relating to § 524(g) of the Bankruptcy Code and the Permanent Channeling Injunction and the Asbestos Insurance Company Injunction, including, without limitation, the validity, application, or construction of the Permanent Channeling Injunction and the Asbestos Insurance Company Injunction, or of § 524(g) of the Bankruptcy Code with respect to the Permanent Channeling Injunction and the Asbestos Insurance Company Injunction; *provided, however,* that, from and after the Effective Date, the jurisdiction of the District Court shall be non-exclusive with respect to any Asbestos Insurance Action or Asbestos Insurance Recovery. Nothing contained herein shall be deemed a finding or conclusion that: (i) the Bankruptcy Court or District Court in fact have jurisdiction with respect to any Asbestos Insurance Action or Asbestos Insurance Recovery; (ii) any such jurisdiction is exclusive with respect to any Asbestos Insurance Action or

Asbestos Insurance Recovery; or (iii) abstention or dismissal or reference of actions effecting the transfer of jurisdiction of any Asbestos Insurance Action or Asbestos Insurance Recovery pending in the Bankruptcy Court or District Court to another court is precluded, inadvisable, or unwarranted. Any court other than the Bankruptcy Court or the District Court that has or is capable of having jurisdiction over any Asbestos Insurance Action or Asbestos Insurance Recovery shall have the right to exercise such jurisdiction.

(g) Notwithstanding the above provisions of this Section, the District Court shall retain its authority and discretion, either *sua sponte* or in response to a motion, to refer any matter over which it retains jurisdiction to the Bankruptcy Court.

### XIII. *Notice of Effective Date*

151. Reorganized ASARCO shall give notice of the Effective Date within five Business Days after its occurrence to all parties, the Bankruptcy Court, and this Court.

### XIV. CONFIRMATION ORDER EXHIBIT 1 SCHEDULE OF RELEASED LITIGATION

### RELEASED LITIGATION

| DOCKET NO. | PLAINTIFFS | DEFENDANTS | NATURE OF ACTION |
|---|---|---|---|
| **District Court, Southern District of Texas** | | | |
| 07–00018 | ASARCO LLC, Southern Peru Holdings, LLC | Americas Mining Corporation ("AMC ") | Fraudulent transfer |
| 07–00203 (Removed 05/02/07) | Phillip Nelson Burns, ASARCO LLC, Southern Peru Holdings, LLC, Mirjana Pavkovich, Warren Elmer Halpap | Grupo Mexico S.A. de C.V. ("Grupo") | Constructive and actual fraud, fraudulent conveyance |
| **Bankruptcy Court; Southern District of Texas** | | | |
| 07–02009 | ASARCO LLC | AMC | Fraudulent transfer |
| 07–02011 | ASARCO LLC | AMC, ASARCO Incorporated, Enthone Inc. f/k/a Enthone–OMI, Inc., EI Liquidation, Inc. f/k/a Enthone, Incorporated, OMI International Corporation | Tax refund complaint: seeking declaration that the refund is property of ASARCO LLC. |
| 07–02062 | ASARCO LLC | Servicios de Apoyo Administrativo, S.A. de C.V. | Recovery of money/ property |
| 07–02063 | ASARCO LLC | Mexicana de Cobre, S.A. de C.V. | Preferential or fraudulent transfer |
| 07–02064 | ASARCO LLC | Minera Mexico Internacional, Inc. | Preferential or fraudulent transfer; and |

| | | | objection to Claim No. 11067 |
|---|---|---|---|
| 07–02071 | ASARCO LLC, AR Sacaton, LLC | AMC, Tri–Point Development, LLC, CMR/Casa Grande, LLC, Vanguard Properties, Inc., First American Title Insurance Company | Fraudulent transfer |

## RELEASE LITIGATION

| DOCKET NO. | PLAINTIFFS | DEFENDANTS | NATURE OF ACTION |
|---|---|---|---|
| **District Court, Southern District of Texas** | | | |
| 07–02072 | ASARCO LLC | Grupo Mexico, SA. de C.V. | Preferential or fraudulent transfer |
| 07–02073 | ASARCO LLC | Minera Mexico S.A. de C.V. | Preferential or fraudulent transfer |
| 07–02075 | ASARCO LLC | AMC, ASARCO Incorporated | Preferential or fraudulent transfer |
| 07–02077 | Official Committee of Unsecured Creditors of ASARCO, LLC, on Behalf of the ASARCO, LLC Bankruptcy Estate | Genaro Larrea Mota–Velasco, German Larrea Mota–Velasco, Xavier Garcia de Quevedo Topete, Oscar Gonzalez Rocha, Alfredo Casar Perez, Daniel Tellechea Salido, Manuel Calderon Cardenas, Alberto de la Parra Zavala, Armando Fausto Ortega Gomez | Breach of fiduciary duties |